Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO: 6:17-cv-00714-PGB-TBS

LORI COSTA,

      Plaintiff,

vs.

METROPOLITAN LIFE INSURANCE
COMPANY,

      Defendant.

_____/

ORIGINAL

| | |
|---|---|
| DEPOSITION OF: | SHAUN KELLEY S. O'NEAL, M.S., Psy.D. |
| DATE TAKEN: | May 10, 2018 |
| TIME: | 10:00 AM - 1:30 PM |
| PLACE: | Shutts & Bowen, LLP<br>1858 Ringling Boulevard<br>Suite 300<br>Sarasota, Florida 34236 |
| REPORTED BY: | PATRICIA A. PILARSKI, FPR<br>and NOTARY PUBLIC |

Page 2

```
 1            APPEARANCES:

 2            APPEARING ON BEHALF OF THE
              PLAINTIFF:
 3
              JOHN V. TUCKER, ESQ.
 4            WILLIAM DEMAS, ESQ.
              Tucker & Lubin, P.A.
 5            5235 16th Street
              St. Petersburg, Florida 33703
 6            (727) 572-5000
              Tucker@tuckerludin.com
 7            Demas@tuckerludin.com

 8
              APPEARING ON BEHALF OF THE
 9            DEFENDANT:

10            JOHN E. MEAGHER, ESQ.
              Shutts & Bowen, LLP
11            200 South Biscayne Boulevard
              Suite 4100
12            Miami, Florida 33131
              (305) 358-6300
13            Jmeagher@shutts.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                    C O N T E N T S

2

     TESTIMONY OF SHAUN KELLEY S. O'NEAL, M.S., PsyD
3
     DIRECT EXAMINATION BY MR. MEAGHER              5
4
     CERTIFICATE OF REPORTER                      112
5
     CERTIFICATE OF OATH                          113
6
     ERRATA SHEET                                 114
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                         E X H I B I T S

2                                                        PAGE

3    DEFENDANT'S EXHIBIT 1 -                             13
     (Shaun Kelley O'Neal, MS, PsyD C.V.)
4
     DEFENDANT'S EXHIBIT 2 -                             25
5    (Expert Witness List)

6    DEFENDANT'S EXHIBIT 3 -                             35
     (Neuropsychological Evaluation of Ms. Costa)
7
     DEFENDANT'S EXHIBIT 4 -                             51
8    (Independent Medical Review)

9    DEFENDANT'S EXHIBIT 5 -                             53
     (Notes from Initial Interview with Ms. Costa)
10
     DEFENDANT'S EXHIBIT 6 -                             66
11   (Dr. Vanderploeg's Medical Examination)

12   DEFENDANT'S EXHIBIT 7 -                             69
     (First page of the three pages of Medical
13   Records that you said you reviewed
     Prior to doing your medical examination
14   Of Ms. Costa in March of 2016)

15   DEFENDANT'S EXHIBIT 8 -                             108
     (Letter from Mr. Tucker, dated 6/30/16)
16

17

18

19

20

21

22

23

24

25

Page 5

```
 1   THEREUPON,

 2              SHAUN KELLEY S. O'NEAL, M.S., PsyD

 3   was adduced as the deponent herein, and being first duly

 4   sworn upon oath, was questioned and testified as

 5   follows:

 6              THE WITNESS:  Yes, I do.

 7                     DIRECT EXAMINATION

 8   BY MR. MEAGHER:

 9       Q.    Could you please state your name.

10       A.    Shaun Kelley O'Neal.

11       Q.    And what is your business address?

12       A.    2650 Bahia Vista, Suite 201, Sarasota, 34239.

13       Q.    What is the name of your business?

14       A.    Gulf Coast Neuropsychology.

15       Q.    What do you do there?

16       A.    I am a neurophysiologist.

17       Q.    Is Gulf Coast Psychology made up of more than

18   one neuropsychologist?

19       A.    No.

20       Q.    You are the only one there?

21       A.    That is correct.

22       Q.    What other mental healthcare professionals are

23   affiliated with Gulf Coast Neuropsychology?

24       A.    None.

25       Q.    Are you the sole owner of that practice?
```

Page 6

```
 1      A.    Yes.

 2      Q.    And how long has that practice been in

 3   existence?

 4      A.    Since May, June 2013.  So, coming up on five

 5   years.

 6      Q.    Are there any other medical professionals

 7   affiliated with the practice, or it's just you?

 8      A.    It's just me.

 9      Q.    And has that been the case since inception back

10   in 2013?

11      A.    Yes.

12      Q.    Prior to that where did you work?

13      A.    For my own company, which was initial S. Kelly

14   O'Neal, LLC.

15      Q.    What does PsyD mean?

16      A.    That means I have a doctorate in psychology.

17      Q.    Are you a Ph.D.?

18      A.    No.  I am PsyD, P-s-y-D.

19      Q.    What is the difference between Ph.D. and PsyD?

20      A.    I have 10 less hours of dissertation time and

21   one less statistics class than what somebody with a

22   Ph.D. would have.

23      Q.    Did you do a dissertation?

24      A.    Yes, I did.

25      Q.    And what was the title of your dissertation, or
```

Page 7

1   the subject matter, if you don't remember the exact

2   title.

3       A.   It was very long and convoluted.  Parsing the

4   language breakdown among individuals with schizophrenia,

5   looking at a comparison between two measures of

6   expressive language function.

7       Q.   Did that dissertation involve

8   neuropsychological testing?

9       A.   Yes, it did.

10      Q.   What year did you complete that?

11      A.   2003, and I graduated in 2004, after finishing

12  my internship.

13      Q.   Where did you do your internship?

14      A.   At Dorothea Dix Hospital in Raleigh, North

15  Carolina.

16      Q.   What was your role there?

17      A.   I served one year on the geropsychiatry unit

18  doing neuropsychological dementia evaluations on

19  inpatients, I spent half the year on the adult

20  psychiatric unit doing psychological evaluations on new

21  intakes, I spent the full year quarter-time on the

22  forensics return-to-capacity unit doing capacity to

23  proceed to trial examinations, and I spent half a year

24  with the Wake County Crisis Admissions Services.

25      Q.   Where did you get your PsyD, your PsyD?

Page 8

1      A.    California School of Professional Psychology,

2   Fresno, California.

3      Q.    Had you applied to any Ph.D. programs in

4   psychology?

5      A.    Yes, I had.

6      Q.    Where?

7      A.    Good Lord.

8      Q.    A bunch?

9      A.    A bunch.

10      Q.    Did you get into any of them?

11      A.    No, I did not.

12      Q.    When we say a bunch, are we talking over 10?

13      A.    Yes.

14      Q.    Do you hold yourself out as a neuropsychologist

15   at this time?

16      A.    Yes, I do.

17      Q.    Are you board certified in neuropsychology?

18      A.    No.

19      Q.    Is there a board certification in

20   neuropsychology?

21      A.    Yes, there is.

22      Q.    What organization gives out board

23   certifications?

24      A.    American Board of Professional Psychology and

25   the American Board of Professional Neuropsychology.

Costa vs. Metropolitan                          May 10, 2018

Page 9

1      Q.    Is the American Board of Professional

2   Psychology known as ABPP?

3      A.    Yes.

4      Q.    Are you a member of ABPP?

5      A.    No.

6      Q.    Why not?

7      A.    The time commitments to pursue board

8   certification status have not met with the time

9   commitments I have for other things in my life at this

10  time point in time.

11     Q.    How long have you been a neuropsychologist?

12     A.    I have been licensed since, I believe, May of

13  2006.

14     Q.    When you say "licensed," are you licensed as a

15  neuropsychologist or some other title?

16     A.    That is a good clarification and I may have

17  misspoke previously.  I am licensed as a clinical

18  psychologist.  There is no such licensure for

19  neuropsychology.

20     Q.    And you became licensed as a clinical

21  psychologist in 2006?

22     A.    Yes.

23     Q.    And since that time you have not found the time

24  to prepare for and take the boards for neuropsychology

25  certification; is that correct?

Page 10

1      A.    That's correct.

2      Q.    Do you need to be a member of ABPP before you

3  even sit for the board certification in neuropsychology?

4      A.    No.

5      Q.    Have you ever sat for a board certification in

6  neuropsychology?

7      A.    No.

8      Q.    Have you ever taken any courses to prepare to

9  sit for such an examination?

10     A.    Other than the courses required for my graduate

11  degree, no.

12     Q.    You mentioned another organization, the

13  American --

14     A.    -- Board of Professional Neuropsychology.

15     Q.    Are you a member of that board?

16     A.    No.

17     Q.    Are the requirements of that board separate and

18  apart for those of the ABPP?

19     A.    Yes, they are separate.  They are very similar,

20  but separate.

21     Q.    And do they have a separate board

22  certification?

23     A.    Yes, they do.

24     Q.    And have you ever sat for that board

25  certification?

Costa vs. Metropolitan                              May 10, 2018

Page 11

1       A.    No, I have not.

2       Q.    Are you a member of that board -- did I just

3    ask that?

4       A.    No.

5       Q.    Why aren't you a member of that other

6    psychology board?

7       A.    Again, it's a matter of I have not had the time

8    to pursue.

9       Q.    You haven't had the time since 2006 to pursue

10   that?

11      A.    That is correct.

12      Q.    And I take it you never sat for their board

13   certification in neuropsychology; is that correct?

14      A.    That's correct.

15      Q.    Do you know the requirements for the board

16   certification of ABPP, what you have to do to get it?

17      A.    I know roughly what is expected, yes.

18      Q.    What is your understanding?

19      A.    Written examination, an oral examination.  A

20   submission of some clinical reports, those have to be

21   reviewed by their membership board.  You have to pass

22   the tests, both the written and the oral.

23      Q.    So, there is a type of peer review of the

24   qualifications of the neuropsychologist; would you

25   agree?

Page 12

1     A.   That is correct.

2     Q.   Have you ever had any such peer review

3  performed as to your qualifications as a

4  neuropsychologist?

5     A.   No, I have not.

6     Q.   What prevents a clinical psychologist holding a

7  license such as yours from holding themselves out as a

8  neuropsychologist, if anything?

9     A.   Actually, nothing.  But to be an ethical

10  practitioner you would want to have the background to

11  specialize in it.

12     Q.   So, other than some internal ethical code there

13  is nothing preventing a clinical psychologist from at

14  anytime hanging out shingles as a neuropsychologist; is

15  that correct?

16     A.   That is correct.

17     Q.   When did you first hang out a shingle as a

18  neuropsychologist?

19     A.   May 2006.

20     Q.   So, you have been doing it for about 12 years

21  now?

22     A.   Yes.

23     Q.   I am sorry.  You may have told me that.  When

24  did you graduate?

25     A.   2004.

Costa vs. Metropolitan                                    May 10, 2018

Page 13

1        Q.    What did you do for those intervening two

2    years?

3        A.    I worked at -- well, I did my fellowship for a

4    year and then I spent about eight months working as a

5    per diem in the adult inpatient psychiatric unit at the

6    Institute for Living in Hartford, Connecticut.

7        Q.    And your post doctoral work was in what?

8        A.    I was at the Institute for Living.  I was

9    assisting a program for cognitive rehabilitation for

10   individuals with schizophrenia.  That was 80 percent of

11   my time, and 20 percent of my time was with the memory

12   disorder clinic affiliated with the hospital.

13            (Defendant's Exhibit 1 marked for

14        identification)

15   BY MR. MEAGHER:

16       Q.    Let me hand you Exhibit 1 to this deposition.

17   And I ask if you can identify that as being your current

18   Curriculum Vitae or if there needs to be any changes or

19   amendments to that.

20       A.    On a quick perusal, I believe that is all

21   correct.

22       Q.    In looking through it, generally speaking, it

23   appeared that you had a specialization in schizophrenia.

24   Is that fair to say?

25       A.    Yes.

Costa vs. Metropolitan                          May 10, 2018

Page 14

1    Q.    And when did your focus on schizophrenia begin?

2    A.    About 1990.

3    Q.    Where were you then?

4    A.    I was a director of activities at a

5    geropsychiatric facility in Topeka, Kansas.

6    Q.    When we say "geropsychiatric," are you dealing

7    with elderly population?

8    A.    Yes, sir.

9    Q.    How long did that concentration in

10   schizophrenia continue?

11   A.    I was -- I held that position for one year, and

12   then I spent the next 10 years working at the Menninger

13   Clinic in the outpatient residential program for

14   individuals with severe and persistent mental illness,

15   i.e., schizophrenia for the most part; and I continued

16   through that until 2000 when I went back to school to

17   get my doctorate.

18   Q.    At that point in time, that is until you went

19   back to school to get your doctorate, you were not

20   focused on neuropsychology; is that fair?

21   A.    That is correct.

22   Q.    When did you first begin to focus on

23   neuropsychology as opposed to schizophrenia?

24   A.    Actually, about 1998 when we started to do a

25   study at the hospital on cognitive rehabilitation for

Page 15

1   individuals with schizophrenia and the director of

2   psychology asked me to assist with the research study.

3   And she, herself, was a neuropsychologist and was giving

4   us neuropsychology one-on-one lectures to, kind of, get

5   us up to speed on what we were going to do in the study,

6   and it -- that just sparked my interest and that

7   continues to today.

8       Q.   So, when you went to the California School of

9   Professional Psychology for PsyD, your emphasis was in

10  neuropsychology; is that correct?

11      A.   That is correct.

12      Q.   How did that emphasize exhibit?  That is, were

13  all of your classes in neuropsych?

14      A.   To get the emphasis in neuropsychology you had

15  to have a number of -- in addition to the core

16  curriculum, you had to have a number of extra classes in

17  neuropsychology; assessment, pathology, developmental

18  neuropsychology, rehabilitation neuropsychology or

19  neuropsychology rehabilitation.

20      Q.   Describe your current practice, please.  What

21  do you do?

22      A.   95 percent of what I do is evaluate older

23  adults for dementia.

24      Q.   And what is the other 5 percent?

25      A.   Younger adults, evaluating for attention

Page 16

1    deficit disorder, and testamentary capacity evaluations.

2        Q.    I take it the testamentary capacity evaluations

3    are also on an elderly population?

4        A.    Yes.

5        Q.    Regarding your 95 percent of the time

6    evaluating dementia, is that also with an elderly

7    population?

8        A.    Yes.

9        Q.    And what are your primary referral sources for

10   that part of your practice?

11       A.    Sarasota Memorial Hospital Memory Disorders

12   Clinic, a number of independent physicians and

13   neurologists in town, and a neuropsychology practice

14   group up in St. Petersburg where I work two days a work

15   in their office seeing their patients.

16       Q.    What is the name of that practice?

17       A.    Central Neurology.

18       Q.    Do you have any neurologists who refer cases to

19   you here in the Sarasota area?

20       A.    Yes.

21       Q.    Who?

22       A.    Patrick Madden.

23       Q.    And are those mostly elderly patients he refers

24   you to?

25       A.    50 plus.  Sometimes younger.

Page 17

1    Q.   50 plus, meaning 50 percent?

2    A.   I am sorry.  50 years of age, plus.

3    Q.   So, the vast majority is over 50 but there are

4    a few outliners?

5    A.   Yes.

6    Q.   With regard to your dementia testing, do you

7    run the same battery of tests that you did with Ms.

8    Costa?

9    A.   No.

10   Q.   I take it there are a few tests that are given

11   in both type of exams; is that correct?

12   A.   Yes.

13   Q.   What are the primary dementia exams you give?

14   A.   The specific tests?

15   Q.   Yes, the specific tests.

16   A.   Semantic Fluency, Lexical Fluency,

17   Confrontational Naming, Boston Naming Test, Trailmaking

18   Test.  I use a couple tests from the Wechsler Adult

19   Intelligence Scale to look at processing speed and

20   attentional concentration.  I use Hopkins Verbal

21   Learning Test, which is specifically geared toward older

22   adults.  It's not quite as erroneous as like the

23   California Verbal Learning Test, which is what I would

24   use in the younger population, as in the case of Ms.

25   Costa.  I used the memory test from the Wechsler Memory

1    Scale, which is a structured auditory memory test,

2    logical memory.  I do the Rey Complex Figure.  I use

3    that with both young and old.  That is digital memory

4    test.  I do a couple of tests looking at executive

5    functioning, problem solving, strategies with the

6    Wisconsin Card Sorting Test, the Weigel's Sorting Test.

7         Q.   Are those the primary ones?

8         A.   I am sure I am leaving something out.

9         Q.   That is fine.  I am not looking for every

10   single one.  Those are the ones that come to mind as you

11   sit here?

12        A.   Those are primary tests, yes.

13        Q.   And I was just talking for just the dementia?

14        A.   For the dementia, right.

15        Q.   What is the medium age of your practice?

16        A.   70 plus.  It's, probably, 73, 4, 5, somewhere

17   in there.

18        Q.   Now, with regard to the other 5 percent of your

19   practice with the ADHD evaluations, I take it that Ms.

20   Costa's exam falls within that 5 percent?

21        A.   It falls within the 5 percent, yes.

22        Q.   Of that 5 percent -- well, let me ask you this:

23   Do you treat any patients or do you just evaluate them?

24        A.   I just do diagnostic assessments.

25        Q.   And that is what neuropsychologists do,

Costa vs. Metropolitan                                           May 10, 2018

Page 19

1    correct?

2        A.    Predominantly, yes.

3        Q.    What percentage of your practice is forensic,

4    that is related to court proceedings or benefit

5    requests, things of that nature?

6        A.    Probably less than 1 percent.

7        Q.    Have you been deposed before?

8        A.    Yes.

9        Q.    On how many occasions?

10       A.    A number.  Six, seven, maybe.

11       Q.    When was the last time?

12       A.    The most recent one was -- I think you have

13   that.  October 28, 2015.

14       Q.    And on whose behalf did you testify?

15       A.    The defendant.

16       Q.    In what kind of case?

17       A.    Disability, auto accident disability.

18       Q.    Was the defendant an insurance company?

19       A.    No.  It was the client, the patient.

20       Q.    I see.  So, this person was being sued.  Were

21   they claiming a neuropsychological deficit?

22       A.    They were suing for disability payments; and,

23   yes, they were claiming a neuropsychological deficit.

24       Q.    You said you were representing the defendant.

25   I am a little confused.  You were representing the

Costa vs. Metropolitan                                    May 10, 2018

Page 20

1    claimant.  That is the person claiming to be entitled to

2    benefits because of a neuropsychological deficit?

3        A.    Yes.

4        Q.    Okay.  Of the forensic work you do what

5    percentage is for defendants, meaning the stakeholder,

6    insurance companies, Social Security Administration,

7    things of that nature, that side?

8        A.    Zero.

9        Q.    And with regard to plaintiffs, claimants, I

10   take it that is 100 percent; is that correct?

11       A.    Um-hum.

12       Q.    You have to answer verbally.

13       A.    Yes; that is correct.

14       Q.    What percentage of your practice is forensic?

15   I think you told me less than 1 percent.

16       A.    Probably, less than 1 percent.

17       Q.    Is that by time or income from that source?

18   Both?

19       A.    Yeah, both.

20       Q.    Has that been the case since 2006?

21       A.    Yes.  I have tended to focus on clinical rather

22   than forensic.

23       Q.    Was the -- you did a post-doctoral fellowship;

24   is that correct?

25       A.    Yes.

Costa vs. Metropolitan                                    May 10, 2018

Page 21

1      Q.   Was that exclusively in neuropsychology or did

2   it just involve neuropsychology?

3      A.   It involved neuropsychology.

4      Q.   What was the predominant nature of that

5   post-doctoral fellowship?

6      A.   Well, I have to elaborate a little bit to

7   describe it.

8      Q.   Sure.

9      A.   It was an outpatient -- intensive outpatient

10   program where individuals predominantly with

11   schizophrenia would come to the campus, and we would

12   hold therapy groups, we would hold cognitive training

13   groups, exercise, socialization skills groups, other

14   groups of that nature.  And these people were in the

15   program for an extensive amount of time.  We are talking

16   three to five years, plus.

17         It was an NIH funded study that a

18   neuropsychologist there at the hospital was -- had

19   gotten, and we had a number of staff there who, that was

20   our focus, was running this clinical and research

21   program.

22      Q.   So, your primary role there was inpatient

23   treatment?

24      A.   Yes.

25      Q.   Correct?

1      A.    That's correct.

2      Q.    It wasn't inpatient evaluation, correct?

3      A.    Primary, no, it was not.

4      Q.    So, while there may have been

5   neuropsychological testing performed on these patients,

6   that was only one small part of the entire program,

7   correct?

8      A.    That's correct.

9      Q.    Were you performing -- or was the program you

10  were in performing full neuropsychological screening or

11  only cognitive screening for those patients?

12     A.    When a person came into the program they got a

13  full neuropsychological evaluation, and then they did

14  periodic screening follow-up assessments taking a few

15  select tests and looking to see had there been change

16  over time.

17     Q.    During that program what were -- what was the

18  typical client or patient?

19     A.    Well, they ranged from early 20s to mid-40s who

20  had been diagnosed with schizophrenia and were

21  functional enough that they could reside outside of the

22  hospital but not completely fully independently

23  functional so that they could live on their own.

24  Generally they lived with mom and dad still and they

25  came to the program.

Page 23

1      Q.    You said the campus.   Where was the campus?

2      A.    Institute of Living.

3      Q.    In Hartford?

4      A.    Hartford, Connecticut.

5      Q.    Were you doing -- you personally doing any

6  cognitive rehabilitation?

7      A.    Yes, I was.

8      Q.    And did you manage a rehab team or were you in

9  part of a rehab team?

10     A.    Yes.

11     Q.    And what was the role of the rehab team?

12     A.    Well, like I described the groups that we did,

13 some therapy groups, some social skills training groups,

14 some cognitive training groups.

15     Q.    Who was your training supervisor?

16     A.    Dana Shagan.

17     Q.    Was that the neuropsychologist?

18     A.    No.

19     Q.    Was Dana Shagan a neuropsychologist?

20     A.    Actually, yes, she was.   The principal

21 investigator was Matthew Kurtz.   I think that is in my

22 C.V., but maybe not.

23     Q.    Was Dana Shagan a board certified

24 neuropsychologist?

25     A.    To the best of my recollection, no, she was

Page 24

1    not.

2       Q.   Did working with schizophrenics qualify you as

3    a neuropsychologist in your opinion?

4       A.   No.

5       Q.   Would you agree that a board certified

6    neuropsychologist has more training and experience in

7    neuropsychology than a psychologist that does not have

8    board certification in that field?

9       A.   No, I would not agree with that statement.

10      Q.   Why not?

11      A.   Because if you looked at the field of

12   neuropsychologists it's, probably, less than 50 percent

13   who are actually board certified and some of them have

14   been practicing for an awfully long time.  My primary

15   supervisor when I was a student had been in practice for

16   15 years and it was another five years before he finally

17   decided to sit for board certification.

18      Q.   So, he is board certified?

19      A.   Um?

20      Q.   He is board certified now?

21      A.   He is.  Now, this is not somebody that I have

22   mentioned before.

23      Q.   Okay.  Who is this?  Well, what was his role,

24   even if you don't remember his name?

25      A.   He was one of my instructors in medical school.

Page 25

```
 1      Q.   It doesn't --

 2      A.   It is one of those instances which I completely

 3 block it.

 4      Q.   Short-term memory deficit.

 5           MR. TUCKER:   That is long-term memory.

 6 BY MR. MEAGHER:

 7      Q.   Sorry.

 8      A.   But if you ask me 10 minutes from now or --

 9 Howard Glidden.

10      Q.   There you go.  It didn't take that long.

11      A.   It takes a little jogging.  There is a lot of

12 files up there to go through.

13      Q.   Exactly.

14           I think I saw somewhere in your materials where

15 you said that since 2011 you have performed 8,500

16 neuropsychological exams; is that correct.

17      A.   8,500 is, probably, a little high.  It's,

18 probably, more like 2,800.  I -- not since 2011.

19      Q.   Let's take a look at what I am talking about

20 here.

21      A.   That would be, probably, the whole time since I

22 have been licensed.

23      Q.   You were licensed in 2006, correct?

24      A.   That is correct.

25           (Defendant's Exhibit 2 marked for
```

1        identification)

2   BY MR. MEAGHER:

3        Q.   Let me hand you what I have marked as

4   Exhibit 2, which is a copy of your expert witness report

5   in this case provided by Ms. Costa's lawyers.

6        A.   I believe you are looking at page 5, first,

7   second -- third paragraph, two-thirds of the way down.

8        Q.   Okay.  I misstated the number.  So, in 11 years

9   you have performed 2,800 evaluations; is that correct?

10       A.   Yes.

11       Q.   Are you equating all neuropsychological

12  examinations as the same, or are there some that are

13  less lengthy than others?

14       A.   Yes.

15       Q.   How long is the average dementia neuropsych

16  that you perform today?

17       A.   Three and a half to four hours.

18       Q.   Of the 2,800 evaluations you have completed

19  what percentage of those were for dementia?  95 percent?

20       A.   Probably, 90 plus percent.  I did more younger

21  adults the first, probably, four years that I was

22  licensed.

23       Q.   When you say younger adults, what age group are

24  we talking about?

25       A.   17 and up.

Page 27

1      Q.   For learning disabilities; ADHD and things of

2   that type?

3      A.   Yes.

4      Q.   With regard to clients being evaluated because

5   of neurological, that is physical neurological problems,

6   what percentage of your practice involves those types of

7   clients?

8      A.   Every single one.

9      Q.   Because they are elderly?

10      A.   Because they are elderly.

11      Q.   Prior to Ms. Costa had you performed

12   evaluations, let's say in the last five years, of any

13   client her age suffering from neurological problems?

14      A.   Yes.

15      Q.   How many occasions?

16      A.   How many, I don't know.  Probably, three dozen,

17   thereabouts.

18      Q.   How would those come to you, those clients?

19      A.   Neurologists or primary care physician

20   referral.

21      Q.   So that I understand -- so, the 11 years you

22   are talking about here with your 2,800 evaluations goes

23   back to the 2006 licensing as a clinical psychologist;

24   is that correct?

25      A.   Yes.

Costa vs. Metropolitan                          May 10, 2018

Page 28

1    Q.    Prior to that did you perform any

2    neuropsychological examinations on your own clients

3    versus somebody who might be in the schizophrenia

4    program somewhere?

5    A.    Prior to getting licensed my only assessment

6    experience outside of internship and fellowship was just

7    that.  No, I have not.

8    Q.    Do you perform neuropsychological independent

9    medical examinations?

10   A.    No, I do not.

11   Q.    Are you registered with any organization for

12   referrals in that area?

13   A.    No.

14   Q.    Have you ever attempted to get into that area

15   of IMEs?

16   A.    I am not sure that this actually qualifies for

17   an IME, but I have done a couple dozen NFL player

18   evaluations with the concussion settlements and these

19   had been referred from attorneys.  But they were not

20   called IMEs.  They were outside the baseline assessment

21   neuropsychological evaluations.

22   Q.    But they were referred by lawyers?

23   A.    They were referred by lawyers.

24   Q.    Do you know Dr. Vanderploeg?

25   A.    No.

Costa vs. Metropolitan                              May 10, 2018

Page 29

1     Q.    Do you belong to any organization focused on

2   neuropsychology?

3     A.    National Academy of Neuropsychology.

4     Q.    When did you join that?

5     A.    Oh, I did that when I was a student.   Probably,

6   2001.

7     Q.    Is there a test to join that?

8     A.    No.

9     Q.    Just a fee, I take it?

10    A.    Yes.

11    Q.    And each year you --

12    A.    And an interest in neuropsychology.

13    Q.    Do you need to have a degree to join that?

14    A.    Um, no, you can join as a student.   You don't

15  have to necessarily be a neuropsychologist to be a

16  member of it either.   As long as you pay your money,

17  they are happy to take you.   But I think they do want

18  you to have some experience in psychiatry, some

19  background.

20    Q.    But there is no requirement that you do, right?

21    A.    That is a good question, and I don't know the

22  answer to that.   It's expected that you would.

23    Q.    Well, it's like if I wanted to join the NRA, I

24  could do that even though I had no interest in guns?

25    A.    That's correct.

1     Q.    This is similar, that if you wanted to do it,

2   you could, but who would do that?

3     A.    Right.   As far as I know, they do not have a

4   stipulation that says if you are not -- have an

5   undergraduate degree in psychology, you can't join.   I

6   don't know.

7     Q.    Do you know what the annual fee is for that

8   organization?

9     A.    No.   Somewhere between 150 and 250.

10    Q.    Do you get a magazine or something, newsletter?

11    A.    Yes.   Actually, I believe I get a journal as

12  part of that, a subscription -- membership fee.

13    Q.    Anything else you get from that organization

14  other than the journal?

15    A.    E-mail updates about relevant issues related to

16  neuropsychology.   Announcements about upcoming

17  workshops, things like that.

18    Q.    When was the last workshop that you attended in

19  neuropsychology?

20    A.    2013.

21    Q.    What was the subject matter specifically?

22    A.    That was the National Academy of

23  Neuropsychology's annual convention.

24    Q.    Where was it held?

25    A.    San Diego.

Page 31

1      Q.   Did you visit friends out in California while

2   you were there?

3      A.   I actually got to run into Dr. Glidden.

4      Q.   Your --

5      A.   My old mentor, teacher.

6      Q.   Other than attending that event in 2013, any

7   other events that you have attended?

8      A.   Every couple of years I will go over to the

9   Miami Sinai Hospital's annual Alzheimer's Mild Cognitive

10  Impairment Conference.

11     Q.   When is the last time you went to that?

12     A.   I believe the last time I went, it's been three

13  years now.

14     Q.   2015?

15     A.   That sounds about right.

16     Q.   When I asked earlier you said 2013.  Is that

17  not a neuropsych specific seminar over at Mt. Sinai?

18     A.   It's specific to Alzheimer's and the various

19  mild cognitive impairment dementias.  The primary focus

20  is Alzheimer's, but they also cover front and temple,

21  etcetera.

22     Q.   They cover a lot of subjects regarding

23  Alzheimer's, right?

24     A.   Alzheimer's and related dementias.

25     Q.   And Alzheimer's isn't particularly important to

Costa vs. Metropolitan                                    May 10, 2018

Page 32

1    your practice because you are seeing so many elderly

2    patients, correct?

3         A.    That's the primary rule out, that I am asked to

4    evaluate for -- the primary diagnosis I am asked to

5    evaluate for.

6         Q.    Have you published in the field of

7    neuropsychology?

8         A.    One.

9         Q.    And what was the name of that?  Feel free to

10   look at your report or resume.

11        A.    Cognitive Rehabilitation With Patients Having

12   Persistent Severe Psychiatric Disabilities.  This is the

13   research study that we did at Menninger's.

14        Q.    I am -- okay.  So, is that called third author?

15        A.    Yes.

16        Q.    Who was the boss?

17        A.    Dr. Lisa Lewis.

18        Q.    And who was Unkefer, U-n-k-e-f-e-r?

19        A.    Evelyn, she was actually a social worker

20   director of the residential program house that I worked

21   at.

22        Q.    So, she was not a psychologist?

23        A.    No.  She was a social worker, clinical social

24   worker.

25        Q.    How about K. Crith?

Costa vs. Metropolitan                         May 10, 2018

Page 33

1      A.    She was a registered nurse.  It was a

2   multidisciplinary team of neuropsychologists, social

3   workers, nurse, myself.  Mr. Fultz there, the final

4   person, he was our statistician.

5      Q.    So, this article was not concentrated on

6   neuropsychology, correct?

7      A.    In a -- in a way.  The cognitive rehabilitation

8   for people with schizophrenia was looking at, can we

9   help improve their cognitive skills; and that is what

10  neuropsychology is about, is looking at cognitive

11  skills.  So, we were looking to see, can doing these

12  exercises help these people to think better and overcome

13  hopefully some of the deficits that the disease has left

14  them with.  So, it is related to neuropsychology.

15     Q.    And I understand related, because you are using

16  neuropsychological testing in order to see whether

17  certain modalities of treatment improve performance,

18  correct?

19     A.    Cognitive performance, yes.

20     Q.    But as indicated by the title, this is mostly

21  about the rehabilitation aspect for schizophrenics?

22     A.    The cognitive rehabilitation aspect.

23     Q.    Correct?

24     A.    Correct.

25     Q.    So, neuropsychological testing was a tool that

Costa vs. Metropolitan                          May 10, 2018

Page 34

1    you used as part of this bigger program?

2        A.   It was our measurement of improvement.

3        Q.   So, it wasn't a question of taking a look at

4    the Wechsler Scales and interpreting data in order to

5    see whether sleep disorders impacted test results or

6    something of that nature; is that fair to say?  In other

7    words, it wasn't specifically examining

8    neuropsychological testing?

9        A.   Neuropsychological testing was used as a

10   measure of, did these people exhibit cognitive

11   improvements based upon the intervention we provided.

12   So, yes, it was a neuropsychological-related issue.

13       Q.   Do you have a copy of that?

14       A.   No.

15       Q.   You have one publication and you didn't keep a

16   copy?

17            MR. TUCKER:  Object to form.

18            THE WITNESS:  I am sure I have a copy buried

19       somewhere in the file cabinet.

20   BY MR. MEAGHER:

21       Q.   Have you done any teaching in neuropsychology?

22       A.   No.

23       Q.   Have you ever been informed that in order to be

24   retained as an independent medical examiner by an

25   insurer you had to be board certificated in

Page 35

1    neuropsychology?

2         A.   No, I have not been directly informed by that.

3         Q.   How about indirectly informed?

4         A.   It sounds like stuff I have heard, yes.

5              (Defendant's Exhibit 3 marked for

6         identification)

7    BY MR. MEAGHER:

8         Q.   Let me hand you what I have marked as Exhibit 3

9    to this deposition, which is a report of your

10   neuropsychological evaluation of Ms. Costa; the date of

11   the report being March 10, 2016.  Can you agree with me

12   that that is what that is?

13        A.   Yes.

14        Q.   Who referred Ms. Costa to you?

15        A.   Dr. Patrick Madden.

16        Q.   Do you consider this to be a forensic referral?

17        A.   No.

18        Q.   Why not?

19        A.   Because it was referred from her neurologist to

20   answer the question, did she have some cognitive

21   problems, and to compare against her prior evaluation.

22        Q.   The prior evaluation was done by whom?

23        A.   Dr. Bowers.

24        Q.   Do you know if Dr. Bowers is a board certified

25   neuropsychologist?

Costa vs. Metropolitan                              May 10, 2018

Page 36

1      A.    Yes, I do; and, yes, she is.

2      Q.    And she has a national reputation; are you

3    aware of that?

4      A.    No, but I am not surprised.

5      Q.    Did the fact that this was coming from a

6    referring physician change your selection of tests as

7    opposed to someone coming referred by a lawyer?

8      A.    No.

9      Q.    So, with regard to the lawyer who referred the

10   NFL test, you would perform the same battery of tests on

11   those persons as you would on Ms. Costa?

12     A.    No.

13     Q.    Why not?

14     A.    Because the NFL has a specific list of tests

15   that we had to administer.

16     Q.    Well, let me ask you generically as to someone

17   coming to you referred by a lawyer.  What, if any,

18   different tests would you be performing?

19     A.    If Ms. Costa were coming to me from a lawyer as

20   opposed to being from her physician, I don't know that I

21   would have chosen any different tests.

22     Q.    So, with -- what are validity testing -- what

23   is validity testing?

24     A.    Validity testing is to make a psychometric

25   assertion if the person's effort is good and consistent

Page 37

1    throughout the assessment.

2        Q.    Is it also used to detect malingering?

3        A.    Yes.

4        Q.    Can it also detect subconscious secondary gain?

5        A.    Pursing that out from another, no.

6        Q.    Why not?

7        A.    It only tells us that they did not -- thinking

8    about the form of the question, let me back up to the

9    original one about, will it tell us if a person is

10   malingering, or whoever it was that you have explicitly

11   asked the question.  And the answer is, no, it will not.

12           It will only tell us if the person is giving

13   effort or not and whether that effort was consistent --

14   or appeared to be consistent throughout the testing.  It

15   will not tell us why the effort may not have been

16   consistent if it were not.

17       Q.    So, if I understand correctly, it doesn't tell

18   you the reason for a lack of effort if it shows a lack

19   of effort?

20       A.    That's correct.  And thank you for allowing me

21   the opportunity for going back to restate that.

22       Q.    If at anytime you need to do that, feel free.

23       A.    Okay.

24       Q.    What validity test did you choose to perform on

25   Ms. Costa?

Page 38

1     A.    I chose several.  I chose one standalone test,

2     which means it's a test that you give specifically for

3     the intent of looking at effort and it's separate from

4     the cognitive tests, and it really doesn't inform

5     anything about cognitive functioning.  And that was the

6     test of memory malingering.

7         Q.    And with regard to non-standalone tests, what

8     tests include validity scales that you gave to Ms.

9     Costa?

10        A.    There were several embedded tests that I used,

11    Reliable Digit Span, the Forced Choice portion of the

12    California Verbal Learning Test, validity scales that

13    were embedded within the Personality Assessment

14    Inventory.  And I think those were -- I think that was

15    the primary ones that I used.  Yes.

16        Q.    At the current time do you use any other

17    validity tests other than the ones you used with Ms.

18    Costa?

19        A.    No.

20        Q.    Are there more sensitive validity tests than

21    the standalone tests that you used?

22        A.    There are tests out there that claim to be more

23    sensitive.

24        Q.    When you use the word "claim," I take it you

25    disagree with that claim?

Page 39

1       A.    I am saying that is what they assert about

2    their tests.

3       Q.    So, why don't you use those tests?

4       A.    Because I am most familiar with the TOMM.    I

5    have given it many, many times.    I like the ease of the

6    administration of it.    I like that it does not involve

7    memorizing a list of words, because I am already going

8    to try to get the person to memorize a list of words

9    later on.    And nobody has really looked at what point do

10   you give a person too many word lists to try to memorize

11   before they start to interact and affect each other.

12   And that is research that has not been done on some of

13   those supposedly more sensitive measures.

14      Q.    You have actually looked at that and you know

15   there is no research on that?

16      A.    To the best of my knowledge, there is not.

17      Q.    Do you spend a lot of time looking at that

18   issue?

19      A.    No, I do not.

20      Q.    So, there might be research?

21      A.    There might be, but I am not aware of it.

22      Q.    Do you know whether the TOMM, T-O-M-M, is

23   considered a weak validity test?

24      A.    It is not considered a weak validity test

25   because in the latest survey by the National Academy of

Page 40

1   Neuropsychology asking neuropsychologists what tests do

2   you use, the TOMM was ranked as one of the most commonly

3   used validity assessment instruments.

4        Q.   So, you equate most "commonly used" with

5   strongest?

6        A.   Beyond most commonly used, it's also got a lot

7   more research supporting its validity as a measure of

8   effort.

9        Q.   Although you haven't really checked that?   I

10  mean --

11       A.   No, that I know.

12       Q.   How do you know that?

13       A.   When I was in internship --

14       Q.   What year?

15       A.   2004, 2005.

16       Q.   Okay.

17       A.   The TOMM was a measure that was used with every

18  single person that we did an evaluation on on the

19  forensic unit, and the forensic post-doc and I were

20  close friends and we talked an awful lot about how good

21  is this test and speculated on ways that perhaps the

22  test could be made a little bit better, a little more

23  sensitive.   So, I had done a great deal of research on

24  the test at that time, and I know that there has been a

25  lot more research that has been published since then.

Costa vs. Metropolitan                      May 10, 2018

Page 41

1    And the research that is out there says that it is a

2    good test, it is a valid test.

3        Q.   My question wasn't really whether it was valid.

4    It's just that it was a weak test of validity.

5        A.   I wouldn't call it a weak test of validity.

6        Q.   And you are relying on these conversations and

7    analysis and research you did back in 2004 for that?

8        A.   And what I have done sporadically since then.

9        Q.   Have other tests been developed to determine

10   validity in the past 14 years?

11       A.   I am trying to think of when some others came

12   out.  Most of the other ones that I am familiar with

13   have been around for awhile.  I don't know whether the

14   14-year mark applies.

15            I know the one that most people consider to be

16   the most sensitive, the Word Memory -- Greens Word

17   Memory Test, and the other version of that medical --

18   Greens Medical Symptom Validity Test.  I am pretty sure

19   those were out at that time in 2001, because I did come

20   across some research looking at that test.

21       Q.   But the reason you don't use those tests, I

22   think you said it's ease of administration, you don't

23   make the person memorize a whole bunch of words?

24       A.   Um-hum.

25       Q.   Is that correct?

Costa vs. Metropolitan                          May 10, 2018

Page 42

1      A.    That's correct.  And my familiarity with it.

2   And in the interim there has actually been a subsequent

3   method for analyzing the results on the TOMM that looks

4   at consistency of responding across time, which is

5   purported to improve its sensitivity.

6      Q.    And do you use that new measure?

7      A.    Yes, I do.

8      Q.    What is that called?

9      A.    The Albany, A-l-b-a-n-y, Consistency Index.

10     Q.    And you used that with Ms. Costa?

11     A.    I don't believe it was published at that time,

12  and I think I got a copy of the scoring program from

13  somebody who was close with one of the authors and gave

14  me his copy of the scoring program to analyze that with.

15  And, yes, I did use that to look at her responses.

16     Q.    Did you administer an MMPI-2 on Ms. Costa as

17  part of your examination?

18     A.    No, I did not.

19     Q.    Why not?

20     A.    I administered the Personality Assessment

21  Inventory instead.

22     Q.    Does that have the same embedded validity

23  measures that the MMPI-2 does?

24     A.    They are not the same, but it has its own

25  validity measures for indicators of exaggeration of

Costa vs. Metropolitan                    May 10, 2018

Page 43

1   symptoms, endorsement of unusual symptoms, of

2   guardedness and inconsistency of responding, which the

3   MMPI has measures along that line as well.  It has more

4   than the PAI does.

5        Q.   So, why the choice to do the test that you

6   chose to do?

7        A.   Because it is -- it has got plenty of research

8   supporting its validity and its strengths in diagnosing

9   psychiatric illnesses.  It is a test I am much more

10  familiar with than the MMPI.  Particularly since the

11  MMPI-2 has come out since I was in graduate school, so I

12  was not trained on the MMPI-2 restructured format.

13       Q.   So, you have never administered the MMPI-2?

14       A.   No, I have not.

15       Q.   How long has that been out?  Ten years?

16       A.   That is a good question.

17       Q.   Over ten years?

18       A.   Probably, 10 or less.

19       Q.   So, I take it that for the tests that you

20  choose to do, those are the ones you trained on back in

21  school and you feel comfortable with them; is that fair?

22       A.   Yes; that is fair.  I wouldn't want to

23  administer a test that I am not feeling qualified to be

24  able to interpret.

25       Q.   Were you aware of any secondary gain issues

Costa vs. Metropolitan                          May 10, 2018

Page 44

1    that Ms. Costa may have been faced with at the time of

2    your examination?

3         A.    No, I was not.

4         Q.    Were you aware of whether she had filed a claim

5    for disability benefits with MetLife?

6         A.    No, I was not.

7         Q.    Is that something you would like to know when

8    you are performing a neuropsychological evaluation?

9         A.    Yes.

10        Q.    Do you ask patients that as part of your

11   history, patient history?

12        A.    On a younger person most of the time I believe

13   I do ask that, yes.

14        Q.    And you would consider Ms. Costa a younger

15   person compared to your patient base, correct?

16        A.    Yes.

17        Q.    But there is no mention of that in your time

18   with her; is that correct?

19        A.    No, I don't believe -- and to be honest, I am

20   not sure that I even asked.  If I did, the answer must

21   have been no, because if it was yes, I know I would have

22   noted it.

23        Q.    Why would you have noted such a thing?

24        A.    Because in instances like that I know that I

25   need to tell the person that, you know, this is a

Page 45

1  clinical evaluation.  That is the purpose of this

2  evaluation.  This is not an IME, which is what you would

3  need to do if you were really filing a claim for

4  disability.  And if that were the case, that we should

5  stop our evaluation right now.  You should get with your

6  attorney.  They should hook you up with an IME qualified

7  neuropsychologist.

8      Q.   And you don't consider yourself an IME

9  qualified neuropsychologist?

10     A.   No.

11     Q.   Why not?

12     A.   If there are requirements out there to be

13 certified as such, I don't know what they are.  And as

14 you mentioned earlier, no, I was not aware that you had

15 to be board certified to be an IME.  Now, if that is a

16 Florida rule, okay, so be it.

17          I know in California you have to pass certain

18 tests to be an IME qualified examiner.  I have never

19 pursued it in the state of Florida because I am not

20 interested in doing that kind of work.

21     Q.   So, if Ms. Costa told you, hey, I have a

22 disability claim with MetLife, you would have stopped

23 the examination and said, go to someone else?

24     A.   Yes.

25     Q.   And I take it that is because you were

Page 46

1   performing the neuropsychological evaluation because

2   Dr. Madden was concerned about the symptoms she was

3   expressing to him and wanted her tested?

4        A.   That is correct.

5        Q.   So, it wasn't for really determining -- what do

6   I want to say -- the validity of her complaints except

7   as is it would affect your conclusions as to whether she

8   suffered from neurocognitive deficits?

9             MR. TUCKER:   Object to form; vague.

10  BY MR. MEAGHER:

11       Q.   Is that something you can answer?

12       A.   There is a lot there to have to unpack.   Break

13  that down a little bit.

14       Q.   In fact, I -- how long did your

15  neuropsychological evaluation take of Ms. Costa?

16       A.   Four and a half hours, thereabouts.   Longer

17  than the typical one.

18       Q.   Why longer than the typical one?

19       A.   Because I did more testing than what I normally

20  would do for a dementia evaluation.

21       Q.   Were some of the tests that you administered on

22  Ms. Costa at her evaluation tests that you don't use

23  very often?

24       A.   No, no.   All the tests that I gave her were

25  tests that I use with regularity enough to be

Page 47

1   comfortable interpreting them and understanding what

2   they mean.

3       Q.   What is the Diagnostic and Statistical Manual

4   of Mental Illness?

5       A.   The Diagnostic and Statistical Manual of Mental

6   Illness is a book that describes what are considered to

7   be the diagnostic features of the variety of mental

8   illnesses.

9       Q.   Are there certain editions?

10      A.   Yes.

11      Q.   What is the current edition?

12      A.   V.

13      Q.   How long has V been out?

14      A.   Three, four years.  Maybe five.

15      Q.   Is that the DSM version that you use when

16  writing down your diagnoses?

17      A.   Yes, it is.  You know what, three years on the

18  DSM-V.  That is a good question.  I don't know off the

19  top of my head.

20           MR. MEAGHER:  Off the record.

21           (Off the record)

22           MR. MEAGHER:  Back on the record.

23  BY MR. MEAGHER:

24      Q.   Doctor, you just said you wished to share

25  something with me.  What is it?

Costa vs. Metropolitan                                    May 10, 2018

Page 48

1    A.   Another reason why I am not board certified is

2    that when I was in graduate school there was three

3    separate board certification agencies for

4    neuropsychology.

5    Q.   Okay.

6    A.   One of those doesn't exist anymore, because

7    they got subsumed by one of the others.

8    Q.   This is back in 2004?

9    A.   No.  This is back when I was in graduate

10   school, 2001, '2, '3, '4, yes.

11   Q.   So, how does that relate to the ensuing

12   14 years when you did not become board certified?

13   A.   Would you want to join an organization that you

14   are not sure that they are still going to be around?

15   Would you want to join an organization where there is

16   another one that says we are equivalent to but we are

17   different?  So, which one is the right one to join?

18   Which one is better?  I am not going to get into that.

19   Q.   So, you joined none of them?

20   A.   Unless they get their act together.  Until life

21   settles down and I have time.

22   Q.   Well, we know the two of them have been around

23   for 14 years at least, right?

24   A.   Yes.

25   Q.   Okay.

Page 49

1    A.   Yes, ABIF has been around -- I don't know, 20,

2    30, 40 years, maybe.

3    Q.   That is not long enough for you to be sure that

4    they are going to be around; is that your testimony?

5    A.   I am sure they are going to be around.   But

6    just some additional aside background about the whole

7    board certification in neuropsychology.

8        For physicians there is one neurology

9    certification board.   There is one obstetrics

10   certification board.   Psychologists, we just can't seem

11   to get our act together.

12   Q.   Psychologists has two, one of which has been

13   around 20, 30, 40 years?

14   A.   Yes.

15   Q.   You can't decide -- you just don't -- you think

16   that 30 or 40 years really doesn't show that it is well

17   established?

18   A.   I am not saying that.

19   Q.   Well, it's not well established enough for you

20   to bank on them being there in the future so you would

21   become board certified; that is one of the reasons you

22   are giving me?

23   A.   Right.

24   Q.   That is something you discussed with Ms.

25   Costa's attorney during the break, right?

Costa vs. Metropolitan                    May 10, 2018

Page 50

1      A.   Yes, I explained to him what I was going to say

2   to you.  And I didn't want to leave you out of the

3   conversation, so I wanted to give you that just when you

4   walked in before we got started again, but I was too

5   late.

6      Q.   I appreciate that.

7      A.   Just when you going down the board

8   certification road in the future you will know that

9   there is more history to it than just what seems to be

10   apparent on the surface.

11      Q.   Do you know when you are performing

12   neuropsychological testing on a person seeking benefits

13   you should perform more than one standalone validity

14   test?

15      A.   I don't think that is a requirement.

16      Q.   Do you think it is a good idea?

17      A.   Probably, is.

18      Q.   And as far as requirements, where are these

19   requirements set forth; do you know, if anywhere?

20      A.   Nowhere that I know of.

21      Q.   And the only standalone -- go ahead.  You

22   wanted to say something?

23      A.   MetLife's neuropsychologist reviewer, whatever

24   his title is -- Dr. Boone, I did believe direct that at

25   least two standalone measures be administered in her

Costa vs. Metropolitan                           May 10, 2018

Page 51

1    evaluation of Dr. Vanderploeg.  That might be an

2    insurance industry requirement.  If there is a ABOPN,

3    American Board of Professional Neuropsychology

4    requirement, it's not known to me.

5         Q.   You brought a folder with you here today.  Is

6    that in response to the subpoena that was served upon

7    you?

8         A.   Yes.

9         Q.   Could I see your folder, please.

10        A.   (Indicating).

11        Q.   Everything in it -- okay.  You separated some

12   things out.  I wanted to see your entire folder.  What

13   did you take out of it?

14        A.   These are records, I believe, you have.  These

15   are my notes from my evaluation with her.  My copy is

16   the review that is in here.  But you have given me

17   copies of those.  You already have them.

18        Q.   Let me just take a look.

19        A.   Just ease for me to be able to answer

20   questions.

21        Q.   What is that?

22        A.   (Indicating).

23        Q.   I think I marked your report.  Let's get the

24   ones out with stickers.

25              (Defendant's Exhibit 4 marked for

Page 52

1    identification)

2    BY MR. MEAGHER:

3      Q.   Let me hand you Defense Exhibit 4 to this

4    deposition.  Can you identify that document for me,

5    please.

6      A.   It's an independent record review that I wrote.

7      Q.   On what date?

8      A.   January 2nd, 2018.

9      Q.   And how did you come about writing that?

10     A.   I was asked to do an independent record review

11   by Ms. Costa's attorney.

12     Q.   Is this the same as -- with no changes as the

13   document we have marked as your expert witness report?

14     A.   That is correct.

15     Q.   I notice there is some margin area in Exhibit 4

16   on the second page, or maybe even more than that.

17     A.   Okay.  I made notes to myself when I was

18   reviewing it this morning.

19     Q.   Let me just get a copy made so we know what we

20   are looking at.  Also, you had some colored markings on

21   one of your documents, some pen.

22     A.   Yes, but there is a copy of it here.  This I

23   brought specifically for you.

24     Q.   Okay.  I didn't know you were handing me that.

25   I thought it was something separate.

Costa vs. Metropolitan                                    May 10, 2018

Page 53

1      A.    No.   This is the first --

2      Q.    And you were kind enough to do colored copies.

3      A.    Yes, I was, and I don't charge extra.

4      Q.    Thank you.

5      A.    You're welcome.

6            (Defendant's Exhibit 5 marked for

7      identification)

8   BY MR. MEAGHER:

9      Q.    Let me hand you what I have marked as

10   Exhibit 5.   What is this document -- or composite

11   document?

12     A.    This is my notes -- this is my notes from the

13   initial interview with Ms. Costa.   It's Exhibit Number

14   5, yes.

15     Q.    But this is actually a copy of your original

16   notes, correct?

17     A.    That is correct; yes.

18     Q.    The subpoena also asked for the raw data.   Did

19   you bring that with you here?

20     A.    That is these sheets here.

21     Q.    This is a summary.   You are talking about the

22   second page of Exhibit 5.   That's a summary of raw data,

23   correct?

24     A.    It is all the raw data, yes.

25     Q.    But it's not actually the raw data.   It's not

Page 54

1    her test responses?

2        A.   No, it's not her test responses.  It's just the

3    scores.

4        Q.   The subpoena asked also for the test questions.

5    Did you bring that with you?

6        A.   I cannot provide those with you.

7        Q.   Why not?

8        A.   Because I am under restriction from the test

9    publisher that I do not share tests with anybody who is

10   not qualified to be able to interpret them.  I also

11   have state statutes that dictate that I not do that.  I

12   also have ethical obligations to the American

13   Psychological Association and the National Academy of

14   Neuropsychology that I do not share what you term raw

15   data test questions, answers like that.

16       Q.   So, here is Exhibit 4 back.

17            MR. MEAGHER:  I will hand a copy to counsel.

18   BY MR. MEAGHER:

19       Q.   To your knowledge, are there any differences

20   between what we marked as Exhibit 4 and what was

21   produced as your expert report that we have marked as

22   Exhibit 3?

23       A.   There are no differences.

24       Q.   Now, I take it that prior to coming here today

25   you reviewed your report?

Page 55

1     A.   Yes.

2     Q.   What else did you do to prepare for this

3  deposition?

4     A.   I reviewed the clinical report that I wrote on

5  Ms. Costa, I reviewed the independent record review

6  report that I prepared.

7     Q.   Anything else?

8     A.   I reviewed the transcript of the deposition

9  that Dr. Vanderploeg gave.

10    Q.   Anything else to prepare?

11    A.   Kind of went through the chart and looked at

12  the tests that I gave and just to, kind of,

13  refamiliarize myself with how she did on the tests.

14    Q.   When you say "the chart," have you brought the

15  chart with you?

16    A.   I brought you what I am able to give you.  I

17  told you the tests I can't give you, and those were the

18  things that I looked at.

19    Q.   So, you looked at things that you have not

20  brought with you here today for the reasons you have

21  stated; is that correct?

22    A.   That's correct.

23    Q.   Did you meet with Ms. Costa's lawyers?

24    A.   I had a brief telephone conversation last night

25  with her attorney.

Costa vs. Metropolitan                                    May 10, 2018

Page 56

1      Q.    Who?  Mr. Tucker?

2      A.    Yes, Mr. Tucker.

3      Q.    When you say "brief," we are talking less than

4   30 minutes?

5      A.    We are talking less than five minutes.

6      Q.    Prior to that had you ever spoken with any of

7   her attorneys?

8      A.    Yes.

9      Q.    Who did you speak with earlier?

10     A.    I spoke with Mr. Tucker many months ago.

11     Q.    Was that at the time that you prepared your

12  report?

13     A.    Yes.

14     Q.    That is dated January 2, 2018, correct?

15     A.    That's correct.

16     Q.    Since January 2, 2018, have you spoken with any

17  attorney representing Ms. Costa?

18     A.    No.  I have had e-mail communications about the

19  initial subpoena that you sent me requesting records,

20  but I did not speak with her attorney.  I spoke with a

21  legal assistant -- or e-mailed with the legal assistant.

22     Q.    The subpoena also asked you for any e-mail

23  communications.  Did you bring those with you?

24     A.    No, I didn't.

25     Q.    Why not?

Costa vs. Metropolitan                          May 10, 2018

Page 57

1        A.    Because I don't have copies of them.

2        Q.    You don't think that you can go back on your

3   computer in the last two months and find copies of

4   e-mails?

5        A.    I could, probably, find them.

6              MR. TUCKER:  You can't have any e-mail

7        communications between my firm and yours.

8              MR.  MEAGHER:  Maybe not, but that is not what

9        he said.

10  BY MR. MEAGHER:

11       Q.    Did somebody advise you not to bring e-mail

12  communications?

13       A.    No.

14       Q.    Who gave you Dr. Vanderploeg's deposition

15  transcripts?

16       A.    Attorney Tucker.

17       Q.    How was that transmitted to you?

18       A.    E-mail.

19       Q.    And did you discuss the deposition with Mr.

20  Tucker?

21       A.    No, I did not.

22       Q.    Have you ever -- have you spoken to Ms. Costa

23  since your examination of her?

24       A.    Yes.

25       Q.    When did you speak with her?

Costa vs. Metropolitan                                    May 10, 2018

Page 58

1      A.    That was when I received a letter from MetLife

2    requesting -- no.  It's when I received a letter from

3    her attorney's law firm requesting her report, and I

4    called her to verify that that was on the up and up and

5    that she wanted me to do that.  And she said yes.  And I

6    contacted her again when I received a letter from

7    MetLife's, Shawn --

8      Q.    White?

9      A.    -- White, requesting records and just asking

10   her if that was okay to do that.  And those were -- to

11   the best of my recollection, these were the only two

12   times I have talked to her.

13     Q.    Did you talk with her substantively about her

14   condition, her claim?

15     A.    No.

16     Q.    Was Mr. Tucker's contact with you asking for a

17   copy of your report on her the first time you learned

18   that she had a claim of any type?

19     A.    Yes.

20     Q.    So, that came as a surprise to you?

21     A.    Yes.

22     Q.    With regard to your report that we have marked

23   as Exhibit 3 --

24     A.    The neuropsychological evaluation, yes.

25     Q.    Did you do prior drafts of that document?

Costa vs. Metropolitan                    May 10, 2018

Page 59

1      A.   No.

2      Q.   That is the only draft you did?  There is no

3    version one?

4      A.   This is it.

5      Q.   Okay.  Did you make any changes to that report

6    after any discussions with anyone?

7      A.   There has been no changes to this report since

8    it was written on March 10, 2016.

9      Q.   Well, I am sorry.  I am talking about your

10   expert witness report.

11     A.   Well, you said Exhibit 3.

12     Q.   I did, and I misidentified it.  Thank you for

13   correcting me.  I was going to ask you about that

14   anyway.

15          So, now let's go to Exhibit 4.

16     A.   The independent review, there have been no

17   changes made to this document since January 2nd of 2018,

18   except for the notes that I wrote in the margin to

19   myself this morning when I was reviewing this document.

20     Q.   Okay.  So, let's take a look at those notes.

21   The first one I see appears in the bottom of page 2 of

22   Exhibit 4; is that correct?

23     A.   Yes.

24          MR. TUCKER:  Hold on a second.  I have a copy

25     with the notes.

Page 60

1    BY MR. MEAGHER:

2        Q.   Taking a look at --

3             THE WITNESS:  You have the handwritten note on

4        it?  Page 2.  There you go.

5    BY MR. MEAGHER:

6        Q.   Page 2, it says firstly, the most complex test

7    on that group of measures is the fourth in a series of

8    very similar tests and thus an alternative explanation

9    could be posted; that once she adapted to the novelty,

10   became familiar with the test, had opportunity to

11   practice, and was more comfortable with the procedure

12   she did better.  Now, it appears that you underlined

13   "she did better;" is that correct?

14       A.   Yes.

15       Q.   And then what did you write underneath that

16   sentence?

17       A.   In reading that my thought was that could have

18   been better worded, and it should have stated -- or

19   could have made the point more clearly, was able to

20   perform up to her true ability level, instead of just

21   simply stating she did better.  I did more specific

22   indication of what I was trying to get at there.

23       Q.   Now, what you were talking about here was the

24   WAIS-IV testing; is that correct?

25       A.   This particular passage, no.  This is about the

Costa vs. Metropolitan                                    May 10, 2018

Page 61

1    DKEFs, Processing Speed Tests.

2         Q.    I see.   D-K-E-F-S; is that correct?

3         A.    Yes.

4         Q.    And this is a group of tests that have four

5    subparts; is that correct?

6         A.    Yes.

7         Q.    And they increase in complexity as you proceed

8    through the subparts; is that fair to say?

9         A.    Yes.

10        Q.    And the first subpart is basically finding a

11   symbol in a group of other symbols; is that correct?

12        A.    I believe so.   This test I do not give

13   frequently and I, probably, have given it twice in 10

14   years.   So, I am not that familiar with it.

15        Q.    Well --

16        A.    I have looked at it.   I saw Dr. Vanderploeg's

17   copies of it.

18        Q.    Well, did you look at it prior to giving it to

19   her?

20        A.    I didn't give her that test.

21        Q.    Who gave her that test?

22        A.    Dr. Vanderploeg gave her this test.

23        Q.    So, this is a criticism that you are giving of

24   Dr. Vanderploeg's interpretation of those test results?

25        A.    Yes.

Costa vs. Metropolitan                              May 10, 2018

Page 62

1      Q.   And those test results -- to simplify it and

2   tell me if it is an inaccurate simplification -- is that

3   she did better on the easier test of that four-part test

4   than she did on the harder part of the test; is that a

5   fair summary?

6      A.   No.  She did better on the harder parts than

7   the easy parts.

8      Q.   Which are the hardest parts?  So, she did worse

9   on the third and fourth part than the first part?

10     A.   No, no.  It gets progressively harder.  She did

11  better on the harder stuff.  Did worse on the easy

12  stuff.

13     Q.   That is what I thought I said, and if I

14  misspoke, I apologize.

15          So, to summarize, she did better on the harder

16  parts than she did on the easier parts?

17     A.   Yes.

18     Q.   In other words, her worse score was on the

19  first step where you are only required to see whether a

20  symbol that you are given is contained in a group of

21  symbols, correct?

22     A.   Yes.

23     Q.   If you know.  You may not know.

24     A.   If that's the way the first test is arranged,

25  yes.

Costa vs. Metropolitan                                    May 10, 2018

Page 63

1      Q.   But since this is a rare test for you, you

2   don't really remember?

3      A.   I don't remember exactly what the first subtest

4   is of it.  I know the second, third, fourth ones are

5   more consistent with what I gave her, the Trailmaking

6   Test, where you have an easier version trails A, and

7   it's just simply connect the dots, and then a more

8   complex version trails B where you alternate your

9   attention and shift back and forth between two different

10  stimuli.  And that would be consistent with the series

11  of progression of increasing complexity on these tests

12  than the DKEFS, except this goes into four different

13  subtests versus just two.

14     Q.   Well, you don't consider yourself an expert on

15  the DKEFS test; is that fair to say?

16     A.   What do you mean by expert?

17     Q.   Meaning that, do you believe -- do you believe

18  that your understanding of the DKEFS test is better than

19  Dr. Vanderploeg's who administered it?

20     A.   No, I do not.

21     Q.   So, you provided an alternative explanation in

22  your report for her doing better on the harder parts of

23  that test; correct?

24     A.   That is correct.

25     Q.   And the explanation you give as a quote,

Costa vs. Metropolitan                                    May 10, 2018

Page 64

1    "alternative explanation," closed quote, you say quote,

2    "could be," closed quote.  So, it's possible is what you

3    are saying is an alternative explanation?

4        A.   Yes.

5        Q.   You are not saying it is the explanation?  You

6    are just saying this is a possibility?

7        A.   That is correct.

8        Q.   And you are saying it's possible that as she

9    adopted -- adapted to the novelty of the test and became

10   familiar with it and had the opportunity to practice and

11   became more comfortable she was able to perform up to

12   her true ability level; is that correct?

13       A.   That's correct.

14       Q.   Now, you have no data showing that, supporting

15   that alternative explanation, correct?

16       A.   No.   That is correct.

17       Q.   And, in other words, these tests have been

18   normed over given to thousands of people; is that fair

19   to say?

20       A.   Yes.

21       Q.   Over -- well, we don't know how many years this

22   test has been around.  Do you know how long the DKEFS

23   Test has been around?

24       A.   10 to 15 years.

25       Q.   So, you know of no studies of that test that

Costa vs. Metropolitan                                    May 10, 2018

Page 65

1    supports your alternative explanation that she became

2    more comfortable and learned the test, etcetera, and

3    that improved her scores, correct?

4        A.   As in regards to that particular test, no, I am

5    not.

6        Q.   You were talking about a mere possibility,

7    right?

8        A.   I am talking about a possibility based upon our

9    knowledge that with increasing familiarity we become

10   better at being able to do a task, and this test gives

11   you several opportunities to, kind of, warm up to the

12   difficulty of the more complex test.

13       Q.   Do you -- have you ever heard of a phrase of --

14   do you believe the DKEFS Test was testing separate and

15   independent areas of brain functioning or those in the

16   anatomical neighborhood of the same region?

17            MR. TUCKER:  Object to form.

18            THE WITNESS:  Are we still talking --

19   BY MR. MEAGHER:

20       Q.   You can answer.

21       A.   Are we still talking about the DKEFS Processing

22   Test or the whole DKEFS?

23       Q.   I am talking about the test that you are

24   talking about there, the four-part DKEFS Test.

25       A.   Okay.  Then your question was?

Page 66

1      Q.    Your question was: Do you believe that these

2   different parts of the test involve separate and

3   independent areas of the brain; if you know?

4      A.    Yes, they do.

5      Q.    What are anatomical neighborhood signs?

6      A.    That is where performance on a test of motor

7   processing speed will show similar level of performance

8   on very similar tests of motor processing speed.

9      Q.    Or they may not show similar performance and

10   that is a question that has to be answered, correct?

11      A.    That's correct.

12      Q.    Isn't it true that that was her situation,

13   where she showed different results, contradictory

14   results on tests of the same anatomical neighborhood?

15      A.    That is correct.

16      Q.    What is your explanation for those differing

17   results, if you have one?

18      A.    It's stated in my report here that with -- with

19   familiarity with comfort, with practice, she is able to

20   perform better on a very similar task even though the

21   complexity of the task gets greater.

22      Q.    And just to be clear, you have no data

23   supporting that specifically to the DKEFS Test, correct?

24      A.    That's correct.

25            (Defendant's Exhibit 6 marked for

Page 67

1       identification)

2    BY MR. MEAGHER:

3       Q.   Let me hand you Defense Exhibit 6.  And can you

4    identify this as being Dr. Rodney Vanderploeg's medical

5    examination that he performed on Ms. Costa in October of

6    2016 -- actually, October 22, 2016?

7       A.   It would appear to be that is what this is.

8       Q.   Would you agree that Dr. Vanderploeg's testing

9    of Ms. Costa was more extensive than your testing?

10      A.   No, I would not.

11      Q.   Did he perform multiple free-standing

12   performance validity tests?

13      A.   Yes, I believe he did.

14      Q.   And you only gave one, correct?

15      A.   That's correct.

16      Q.   So, in that regard, he provided more testing to

17   her on that issue, right?

18      A.   He gave her one more test, performance

19   validity, than I did; that's correct.

20      Q.   Well, another way to put it, he gave twice as

21   many as you did, right?

22      A.   You could accurately state it that way, yes.

23      Q.   You gave the Personal Assessment Inventory to

24   assess psychological functioning but not the MMPI-2,

25   correct?

Costa vs. Metropolitan                          May 10, 2018

Page 68

1       A.    That is correct.  It's called Personality

2   Assessment Inventory, just to -

3       Q.    My apologies.  Thank you for correcting me.

4             Is that also known as the PAI?

5       A.    Yes, it is.

6       Q.    Would you agree that the PAI has fewer and less

7   sensitive validity scales as compared to the MMPI-2?

8       A.    I would agree that it has fewer validity

9   scales, but I would not agree that they are less

10  sensitive.

11      Q.    Do you know of any data supporting that

12  conclusion, that is what you have just stated, that the

13  PAI is just as sensitive on validity scales as the

14  MMPI-2?

15      A.    I don't know of any data that says the MMPI is

16  less sensitive on its validity data than the MMPI is on

17  its validity data.

18      Q.    I think you used MMPI twice in that sentence.

19  Can you restate that.

20      A.    I am sorry.

21            To the best of my knowledge, I do not know of

22  any research indicating that the validity scales on the

23  PAI are any less sensitive than the MMPI.  Did I get it

24  right that time?

25      Q.    Yes.  I mean, I think that is what you meant to

Page 69

1    say.  I am not saying it's right.  But you said to the

2    best of your knowledge, correct?

3         A.   Yes.

4         Q.   So, it is right.

5              You put in your report that you reviewed

6    medical records of Ms. Costa.  Where are those?

7         A.   It's in this packet here that I brought for

8    you.

9         Q.   So, the documents --

10        A.   Do you want me to find it?

11        Q.   Yes.  The documents that we marked as

12   Exhibit 5.

13        A.   There you go (indicating).  I don't know --

14   yes, that is from his office, and that is from his

15   office, and that is from his office.  That is the extent

16   of the medical records I had when I did her clinical

17   evaluation.

18             (Defendant's Exhibit 7 marked for

19             identification)

20   BY MR. MEAGHER:

21        Q.   So, I am going to mark as Exhibit 7, the first

22   page of the three pages of medical records that you said

23   you reviewed prior to doing your medical examination of

24   Ms. Costa in March of 2016; is that correct?

25        A.   That's correct.

Page 70

1      Q.    Who provided these to you?

2      A.    Dr. Madden's office.

3      Q.    So, the first page -- we can just look at it.

4   Do you have a copy there?

5      A.    No.

6      Q.    We can look at it together.  The first page is

7   a patient registration form, correct?

8      A.    Um-hum.

9      Q.    Correct?

10     A.    Yes.

11     Q.    Now, that is from Dr. Madden's office and not

12   yours?

13     A.    That is correct.

14     Q.    The second is a follow-up office visit note of

15   date of service January 5, 2016, correct?

16     A.    That is what is stated there, yes.

17     Q.    Did you review this document?

18     A.    Yes, I did.

19     Q.    And what was significant in this document to

20   you prior to performing your exam on her in 2016?

21     A.    That she had some marked problems with her

22   gait; question of sleep problems.

23     Q.    Anything else?

24     A.    Internuclear ophthalmoplegia, which is not

25   something I am qualified to describe or define.  It's a

Costa vs. Metropolitan                                    May 10, 2018

Page 71

1    medical term.  Cervical pain, and frontal processing

2    errors.  So, essentially this is an overview of her

3    presenting complaints to him, the frontal processing

4    errors, okay.  In my evaluation I know I need to take a

5    close look at frontal lobe functions for her.

6        Q.   Now, did you have an understanding that Dr.

7    Madden had found frontal processing errors from your

8    review of that document?

9        A.   I couldn't see on there what the frontal

10   processing errors were that he was referring to.

11       Q.   So, you don't know whether that came from the

12   patient self-report or something Dr. Madden found on his

13   examination as a neurologist; is that fair?

14       A.   That's correct.

15       Q.   And the third and last page of the medical

16   records you had is ancillary testing?

17       A.   Essentially this is the referral to me for

18   neuropsychological testing.  And again, the frontal

19   processing errors and memory problems.

20       Q.   So, you really only had one page of medical

21   records; is that fair?

22       A.   Yes.

23       Q.   The other two were administrative?

24       A.   That's correct.

25       Q.   In your report do you list the documents that

Costa vs. Metropolitan                                    May 10, 2018

Page 72

1    you reviewed?

2         A.    I don't spell them out in a separate heading.

3    I just on page --

4         Q.    2?

5         A.    I think page 1 is all that she told me.  Page 2

6    is -- the second paragraph on page 2 refers to the

7    report -- the neuropsychological evaluation that was

8    done by Dr. Bowers that I did get a copy of and did

9    review.

10        Q.    Is that in the materials you brought here

11   today?

12        A.    I believe it is, yes.

13        Q.    Okay.

14        A.    I don't think I have anything that specifically

15   said, according to the evaluation that was done by Dr.

16   Madden on January 5th, here were his findings.  I didn't

17   specifically report that.

18        Q.    Okay.

19        A.    I think I just merged what she told me in what

20   I got from that into the background information section

21   of the report, page 1 in the top part of page 2.

22        Q.    In Exhibit 2, your expert witness report here,

23   at the very beginning you say you have medical records

24   from 2010 to present.

25        A.    Yes.

Page 73

1       Q.   Are those just the records we just discussed,

2   or did you review additional medical records in addition

3   to what you have produced here today?

4       A.   For my clinical evaluation that I did in 2015?

5       Q.   I am talking about now everything you reviewed.

6       A.   For this, yes, I have those.

7       Q.   Did you bring them?

8       A.   No, I did not.

9       Q.   Why not?  The subpoena asked for them.

10      A.   It was hundreds of pages of files that were

11  electronically delivered to me by counsel, and I don't

12  know that you didn't already have a copy of them.  If

13  you want them, I will get them to you.

14      Q.   Yes, I would like for you to electronically

15  transmit them to us after the deposition and we will see

16  whether we have any questions about them.

17      A.   All right.

18           THE WITNESS:  Did they not get copies?  Can I

19      ask you that?  Okay.  All right.

20  BY MR. MEAGHER:

21      Q.   You say hundreds of pages.  Do you know whether

22  any of those medical records included examinations

23  performed to Ms. Costa at John Hopkins University?

24      A.   I believe some of those were in there.

25      Q.   And what did they show, if you recall?

Page 74

1      A.    They were examinations for ruling out lupus or

2    multiple sclerosis or other autoimmune type disorders

3    that I believe was primarily on the recommendation of

4    Dr. Madden that she go up and get those done.

5      Q.    Do you recall whether they in fact ruled out

6    any autoimmune disorders?

7      A.    To the best of my recollection of those, there

8    was no definitive ruling out of any disorder.  There was

9    statements more along the line of consistent with but

10    not clearly diagnostic of we are not sure.

11      Q.    So, is it your understanding as we sit here

12    today they are still actively pursuing whether Ms. Costa

13    has multiple sclerosis?

14      A.    I don't know the status of that.

15      Q.    And your understanding is that they have not --

16    well, do you know whether they have told Ms. Costa not

17    to worry about MS and autoimmune disorders because the

18    testing doesn't indicate she has any of that?

19      A.    I don't know what they have told us because I

20    have not communicated with her.

21      Q.    Well, off the record said that, you would have

22    seen it?  Did you see that in the records?

23      A.    I don't recall the records saying we told Ms.

24    Costa this.

25      Q.    Were there any records from Brigham and Women's

Page 75

1  Hospital?

2      A.    Probably.

3      Q.    Where is that located?

4      A.    Where is Brigham and Women's Hospital?

5      Q.    Yes.

6      A.    It's in Massachusetts.  Boston, I believe.

7      Q.    Do you know who they are affiliated with?

8      A.    I believe it's Harvard.

9      Q.    Do you recall seeing any Brigham and Women's

10  Hospital records?

11     A.    I think so.

12     Q.    Do you recall the conclusion as to there being

13  no MS?

14     A.    To the best of my recollection, is that they

15  are not conclusive.

16     Q.    But we don't have those here with you today so

17  we can check, right?

18     A.    Right.

19     Q.    When we -- do you believe that Dr.

20  Vanderploeg's examination was more comprehensive than

21  yours?

22     A.    No.

23     Q.    Would you agree with me that he had vastly more

24  medical records for Ms. Costa than the single page you

25  had?

Costa vs. Metropolitan                                              May 10, 2018

Page 76

1       A.    Yes.

2       Q.    But that in your opinion doesn't make it more

3    comprehensive in any manner?

4       A.    He had more medical information on her

5    background than I did.

6       Q.    Do you think that is helpful to an examiner?

7       A.    That didn't mean that he did better or more

8    neuropsychological assessment than I did.  It just means

9    he had more background information than I did.  And at

10   the time that I did my evaluation those records weren't

11   even done yet, to the best of my recollection.

12      Q.    How do you know?

13      A.    Because I believe all of the records that were

14   given to me to review were done after the time I had

15   seen her.  Because I believe Dr. Madden had recommended

16   that she go up to Massachusetts, Brigham and Women's,

17   but I don't believe she had been there yet by the time I

18   had seen her.

19      Q.    What about Dr. Madden's office chart, do you

20   think the first time he saw her was the date of the

21   single-page date of service that you got?

22      A.    It says a follow-up office visit at the top of

23   the page.  I would presume that would mean that he had

24   seen her before.

25      Q.    Well, assuming that he began to see her in

Costa vs. Metropolitan                    May 10, 2018

Page 77

1   2015, would you agree with me that Dr. Vanderploeg had

2   more of her treating physician records than you did at

3   the time of the examination?

4       A.   Yes.

5       Q.   But you still say we don't know if it's a more

6   comprehensive exam, just more information was available

7   to Mr. Vanderploeg; is that your position?

8       A.   Yes.

9       Q.   You make comments in the report about Ms. Costa

10  has declined from premorbid cognitive functioning; is

11  that correct?

12      A.   I am sure that is, probably, stated at some

13  point in my report.

14      Q.   Could you find out where you would state such a

15  thing.

16      A.   Well, I certainly would say it in the

17  conclusions on page 7.

18      Q.   And read to me what you wrote there.

19      A.   Well, compared to her prior testing she was

20  demonstrating some persisting and progressive deficits

21  in visual motor and visual scanning processing speed,

22  fine motor speed and dexterity.

23      Q.   Where are you reading?

24      A.   I am sorry.  Third paragraph down, page 7.

25      Q.   Okay.

Page 78

1       A.    That is just compared to her prior testing.   I

2    think that -- let's see.  I don't think I specifically

3    stated in the conclusions specifically that these were

4    cognitive declines compared to premorbid.  I just said

5    demonstrate predominant deficits and processing speed

6    and motor speed.

7       Q.    Take a look at, if you would, clinical

8    impressions where you write, quote, premorbid

9    intellectual ability was predicted to be in the average

10   to high average range while current estimates suggest a

11   marked decline compared to prior levels, closed quote.

12   Is that what you wrote?

13      A.    Yes.

14      Q.    How did you determine her premorbid

15   functioning?

16      A.    The Wechsler Test of Premorbid Functioning.

17      Q.    And what was her score on that test?

18      A.    Her score on that test would suggest that her

19   premorbid intellectual ability was 107.

20      Q.    What was her score?

21      A.    With a standard -- okay.  What was her score?

22      Q.    Yes.

23      A.    The way that test works is it's a list of words

24   that you read and your raw score is how many words did

25   you correctly pronounce, and then you enter that into a

Page 79

1    computer program that takes that score, her age, gender,

2    region of education, what region of the country you are

3    educated in, your race, your age, education, where you

4    were educated; and comes up with this score that is an

5    estimate of what her premorbid intellectual ability,

6    probably, was within a standard of error of,

7    approximately, 15 points, one way or the other.  So, in

8    other words, her IQ premorbidly could be estimated to

9    range somewhere between 92 and 122.

10       Q.   And she scored at 107?

11       A.   This gives you the middle of that distribution

12   range.

13       Q.   Well, her score --

14       A.   That is what this score says.

15       Q.   So, she had average premorbid functioning?

16       A.   That is what that test says, yes.

17       Q.   And did Dr. Vanderploeg perform that test also?

18       A.   I believe he did.

19       Q.   It's the TOPF, right?

20       A.   That's correct.

21       Q.   Test of Premorbid Functioning.

22       A.   Do you want me to look it up?

23       Q.   Yes, please.

24       A.   Okay.

25       Q.   Maybe -- you did a summary of all the test

Page 80

1    results for Dr. Bowers, Vanderploeg and your yourself as

2    part of your expert witness report. Do you recall that?

3         A.    I compared the scores between all of those,

4    yes.

5              If this is what he administered, he says that

6    her premorbid IQ was 107.

7         Q.    Same as yours, right?

8         A.    Yes.

9         Q.    And so, what did -- so, at least on that test

10   result, in the two years there had been no decline for

11   that one task, correct?

12        A.    Presuming that he actually gave her this test

13   and he wasn't just reporting that this was the scores

14   that I got. I am not sure.

15        Q.    Well, I believe he did but you can check.

16        A.    I would assume he did it himself. And that if

17   he did use mine, then he should have cited it. So, I am

18   guessing that he, probably, did. But he didn't list

19   tests administered in a separate section like I did.

20   So, it would take a little digging.

21        Q.    Did Dr. Bowers perform the TOPF?

22        A.    I don't believe so.

23        Q.    Could you take a look, please.

24        A.    Yes, I am looking. No, she did not.

25        Q.    So, on what basis -- so, you have given me the

Costa vs. Metropolitan                    May 10, 2018

Page 81

1   range.  What is the range of premorbid IQ?  98 to 122,

2   is that what you said?

3        A.   I can't quote you the exact standard error on

4   that test, but in general it's about 15 points one way

5   or the other.  So, it, probably, ranges somewhere

6   between 92 and 122.  And to give you an example of what

7   I mean by that is that if we gave her that test 100

8   times, 95 out of those times her score would range

9   somewhere between 92 and 122.

10       Q.   So, she was in the average range of premorbid

11   intellectual functioning according to this test,

12   correct?

13       A.   Correct.

14       Q.   So, why did you put in your report that she was

15   predicted to be in the quote, average to high average

16   range?

17       A.   Because this was based on what just word

18   reading would give you, and with a -- because -- like I

19   said, it could be 15 points one way or the other.  92 is

20   still in the average range.  122 is a superior range.

21   But everything between 110 and 120 is high average.  So,

22   it could have been anywhere in the average to high

23   average range with a 95 percent degree of certainty.

24       Q.   Well, it could have been in the low average

25   range too?

Page 82

1    A.    No.

2    Q.    Why not?

3    A.    5 percent chance that it could be.

4    Q.    Okay.  So, you don't know, right?

5    A.    No, we don't.  This is the best that we can do.

6    Q.    And she scored a 107, which is -- let me see --

7    15 higher than the low point of 92 and 15 lower than the

8    high point of 122.  But you are assuming that she is up

9    at the 122 range premorbid.  Is that the way you

10   interpret this test?

11   A.    The way I interpreted the test was 107 was the

12   midpoint of the range between what would be 92 and 122,

13   and most of that range would be in the average to high

14   average range.  107 is pushing the upper ends of the

15   average range.  110 is where you start high average.

16   So, this is only 3 points away from high average.

17         When you have got a 30 point range of scores,

18   it's easier to say it's more than likely between average

19   and high average.

20   Q.    But you don't know where it falls?

21   A.    I have no idea where it falls.  It could have

22   been in the borderline of impaired range for all I know.

23   Q.    Premorbid?

24   A.    Premorbid.  It could have been in the superior

25   range too.  I don't know.

Costa vs. Metropolitan                                    May 10, 2018

Page 83

1     Q.   You answered how you interpreted -- past

2  tense -- that test.  Now that you have seen there are

3  two results identical, does that affect your opinion as

4  to whether she is properly considered to be in the

5  average or high average range of premorbid intellectual

6  functioning?

7     A.   I would say that that gives us a greater degree

8  of certainty that her premorbid intellectual ability is

9  somewhere to the average to high average range.

10    Q.   Why high average again if she scored the

11 identical score of 107?  You are just using the

12 15 points and --

13    A.   Because the standard error of measures is,

14 approximately, 15 points; and that allows me to go from

15 92, which is average, to 122, which is superior.

16    Q.   Even though she scored only 107?

17    A.   Right.  But again, we still don't know.  He

18 gave her the same test that I did.  He is relaying the

19 same level of certainty that I did.

20    Q.   And he is saying it's average premorbid

21 functioning, correct?

22    A.   Yes.

23    Q.   Would you agree with me that a

24 neuropsychological testing a significant statistical

25 difference is not necessarily clinically meaningful?

Costa vs. Metropolitan                                        May 10, 2018

Page 84

1     A.   Do you want me to explain what that means?

2     Q.   No. I said, do you agree with that statement?

3     A.   Yes, I agree with that.

4     Q.   Now you can explain what your understanding of

5     what my statement is.

6     A.   Let me give you a good example.  Years ago they

7     used to say that African Americans scored significantly

8     lower on IQ tests than white people did.  In actuality,

9     the difference in the scores was statistically

10    significant, but it was clinically meaningless, because

11    the difference was actually only about 3 to 4 points.

12         If you get a thousand people and the average

13    difference between them is 5 points, that is

14    statistically significant; but in a clinical sense that

15    5 points is really meaningless because that is just not

16    that much difference.  But when you are looking at

17    statistics, that is a different thing than clinical

18    significance is.  Clinical significance gets more

19    functional abilities, statistical significance, gets

20    more at according to just pure numbers what is

21    significant.

22    Q.   What performance -- what test performed in your

23    examination of Ms. Costa did you believe indicated a

24    significant decline from her premorbid average

25    functioning?

Costa vs. Metropolitan                           May 10, 2018

Page 85

1    A.    Her ability to process information quickly and

2    efficiently.

3    Q.    That is shown by what?  I am sorry.  What

4    specific test?  You talked about her ability to process

5    quickly.

6    A.    That would be -- you want the specific test?

7    Q.    Yes, sir, please.

8    A.    Trails A and B, the Wechsler Coding Subtest and

9    Symbol Search Subtest and the Stroop Color Word Test.

10   Those are all measures that predominantly rely on

11   efficient processing of information quickly.

12   Q.    Have you ever heard of a Dr. Kyle Boone in the

13   area of psychology?

14   A.    Um-hum.

15   Q.    You have to answer verbally.

16   A.    Yes.

17   Q.    Are you aware of Dr. Kyle Boone's research that

18   has shown the typical pattern for high IQ individuals

19   that have particular strength in circumscribed areas

20   with remaining skills average or perhaps even lower?

21   A.    Yes, I am familiar with that.

22   Q.    Are you aware of research that demonstrates

23   that marked intraindividual variability performance is

24   very common in normal adults, particularly with persons

25   with a high IQ?

Costa vs. Metropolitan                                          May 10, 2018

1      A.    Yes, I am familiar with that.

2      Q.    Are you aware of Schreklin's findings -- have

3  you ever heard of a Dr. Schreklin (phonetic)?

4      A.    I know the name, yes.

5      Q.    Are you aware of Schreklin's findings in 2003

6  that found that 66 percent of 197 healthy adults had

7  discrepancies of 3 or 4 more standard deviations between

8  the highest and lowest test scores in a battery of 32

9  neuropsychological measures?

10     A.    I am not familiar with that particular study,

11  but that sounds very familiar.

12     Q.    Would you disagree with -- is it true that

13  there is considerable variability in cognitive test

14  performance with persons without a history of neurologic

15  injury and without psychological disorder?

16     A.    Yes, that is true.

17     Q.    You reported Ms. Costa demonstrated deficits in

18  processing speed?

19     A.    Yes.

20     Q.    You just mentioned that, correct?

21     A.    Yes.

22     Q.    On these measures in your exam, the Simple

23  Search and Coding, she obtained scale scores of 7 and 8;

24  is that correct?

25     A.    Yes; that's correct.

Page 87

1    Q.   Why are you viewing these as average to low

2  average scores?

3    A.   Because that is where those scale scores fall

4  within the low average range.

5    Q.   According to the test parameters?

6    A.   Yes.

7    Q.   What are the test parameters for average on

8  that -- those tests?

9    A.   You mean the score on the test?

10   Q.   Yes, the range.

11   A.   What do you call the average range?  The

12  average range is 90 to 110 -- or 91 to 110.

13   Q.   Well, I am talking scale scores, because you

14  used 7 and 8.

15   A.   8 is the cusp between average and low average.

16  9 is average.  10 is average.  11 is average.  12 is

17  average to high average.  7 is low average.  6 is

18  borderline impaired.  So, a 7 and 8, 7 is smack in the

19  middle of low average range, the 8 is right between

20  average and low average.

21   Q.   Are you interpreting any low average range of

22  performance that is indicating that Ms. Costa has

23  experienced cognitive decline?

24   A.   Yes.

25   Q.   How do you do that in light of your agreement

Costa vs. Metropolitan                                      May 10, 2018

Page 88

 1    with my earlier statements that there is score

 2    variability up to -- was it 3 --

 3        A.   Standard deviations.

 4        Q.   Standard deviations on people in testing?

 5        A.   I can't say with 100 percent certainty that

 6    these do not represent just normal variability.

 7        Q.   Can you even say it with probability that they

 8    do?

 9        A.   I am afraid that if I say yes that you will ask

10    me to assign a number to it.  I can't really assign a

11    number to it.  It's probable.

12        Q.   Well, when you say --

13        A.   Yes.

14        Q.   When you say probable, are you talking really

15    just possible based upon your opinion or --

16        A.   No.

17        Q.   -- you can tell us that it is probable?

18        A.   I can tell you that it's probable.

19        Q.   What is probable, just so we are clear?

20        A.   That the scores that appear to be significant

21    departures from premorbid function are in fact nothing

22    than just relative lifelong weaknesses that she's always

23    had.

24        Q.   And as the basis for that you are considering

25    her premorbid functioning to be high average?

Page 89

1    A.    Average to high average range, yes.

2    Q.    Up to 122, correct?

3    A.    Correct.

4    Q.    Do you agree that the actual premorbid

5    functioning test score is the most important indicator

6    of what her premorbid functioning was?

7    A.    No.

8    Q.    Do you believe that all attorneys are in the

9    high average IQ range?

10   A.    No.

11   Q.    That is shown to be not true, right?

12   A.    I don't know the research that demonstrates

13   that, but just based on general variability I would

14   assume that that holds for physicians and lawyers and

15   psychologists and most other professions.

16   Q.    That is, you may find any range from low

17   average people who really apply themselves to high

18   average or genuses, right --

19   A.    Right.

20   Q.    -- in any particular occupation?

21   A.    Correct.

22   Q.    So, you can't assume from someone's job or

23   occupation how smart they are with regard to IQ; fair?

24   A.    That is correct.

25   Q.    If you can take a look at the 2010 neuropsych

Costa vs. Metropolitan                              May 10, 2018

Page 90

1   examination by Dr. Bowers that is in your materials.

2       A.   Yeah; it's right here.

3       Q.   She pointed out -- you can find the area where

4   she talked about her slowness in performance of certain

5   tests was a stylistic problem.  Do you recall that?

6   Triple checking, I think she used that phrase.

7       A.   I don't recall her using that phrase.  I would

8   have to read through this whole thing.  If you can cite

9   a page and paragraph.

10      Q.   Sure.  Her phrase was over thinking.  I am

11  sorry.  Do you recall that.  It's on page --

12      A.   Yes, page 4; or did it go onto the next one?

13      Q.   It says -- where is it?  It's under first and

14  most concerning.

15      A.   Yes.

16      Q.   And then the next --

17      A.   In part this was due to her over thinking the

18  task.

19      Q.   Do you recall Dr. Vanderploeg saying that her

20  slowness of performance in the symbol search was a

21  result of her triple checking her results?

22      A.   Yes.

23      Q.   In other words, she wanted to be very careful

24  to get it right?

25      A.   Yes.

Costa vs. Metropolitan                                    May 10, 2018

Page 91

1      Q.   Do you consider that a cognitive impairment or

2   a stylistic choice?

3      A.   I do not know.

4      Q.   Well, we know that -- at least from the report

5   of Dr. Bowers, is that she saw an element of over

6   thinking in Ms. Costa's response, correct?

7      A.   Correct.

8      Q.   And this was back in 2010, right?

9      A.   Correct.

10     Q.   And as far as you know, she was practicing law

11   in 2010, right?

12     A.   Correct.

13     Q.   And was through the time you examined her,

14   according to what you knew, right?

15     A.   That is correct.

16     Q.   Her results on fingertapping in your

17   examination, could you go to those, please.

18     A.   Yes.

19     Q.   What was her score on fingertapping?

20     A.   She averaged 20 and a half taps per trial with

21   her left hand and 23 taps per trial on the right.

22     Q.   So, we are looking at a combined score of 43

23   for finger taps?  Is that how we do it?

24     A.   That would be a combined score, but that is not

25   how we score it.

Costa vs. Metropolitan                          May 10, 2018

Page 92

1      Q.   Let me ask you this: Did that put her in the

2  impaired?

3      A.   Yes.

4      Q.   In fact, it was implausible that she would have

5  those results; is that fair?

6      A.   It's possible, yes.

7      Q.   No.  I said implausible.

8      A.   Oh, implausible.  No, it's not implausible that

9  she could have those.

10     Q.   What were her finger tap scores with Dr.

11  Bowers?

12     A.   32 left and 31 right.

13     Q.   And how about with Dr. Vanderploeg?·

14     A.   I don't know, because he didn't administer the

15  test in a valid manner.

16     Q.   Because he didn't have the finger tap

17  mechanism?

18    ·A.   That's correct.

19     Q. .  Do you know whether or not having the finger

20  tap mechanism would actually show a lower score?

21     A.   I have no idea what it would do.

22     Q.   Well, just humor me and take a look at scores

23  even in an invalid manner and tell me what they were,

24  please.

25     A.   Okay.  34 left and 33 and a half right.

1     Q.   So, if we look at Dr. Vanderploeg and Dr.

2  Bowers' reports, they are virtually identical, right?

3     A.   Yes.

4     Q.   Yours, however, are -- what were they?  In the

5  20s?

6     A.   Yes.

7     Q.   But you believe yours are some indication of

8  cognitive impairment or what?

9     A.   I believe that there was something going on

10  that caused her to have those scores that low that was

11  either in her brain or somewhere peripheral to that.

12     Q.   In her brain or conscious, right?  You don't

13  know?

14     A.   I don't know.

15     Q.   You would agree with me that of those three

16  examinations of the same thing, you are the outliner,

17  not Dr. Bowers or Dr. Vanderploeg, correct?

18     A.   That's correct.

19     Q.   Are you judging from that single test result --

20  are you giving significance to that single test results

21  for the basis for any of your conclusions about

22  cognitive impairment?

23     A.   No, I am not.

24     Q.   You threw that one out, kind of, like the

25  Russian judge score in the diving competition at the

Page 94

1    Olympics?

2        A.   No.   I used it in addition to other scores that

3    in my opinion were significantly below to where they

4    should be.

5        Q.   And which were those again?   Did you give me

6    those already?

7        A.   Yes.

8        Q.   The Stroop?

9        A.   Stroop, Trails, Coding and Symbol Search.

10   Yeah.

11       Q.   Now, did Ms. Costa improve on any test results

12   between her examination with Dr. Bowers and yours?

13       A.   I believe she did, yes.   Yes, she did.

14       Q.   Which ones did she improve on?

15       A.   She improved on the Boston Naming Test and

16   Lexical Fluency and on the Wisconsin.

17       Q.   Wisconsin Card Sorting?

18       A.   Card Sorting, yes.

19       Q.   Any others?

20       A.   I believe those were the ones where we saw the

21   biggest change.

22       Q.   Could you show me in your report where you note

23   those positive changes on her neurological findings.

24       A.   Page 7, third paragraph, compared to her prior

25   testing.

Page 95

1      Q.    Hold on.  Let me find it.

2      A.    Sure.

3      Q.    Third paragraph.  Well, here you are saying

4    there is --

5      A.    In the very last -- the last two lines, in a

6    few areas of near resumption of prior expected levels of

7    functioning(naming, lexical fluency, problem solving).

8    Problem solving is the Wisconsin.

9      Q.    Well, you say "near resumption of prior

10   expected levels," but actually she has improved from her

11   levels in 2010, correct?

12     A.    Right.

13     Q.    So's not a resumption to improve.

14     A.    She went down here to up here.

15     Q.    And you think that is resuming?  Like when I am

16   driving and I have my car at 55 and then I slow down to

17   35, I resume by going back to 55, right?

18     A.    That is the implication of that statement, yes.

19     Q.    So, you are assuming that she was better before

20   she saw Dr. Bowers; is that correct?  Explain how you

21   are using resuming, because I don't understand it.

22     A.    In other words, I think that that was her level

23   of ability before she saw Dr. Bowers, and for whatever

24   reason her performance on those tests was better at the

25   time that I saw her.  And it was back up to the level

Page 96

1    near where I would expect it to be.

2        Q.    So, she was actually in a worse state of

3    neuropsychological functioning in 2010 when she saw Dr.

4    Bowers than she was when she saw you?

5        A.    On those particular tests she was.

6        Q.    And she was practicing law.  Do you know how

7    she was managing to do that?

8        A.    No, I do not.

9        Q.    Because she might not have been impaired even

10   with those test results, correct?

11       A.    That is correct.

12       Q.    And even with your test results she might not

13   be impaired?

14       A.    That's correct.

15       Q.    Other than that mention in the report of this

16   resumption of prior expected levels of functioning, is

17   there any other mention of this improvement on test

18   scores?

19       A.    No.  Those were the main ones.

20       Q.    Would you agree with me that this pattern of

21   improved performance does not support a conclusion that

22   she has neurological disorder?

23       A.    No, I would not.

24       Q.    Do you know if any neurologist has found her to

25   have any organic neurological disorder as we sit here

Page 97

1    today?

2         A.   Yes.

3         Q.   Who?

4         A.   Dr. Madden.

5         Q.   What is his diagnosis of neurological disorder?

6         A.   He pointed out that there was an MRI record he

7    reviewed and found there were signs of an old stroke or

8    lacunar infarct -- or I think somebody else's report

9    called it little black holes in her cerebellum,

10   specifically the petiole of the cerebellum.  So, there

11   is an organic damage that was identified after I saw

12   her.

13        Q.   Okay.  So, it's your understanding that Dr.

14   Madden has determined that this petiole finding impairs

15   her in some manner?

16        A.   I don't know what his impressions have been

17   since I saw her, other than I think the one or two

18   additional records I got that were done shortly after I

19   saw her where he got some additional records from

20   Brigham and Williams, or wherever he got them from, that

21   he referenced this MRI showing this thing.  I don't know

22   what his diagnostic impressions were beyond the point of

23   time of the letter -- the record, the one-page medical

24   record that I got from him.

25        Q.   So, you don't know what, if any, clinical

Page 98

1    significance he ascribes to this petiole issue?

2        A.    Correct.

3        Q.    You only believe that he noted it existed; you

4    recall that?

5        A.    Yes.

6        Q.    Other than this petiole issue, any other

7    neurologic finding by Dr. Madden of an organic problem

8    that besets Ms. Costa?

9        A.    Not that I am aware of.

10            (Recess taken from 12:30 p.m. through 1:15)

11   BY MR. MEAGHER:

12       Q.    Dr. Boone, we are back from lunch.  Did you

13   discuss the case with anyone?

14       A.    I am not Dr. Boone.

15       Q.    I am sorry.  Dr. O'Neal.  Did you discuss the

16   case with anyone?

17       A.    Yes.

18       Q.    With whom?

19       A.    With the attorney.

20       Q.    And that is Ms. Costa's attorney, Mr. Tucker?

21       A.    Yes, Mr. Tucker.

22       Q.    You have to wait until I finish my question.

23            You discussed the case with Mr. Tucker during

24   lunch.  What did you talk about?

25            MR. TUCKER:  You can't ask him that.

Page 99

```
 1            MR. MEAGHER:  I certainly can.  He is under

 2      oath.  He is a witness.  And you cannot take a break

 3      and coach a witness while he is on the stand.  It is

 4      just like a deposition.

 5            MR. TUCKER:  I didn't coach the witness.

 6            MR. MEAGHER:  Then I can ask him what he

 7      talked about.

 8   BY MR. MEAGHER:

 9      Q.   Let me ask you this: Is he your attorney?  Is

10   he representing you?

11      A.   No, he is not representing me.

12      Q.   Okay.  So, what did you discuss with Mr.

13   Tucker?

14            MR. TUCKER:  Objection; predicate, work

15      product.

16            MR. MEAGHER:  Well, you can answer.

17            THE WITNESS:  Can I answer?

18            MR. TUCKER:  You can answer.  We didn't talk

19      about the deposition.  So --

20            THE WITNESS:  I asked about her current state

21      of health.

22   BY MR. MEAGHER:

23      Q.   What did he tell you?

24      A.   That they are still trying to determine the

25   diagnosis for her.
```

Page 100

```
 1      Q.   Did you eat lunch with him, Mr. Tucker?

 2      A.   No, I didn't.

 3      Q.   How long did you speak with him?

 4      A.   Five minutes.

 5      Q.   What did you discuss other than the state of

 6   health of Ms. Costa?

 7      A.   That is it.

 8      Q.   Did you discuss your testimony at all?

 9      A.   No.

10      Q.   Is there anything in your testimony you want to

11   change as we sit here now?

12      A.   No.

13      Q.   Taking a look at your witness report for

14   purposes of litigation --

15      A.   What is that?   Number 6?

16           MR. MEAGHER:   That's the one that has the

17      expert witness disclosure.

18           MR. TUCKER:   4.

19   BY MR. MEAGHER:

20      Q.   4.

21      A.   Okay.

22      Q.   Would you agree with me that in

23   neuropsychological testing a one standard deviation

24   change is not at all unusual?

25      A.   No, I wouldn't agree with that.
```

Costa vs. Metropolitan                              May 10, 2018

Page 101

1      Q.   How is it unusual to have a one standard

2   deviation change from one test to another?

3      A.   From one test to another or one time to

4   another?

5      Q.   One test to another.

6      A.   Say between -- between one test to another

7   test, one standard deviation change is nothing

8   significant.

9      Q.   You talked about Ms. Costa having difficulty

10  with processing speed; is that correct?

11     A.   Yes.

12     Q.   How does she drive a car?

13     A.   I have no idea.

14     Q.   When you say "you have no idea," is it the

15  sense that I can't believe she drives a car in her

16  condition or I don't know whether her motor function

17  problems at all affect her ability to drive?

18     A.   I don't know that her motor function or other

19  problems would affect her ability to drive.

20     Q.   You are located in Sarasota, correct?

21     A.   Yes.

22     Q.   And she lives in Melbourne, Florida, right?

23     A.   Correct.

24     Q.   So, I did a quick Mapquest search and it's

25  about 200 miles away from one to the other.

Page 102

1       A.    Um-hum.

2       Q.    Do you agree with that?

3       A.    I will take your word on it.

4       Q.    Do you know why she was choosing to drive to

5   see you rather than seeing a neuropsychologist in, say,

6   Orlando or Tampa, two hours closer to her?

7       A.    My best guess would be that Dr. Madden highly

8   recommended me.

9       Q.    Let me ask then why she was seeing Dr. Madden

10  to your understanding in Sarasota when I am sure there

11  are some qualified neurologists in Melbourne, Orlando or

12  Tampa, in addition to Sarasota?

13      A.    I have no idea.

14      Q.    Does that strike you as odd that someone with

15  motor difficulties would choose treating physicians in

16  Sarasota rather than in her hometown of Melbourne if she

17  was having difficulties?

18      A.    If somebody were recommended to a CA specialist

19  who was located perhaps some distance away, some people

20  are motivated enough to go that distance.

21      Q.    So, that doesn't strike you as odd?

22      A.    No.

23      Q.    And specifically with regard to Ms. Costa, not

24  just some people.  Ms. Costa is complaining of motor

25  difficulties choosing to do that, that didn't strike you

1    as odd as a clinician?

2       A.    No.

3       Q.    How many neuropsychological exams do you do on

4    the east coast of Florida who live there?

5       A.    Two.

6       Q.    On what occasions were those?

7       A.    One was a dementia evaluation.

8       Q.    Where does that person live?

9       A.    I want to say West Palm Beach.

10      Q.    And why were you selected for that dementia

11   evaluation?

12      A.    Because one of the supposedly best

13   neuropsychologists in the state was initially approached

14   to do this at the family's request.  And they did not

15   have a timeframe available, and so they reached out to a

16   company that I worked for at that time.  And because I

17   was the dementia expert with that group, they asked me

18   to go and see that person.

19      Q.    What group was that?

20      A.    Comprehensive MedPsych Systems.

21      Q.    When did you work for them?

22      A.    It is in my Vitae.  2006 to 2011, when I went

23   out on my own.

24      Q.    Did the person that purportedly suffered from

25   dementia drive him or herself over to your office from

Page 104

1    the east coast?

2         A.    I drove over there.

3         Q.    Okay.  So, you did the exam there?

4         A.    Yes.

5         Q.    In West Palm Beach?

6         A.    Yes.

7         Q.    I was asking how many people have driven from

8    the east coast of Florida --

9         A.    My apologies.  One.  Ms. Costa.

10        Q.    Did you tell her that she couldn't work as a

11   trial attorney?

12        A.    No.

13        Q.    It's true, though, that she told you she didn't

14   feel capable to work as a trial attorney; is that fair?

15        A.    That is a fair statement, yes.

16        Q.    You diagnosed her, I believe, with semantic

17   symptom disorder; is that correct?

18        A.    No; that is not correct.

19        Q.    What did you diagnose her with?

20        A.    Cognitive disorder not otherwise specified and

21   adjustment disorder with anxiety.

22        Q.    Well, you agreed with Dr. Vanderploeg's

23   diagnosis with semantic disorder, correct?

24        A.    As was stated in my independent record review

25   of January 2nd, 2018; yes, I did.

Page 105

1      Q.    In fact, you state, quote, I would agree with

2   Dr. Vanderploeg's diagnosis of semantic symptom

3   disorder," correct?

4      A.    Yes.

5      Q.    How does one treat such an order?

6      A.    Psychotherapy is generally the first line of

7   treatment.

8      Q.    When you say "psychotherapy," are you talking

9   about with a psychiatrist and counseling, as well as

10   medications?

11      A.    Counseling first and foremost.  Medication if

12   it was indicated.

13      Q.    What would indicate the need for medications?

14      A.    Higher levels of anxiety or in depression that

15   were not abating as a result of psychotherapy.

16      Q.    So, with regard to medications, you would need

17   to see an M.D. psychiatrist, correct?

18      A.    Correct.

19      Q.    Have you seen situations where people suffering

20   from such a disorder have a very focused concentrated

21   amount of therapy and medication, that is psychological

22   counseling on a weekly basis and psychiatric visits for

23   medication adjustments?

24           MR. TUCKER:  Object to form.

25           THE WITNESS:  What is the first part of the

Costa vs. Metropolitan                          May 10, 2018

Page 106

1      question?

2   BY MR. MEAGHER:

3      Q.   With people suffering from a semantic --

4      A.   With people who have this, do that kind of a

5   treatment?

6      Q.   Yes.

7      A.   Yes.

8      Q.   And certainly if it was impairing they might

9   require more treatment than somebody who is just having

10  a mild problem with it; would you agree?

11     A.   Yes.

12     Q.   Is there also inpatient treatment for that if

13  it gets severe enough?

14     A.   If it got debilitating enough, yes.

15     Q.   You said you read Dr. Vanderploeg's deposition;

16  is that correct?

17     A.   Yes.

18     Q.   Anything that sticks out in your mind as we sit

19  here today as being incorrect in what he testified to or

20  that you vehemently disagreed with?

21     A.   Yes.

22     Q.   What can you recall?

23     A.   His assertion that his administration of the

24  finger tapping test was the valid administration of the

25  finger tapping test.

Page 107

1       Q.    Okay.  Anything else?

2       A.    That is really the one thing that stuck out for

3  me.

4       Q.    In part of your records you found her quick to

5  initiate taps; is that correct?

6       A.    Yes.

7       Q.    How do you correlate that to a slowing of

8  responses, or is it contraindicated?

9       A.    If I give you a piece of paper and I ask you to

10  start reading it and you pick it up and you start

11  reading it, in my perspective that is quick to initiate

12  the task.  Now, how long it takes you to read through

13  the paper, that is a different matter.

14       Q.    At one point you criticize the videotaping of

15  Dr. Vanderploeg's examination; is that correct?

16       A.    Yes.

17       Q.    I think you ultimately found that you didn't

18  believe there was really any difference due to the

19  videotaping; is that fair to say?

20       A.    Yes.

21       Q.    And you understand that it was Ms. Costa's

22  attorney who insisted on the examination being

23  videotaped?

24       A.    I am not sure that I was aware that is how it

25  came about, no.

Page 108

1            (Defendant's Exhibit 8 marked for

2       identification)

3   BY MR. MEAGHER:

4       Q.   I am going to hand you Exhibit 8 to this

5   deposition.  It is a letter from John Tucker, dated June

6   30, 2016.  As you can see, he stated that Ms. Costa will

7   not be able to attend the IME set for June 27, 2016,

8   because the neuropsychologist at MetLife selected

9   refused to let a videographer, and Ms. Costa has a right

10  to have such an exam.  Did I paraphrase that correctly?

11      A.   That sounds correct.

12      Q.   So, if we are going to blame anyone for the

13  recording, we'll have to blame Ms. Costa's attorney?

14      A.   Those are your words.  I am --

15      Q.   Well, those aren't my words.  Those are Mr.

16  Tucker's words.

17           MR. TUCKER:  Object to form.

18           THE WITNESS:  I will agree with your

19      statement.

20  BY MR. MEAGHER:

21      Q.   Your examination of Ms. Costa occurred in March

22  of 2016; is that correct?

23      A.   I believe it was February.

24      Q.   I apologize.  February.

25      A.   February 25, 2016.

Costa vs. Metropolitan                                    May 10, 2018

Page 109

1       Q.   Is it true to say that that examination only

2   determines her cognitive functioning on that date?

3       A.   Yes.

4       Q.   So, with regard to her cognitive functioning

5   five months earlier, you would have no opinion on that?

6       A.   That is correct.

7       Q.   When you performed your examination of Ms.

8   Costa did you ask her about any particular life

9   stressors she may have been undergoing at the time of

10  your examination?

11      A.   Yes.

12      Q.   Because that is an important part to see what

13  is affecting her socially?

14      A.   Yes.

15      Q.   Okay.  Did she discuss with you any problems

16  she was having at her law firm?

17      A.   In her inability to do her work as effectively

18  as she was used to, yes.

19      Q.   Did she discuss with you any financial problems

20  her law firm was having as a result of an IRS audit?

21      A.   Not that I am aware of.

22      Q.   Or anything related to that type of financial

23  difficulty?

24      A.   Not that I am aware of.

25      Q.   Did she discuss with you that, although, she

Page 110

1   says she was a partner in the practice, she had received

2   only 1.5 percent of the firm's profits in 2015?

3        A.   I didn't ask a question like that and she

4   didn't offer information like that.

5        Q.   Well, you asked her about stressors, correct?

6        A.   Right.

7        Q.   So, if you are supposed to get 50 percent of

8   your income and you only got 1.5, would you believe that

9   might be a stressor for someone?

10       A.   I would believe, yes, for someone that would be

11  a stressor.

12            MR. MEAGHER:  I have no further questions.

13       Thank you, Doctor.

14            MR. TUCKER:  Let's take a break for a minute.

15       I may have a couple follow-ups.

16            (Recess taken)

17            MR. TUCKER:  I don't have any questions.  If

18       it is transcribed we would like a copy.

19            MR. MEAGHER:  Doctor, you have the opportunity

20       to either read the transcript once it's typed up --

21            THE WITNESS:  I would like that.

22            MR. MEAGHER:  So, the court reporter will

23       arrange that with you.

24            And we'll order.  And please attach the

25       exhibits.

Page 111

1          (THEREUPON, the right to read and sign the

2     deposition and/or the right to waive reading and

3     signing were explained to the deponent; whereupon

4     the d.

5          (Deponent did not waive that right, and the

6     taking of this deposition was concluded at 1:30

7     p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1             CERTIFICATE OF COURT REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF SARASOTA

5

6        I, Patricia Pilarski, do hereby certify that I was

7    authorized to and did stenographically report the

8    deposition of SHAUN KELLEY O'NEAL, M.S., PsyD; that a

9    review of the transcript was requested; and that the

10   foregoing transcript is a true and correct record of my

11   stenographic notes.

12

13       I FURTHER CERTIFY that I am not a relative,

14   employee, or attorney, or counsel of the parties, nor am

15   I a relative or employee of any of the parties' attorney

16   or counsel connected with the action, nor am I

17   financially interested in the action.

18

19       DATED this 22nd day of May, 2018.

20

21

22

23

24   *Patricia A. Pilarski*

25             Patricia Pilarski

1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF SARASOTA

5

6        I, Patricia Pilarski, Florida Professional Reporter,

7    Notary Public, State of Florida, certify that the

8    witness, Shaun Kelley O'Neal, M.S., PsyD, personally

9    appeared before me on the 10th day of May, 2018, and was

10   duly sworn.

11       WITNESS my hand and official seal this

12   22nd day of May, 2018.

13

14                        *Patricia A. Pilarski*

15                        Patricia Pilarski
                          Notary Public
                          State of Florida
16                        Commission #FF132674

17                        My Commission Expires: 7/31/2018

18

19

20

21

22

23

24

25

Page 114

```
 1                    E R R A T A   S H E E T

 2    IN RE: Lori Costa v. Metropolitan Life Insurance Company

 3    DEPOSITION OF: Shaun Kelley O'Neal, M.S., PsyD

 4    TAKEN: May 10, 2018

 5    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

 6    Please sign, date, and return this sheet to our office.
      If additional lines are required for corrections, attach
 7    additional sheets.

 8    At the time of the reading and signing of the
      deposition, the following changes were noted:
 9
      -------------------------------------------------------
10    Page  Line    Change                    Reason
      -------------------------------------------------------
11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    Under penalty of perjury, I declare that I have read y
      deposition and that it is true and correct subject to
23    any changes in form or substance entered here.

24    SIGNATURE OF DEPONENT:_____

25    DATE:_____
```