UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.  6:17-cv-00714-PGB-TBS


LORI COSTA,

        Plaintiff,

vs.

METROPOLITAN LIFE INSURANCE
COMPANY,

        Defendant.
_____/


5235 16th Street North
St. Petersburg, Florida
9:33 a.m. to 2:01 p.m.
November 30, 2017


VIDEOTAPED DEPOSITION OF SEAN WHITE


        Taken on behalf of the PLAINTIFF before Kim
Auslander, RPR, CRR, Notary Public in and for the State
of Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.

```
 1   APPEARANCES:

 2
     ATTORNEYS FOR PLAINTIFF
 3
             JOHN V. TUCKER, ESQ.
 4           AMY RAY, ESQ.
             TUCKER & LUDIN, PA
 5           5235 16th Street North
             St. Petersburg, Florida 33703
 6

 7

 8   ATTORNEYS FOR DEFENDANT

 9           JOHN MEAGHER, ESQ.
             SHUTTS & BOWEN, LLP
10           200 South Biscayne Boulevard
             Miami, Florida 33131
11

12

13

14

15

16   ALSO PRESENT: Scott Hay, Videographer

17

18

19

20

21

22

23

24

25
```

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1                        I N D E X

2

     Deposition of SEAN WHITE                Page No.
3

4

5    Examination by Mr. Tucker                   7

6    Witness Signature Page                    139

7    Errata Sheet                              140

8    Certificate of Oath of Witness           141

9    Read and Sign Letter                      143

10

11                        * * *

12                    E X H I B I T S

13   PLAINTIFF'S

14   No.                Description           Page No.

15   Exhibit 1          Intake Form              13

16   Exhibit 2          Policy                   14

17   Exhibit 3          Claim Forms              25

18   Exhibit 4          Phone Call Note          28

19   Exhibit 5          File Documentation       30

20   Exhibit 6          Acknowledgment Letter    35

21   Exhibit 7          Status Letter            37

22   Exhibit 8          Financial Referral Form  45

23   Exhibit 9          Database Query Request   46

24   Exhibit 10         Field Report Request     49

25             (Exhibits continued on next page.)

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1                     E X H I B I T S (Continued)

2    PLAINTIFF'S

3    No.                  Description              Page No.

4    Exhibit 11           Composite                    51

5    Exhibit 12           Medical Review Form          52

6    Exhibit 13           12/14/15 Letter              56

7    Exhibit 14           Financial Report             58

8    Exhibit 15           Photographs                  62

9    Exhibit 16           Field Claim Report           63

10   Exhibit 17           E-mail                       66

11   Exhibit 18           Composite                    70

12   Exhibit 19           12/8/15 Letter               73

13   Exhibit 20           12/9/15 Review               75

14   Exhibit 21           12/11/15 Letter              79

15   Exhibit 22           Seehausen Report             80

16   Exhibit 23           Memo/Claim File              87

17   Exhibit 24           12/30/15 Letter              88

18   Exhibit 25           1/4/16 Letter                95

19   Exhibit 26           E-mail                       96

20   Exhibit 27           1/6/16 Phone Call Note       98

21   Exhibit 28           1/7/16 Letter               100

22   Exhibit 29           Composite                   101

23   Exhibit 30           1/11/16 Letter              105

24   Exhibit 31           Letter                      106

25              (Exhibits continued on next page.)

1                    E X H I B I T S (Continued)

2    PLAINTIFF'S

3    No.                 Description              Page No.

4    Exhibit 32          Composite                106

5    Exhibit 33          1/26/16 Phone Call Note   110

6    Exhibit 34          1/29/16 Referral          111

7    Exhibit 35          1/29/16 Letter            112

8    Exhibit 36          Referral                  112

9    Exhibit 37          Referral                  116

10   Exhibit 38          IME document              117

11   Exhibit 39          8/29/16 Letter            120

12   Exhibit 40          6/24/16 Letter            121

13   Exhibit 41          9/16/16 Phone Call Note   123

14   Exhibit 42          10/24/16 Evaluation       125

15   Exhibit 43          11/1/16 Report            126

16   Exhibit 44          1/6/17 Benefit documentation  130

17

18

19

20

21

22

23

24

25

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

```
1              VIDEOGRAPHER:  This is tape number one to the
2        videotaped deposition of Sean White in the matter
3        of Lori Costa versus Metropolitan Life Insurance
4        Company, Case Number 6:17-cv-00714-PGB-TBS.
5              This deposition is being held at
6        5235 16th Street North, St. Petersburg, Florida.
7        Today's date is November 30, 2017.  The time is
8        approximately 9:33 a.m.
9              My name is Scott E. Hay, and I am the
10       videographer.  The court reporter is Kim Auslander.
11             Counsel, will you please introduce yourselves
12       for the record, after which the court reporter will
13       swear in the witness.
14             MR. TUCKER:  My name is John Tucker.  I am
15       with the firm of Tucker & Ludin, PA.  I represent
16       the Plaintiff, Lori Costa.  With me is Amy Ray;
17       also an attorney, cocounsel on the case.
18             MR. MEAGHER:  John Meagher from the firm of
19       Shutts & Bowen, representing Defendant,
20       Metropolitan Life Insurance Company.
21                       SEAN WHITE
22             Was called as a witness and, having been first
23   duly sworn and responding, "I do," was examined and
24   testified as follows:
25                       EXAMINATION
```

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    BY MR. TUCKER:

2         Q     Good morning, sir.

3         A     Good morning.

4         Q     What is your full name, please.

5         A     Sean Francis White.

6         Q     How do you spell your first name?

7         A     S-E-A-N.

8         Q     By whom are you employed?

9         A     Metropolitan Life Insurance Company.

10        Q     How long have you been employed by

11   Metropolitan Life Insurance Company?

12        A     Six years.

13        Q     And, as you heard, my name is John Tucker.  I

14   represent Lori Costa in this case.  I am going to be

15   asking you some questions about a claim that I believe

16   you handled; is that correct?

17        A     That's correct.

18        Q     All right.  Let's start first with your

19   background with Met Life.

20              Do you remember what year you started with

21   Met Life?

22        A     2011.

23        Q     And when I refer to Met Life, can we agree

24   that that means Metropolitan Life Insurance Company?

25        A     We agree.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1      Q     Okay.  What was the position you were hired

2   into when you started with Met Life?

3      A     A IDI claims specialist; individual disability

4   claims specialist.

5      Q     Is that the position you are still in?

6      A     Senior claims specialist, at the time the

7   claim was filed, if that's what you're asking.

8      Q     Does that mean you received a promotion

9   somewhere along the way?

10     A     Correct.

11     Q     Tell me when that happened.

12     A     2014.

13     Q     What's the difference between those two

14  positions?

15     A     Senior level just handles more complex

16  situations.  You develop the technical skills to reach

17  the senior level.

18     Q     When you handled Ms. Costa's claim, were you

19  at the senior level?

20     A     Yes.

21     Q     And when you started with Met Life, what type

22  of training did you go through to do your job?

23     A     It's mostly on-the-job training, start out

24  with lower level cases, ease you into the position.

25     Q     Did you have any kind of a training course?

1        A    Initial two-week training where you're working

2    with examiners that already work there to kind of give

3    you background on the job, and how to use your

4    resources, and things like that.

5        Q    Okay.  What is your educational background?

6        A    I have a bachelor's degree from Florida State

7    University.

8        Q    And what is that degree in?

9        A    Business and marketing and management.

10       Q    Did you take any insurance courses when you

11   were at Florida State University?

12       A    No.

13       Q    Since you've been employed at Met Life, have

14   there been any organized courses or continuing education

15   that you have attended?

16       A    There have been many online continuing

17   education courses.

18       Q    Is that something that the company prepared or

19   something external or outside the company?

20       A    The company prepared.

21       Q    Do you recall any of the topics?

22       A    I can recall some of them.  It wouldn't be all

23   topics.

24       Q    Can you tell me what you recall?

25       A    A lot of them are related to ethics, fraud.

Page 10

1     Q    Any courses in educating people in your

2  position about medical conditions?

3     A    No.

4     Q    If I could, I would like to get an

5  understanding of where your position is in the company.

6          What is the title of the person who's your

7  direct supervisor?

8     A    At the time of this claim, it was IDI claims

9  manager.

10     Q    Do you remember who that was?

11     A    Mr. Kris Anderson.

12     Q    Is Mr. Anderson still with the company?

13     A    Yes, sir.

14     Q    Has that changed?

15     A    Can you --

16     Q    You said at the time that was the IDI claim

17  manager.

18          Before that question is answered, what does

19  IDI stand for?

20     A    Individual disability insurance.

21     Q    Okay.  So has the organization changed such

22  that you no longer report to the IDI claim manager?

23     A    Correct.  I'm now an IDI claims manager

24  myself.

25     Q    I see.  Okay.  Who does the IDI claims manager

1    report to?

2         A    The IDI claims director.

3         Q    Are all of these people located in your office

4    in Tampa?

5         A    Correct.

6         Q    What is the address of that office?

7         A    I don't know the exact address.  It's the

8    Highwoods Preserve Center in New Tampa.

9         Q    At the time you were handling Ms. Costa's

10   claim, who was the IDI claims director?

11        A    Mr. John Dieguez easy.

12        Q    Can you spell his last name?

13        A    D-I-E-G-U-E-Z.

14        Q    When you handled Ms. Costa's claim, were

15   either Mr. Anderson or Mr. Dieguez involved in any

16   aspect of the claim?

17        A    As far as handling the claim, I'm responsible

18   for handling the claim, but we did -- I did speak with

19   my manager to discuss where I was at with the claim, and

20   ultimately he would need to sign off on certain letters.

21        Q    Is there a certain type of letter that the IDI

22   claims manager has to sign off on at Met Life?

23        A    If we are denying a claim, then that would

24   require the review of a manager before that goes out.

25        Q    All right.  Did you review any documents in

e6330695-ebf3-41d5-9959-7d22ed8aebe6e

1    preparation for your deposition today?

2         A    Yes, I did.

3         Q    What documents did you review?

4         A    I tried to review the entire claim file.

5         Q    Is the claim file maintained in a paper format

6    or in an electronic format?

7         A    It's in a paper format.

8         Q    It actually has a file jacket, for lack of a

9    better term?

10        A    Right.

11        Q    What is the term used at Met Life to describe

12   that paper inside that file jacket?

13        A    The file itself; the claim file.

14        Q    So it's called the claim file?

15        A    Correct.

16        Q    Okay.  I am going to ask you some questions

17   today about documents that have been produced by

18   Met Life in this litigation.  They bear some numbers in

19   the lower right-hand corner, and we will refer to those

20   numbers.

21            Those numbers, my understanding, were affixed

22   by Met Life's counsel.  They were put on the page by

23   Met Life's counsel.  You may hear me call those Bates

24   numbers -- I don't know if you've ever heard that name

25   before -- but we will refer to those for identification.

1           I'm going to start with a document that I'll

2    mark as Exhibit 1 to your deposition and ask you if you

3    can identify what this is.

4           (Plaintiff's Exhibit 1 marked for

5           identification.)

6      A    This would be an intake form.

7      Q    Who complete this?

8      A    Individual disability claims examiner would

9    complete this form.

10     Q    And, at the top, it makes a reference to call

11   received from PH.  Does that mean policyholder?

12     A    That's correct.

13     Q    Is this document the first document that was

14   created in the claim file when a call came in from

15   Ms. Costa?

16     A    Yes.

17     Q    Put another way; this was basically the report

18   of the claim from the insured?

19     A    This was the initial notice.

20     Q    Okay.  What's the date on this?

21     A    September 30, 2015.

22     Q    It indicates call taken by Susan.  Do you know

23   who Susan was?

24     A    Yes, I know who Susan is.

25     Q    What is Susan's last name?

Page 14

1        A     Susan Ballata.

2        Q     Do you know how to spell that?

3        A     B-A-L-L-A-T-A.

4        Q     What is her position?

5        A     She's presently an IDI claims manager.

6        Q     What was she at the time?

7        A     I can't be clear on what her title was at the

8   time.

9        Q     Do you recall having any conversations with

10  Ms. Ballata about Ms. Costa?

11       A     No, I don't recall any conversations with her.

12       Q     Would you have reviewed what we've marked as

13  Exhibit 1 when you began handling the file?

14       A     Yes.

15       Q     Now, there is a reference there to a policy

16  number 6531379AH; is that correct?

17       A     That's correct.

18       Q     In handling the claim, would you have reviewed

19  the policy?

20       A     I would have.

21             MR. TUCKER:  I would like to show you what I

22       will mark as Exhibit 2 to your deposition.

23             (Plaintiff's Exhibit 2 marked for

24             identification.)

25  BY MR. TUCKER:

1        Q     I'll first ask you if you can identify the

2   Bates page number in the lower right-hand corner of the

3   first page.   That's that ML slash LC number.

4        A     Can I identify it as reading it?

5        Q     What does it say?   Yes.

6        A     ML slash LC dash CF001710.

7        Q     From now on, I think we can probably just

8   refer to the numbers as opposed to the letters, because

9   I believe they are uniform for all these Bates page

10  numbers.   We are doing that just for identification.

11             Would you be able to take a look at this and

12  tell me if this is the policy that's referred to on

13  Exhibit 1?

14       A     Yes, it's the policy that's referred to on

15  Exhibit 1.

16             MR. MEAGHER:   John, just for the record, I

17        don't see an application in here, so I think that's

18        technically part of the policy.   I don't think it

19        affects any terms, but just note that.

20  BY MR. TUCKER:

21       Q     Mr. White, would you have reviewed the

22  application at the time that you were reviewing the

23  policy and handling the claim?

24       A     I would have, yes.

25       Q     Okay.   And, for the record, I don't believe

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    the application was affixed directly after the documents

2    that were produced in this Bates sequence.

3              Mr. White, does the range of documents -- of

4    pages go in terms of page numbers from 1,710 to 1,735 in

5    what we've marked as Exhibit 2; in other words, is 1,735

6    the last number?

7              MR. MEAGHER:  I have 1,736.

8              MR. TUCKER:  I may have read it wrong.

9              MR. MEAGHER:  Unless you gave me a bonus page.

10             MR. TUCKER:  I read it wrong.  I apologize.

11   1,710 through 1,736.

12             THE WITNESS:  It does go from 10 to 36.

13   BY MR. TUCKER:

14        Q    Are there any missing pages as you were

15   leafing through there?

16        A    No, there's no missing pages.

17        Q    Okay.  I should have asked you before; did you

18   have any work experience between the time you left

19   Florida State University as a graduate of that school

20   and when you started with Met Life?

21        A    Did I have any work experience?

22        Q    Yes.  Did you work anywhere else other than

23   Met Life after you graduated from FSU?

24        A    Yes, I did.

25        Q    Where?

1       A     I worked for HealthFirst.

2       Q     What is HealthFirst?

3       A     HealthFirst is a system of hospitals in

4    Brevard County, Florida.

5       Q     Doing what?

6       A     Mainly responsible for patient billing.

7       Q     Did you have any experience reading disability

8    insurance policies or handling disability insurance

9    claims when you worked there?

10      A     No, sir.

11      Q     How long did you work there?

12      A     Three years --

13      Q     Okay.

14      A     -- give or take.

15      Q     Between that job and Met Life, did you work

16   anywhere else?

17      A     No.

18      Q     So you went from HealthFirst to Met Life?

19      A     Correct.

20      Q     Was there any gap in there?

21      A     There was a gap where I was a temp for

22   Met Life; temporary associate.

23      Q     And why did you separate from HealthFirst?

24      A     Because I moved to Tampa from Brevard County,

25   so that was a decision to leave the company and move to

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    Tampa.

2         Q    Okay.  When you started at Met Life, did you

3    have any training in how to read their insurance

4    policies?

5         A    Prior to starting at Met Life; is that the

6    question?

7         Q    We can start there.  So before you actually

8    started on your first day at Met Life, did you have any

9    training in how to read Met Life insurance policies?

10        A    No, sir.

11        Q    Or any disability insurance policies?

12        A    No, sir.

13        Q    So when you started at Met Life, did Met Life

14   have any kind of organized course where they taught you

15   about reading disability income insurance policies?

16        A    No organized course.  Just, when you start,

17   you get a basic two-week training, and then after that,

18   you know, you're expected to ask questions to understand

19   the policy.

20        Q    So, in your two-week training, were you

21   effectively shadowing somebody, or were you doing course

22   work?

23        A    Wouldn't be course work.  It would be more

24   just being presented with how things are done in the

25   department.  Not actual course work.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1      Q    Was it lecture-oriented?

2      A    It would be a one-on-one situation where

3  you're just being taught; not like a course where you're

4  expected to take an exam afterwards.

5      Q    Okay.  And it wasn't a class with other

6  people; it was you and one other person?

7      A    Right.  It's like an on-boarding training.

8      Q    Okay.  Who did your training?  Who was the

9  person that one-on-one'd with you?

10     A    As I stated before, it was with the examiners

11 in the department.  It wasn't one particular person

12 during a two-week process.  To recall the individuals, I

13 wouldn't be able to do.

14     Q    Okay.  So, getting back to where we were; you

15 would have reviewed the insurance policy, the disability

16 income policy, while you were handling Ms. Costa's

17 claim, correct?

18     A    Correct.

19     Q    Do you remember when you first reviewed it?

20     A    It would have been right when it was given to

21 me; right when it was assigned to me is when I would

22 have reviewed the policy.

23     Q    Is there some type of notation you make in the

24 file to indicate you've reviewed the policy?

25     A    There's no documentation or, you know,

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    notification that I've reviewed the file -- reviewed the

2    policy.

3         Q    Okay.  Is the policy something that you would

4    have reviewed in a computer, or would you have received

5    a paper copy of it?

6         A    It would have been a paper copy.

7         Q    Did you have to request that, or did somebody

8    provide it to you?

9         A    It's provided to me once the claim is set up.

10        Q    Let's turn back to Exhibit 1.  There is a

11   reflection in a typed paragraph, if you would, under

12   primary diagnosis, the phrase multiple diagnosis, see

13   below.

14             Do you see that?  Right under the New Mexico

15   box.  Primary diagnosis, then to the right.

16        A    And it says -- can you repeat it?

17        Q    It says multiple diagnosis, see below.

18        A    Oh, yes, I see.

19        Q    All right.  There is a paragraph below that

20   that includes various information and starts with some

21   conditions that -- it says, policyholder's neurologist

22   diagnosed.

23             Do you see that sentence?

24        A    I do.

25        Q    What is the date that's referenced there?

Page 21

1       A     September 18, 2015.

2       Q     All right.  And it lists several different

3    things.  It starts with a phrase ataxic, A-T-A-X-I-C,

4    gait.

5             When you got this file, did you know what that

6    was?

7       A     I can't recall, but I would think I wouldn't

8    know what that was.

9       Q     Did you say would or wouldn't?

10      A     Would not.

11      Q     Okay.  Today, as we sit here, do you know what

12   ataxic gait is?

13      A     I believe I have a good understanding of what

14   an ataxic gait is.

15      Q     What is your understanding?

16      A     It's when there's a -- you are -- when you are

17   walking, you apparently have a gait that's abnormal.

18      Q     So it's any abnormal gait; is that your

19   understanding?

20      A     As best as I can recall.

21      Q     The list continues; tingling in hands, feet,

22   face, and legs.

23            Did you feel you needed explanation about that

24   when you got the file?

25      A     Needed explanation as in?

1        Q     Did you know what those meant?

2        A     Not exactly for her.  This is the initial

3    intake form, so...

4        Q     I'm asking if you had a general understanding

5    of what these terms meant.

6        A     I believe I would have a general understanding

7    of what tingling in the hands and feet means.

8        Q     What does it mean to you?

9        A     That somebody must be experiencing a tingling

10   sensation in their hands.  Exactly what it says.

11       Q     What do you understand the word tingling to

12   mean?

13       A     Other than exactly what it states, I mean, it

14   would be tingling in your hands.  Really I don't have a

15   better description.

16       Q     Let's go on on the list.  The next word is

17   fibromyalgia.  When you got this file, were you aware of

18   what fibromyalgia is?

19       A     Well, I'm not a doctor, but a general

20   understanding would be, I believe, unexplained pain.

21       Q     And the next phrase is disruptive sleep.  What

22   did you understand that to mean?

23       A     That she's stating that she experiences

24   disruptive sleep, or that she has interrupted sleep.

25       Q     The next phrase is transient ophthalmoplegia.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 23

1   Did you understand what that was?

2        A    No.  I would have had to have that clarified.

3        Q    What is your understanding of what that is

4   today?

5        A    I know it's an issue with your vision, but I

6   still don't really have a full understanding of what

7   that would mean, but I rely on my consultants to tell me

8   whether or not that's a condition that she would have.

9        Q    Okay.  The next medical term in there is

10  vertigo.  Do you know what vertigo is?

11       A    I have a general understanding of vertigo,

12  yes.

13       Q    What is your understanding of what vertigo is?

14       A    Dizziness.

15       Q    The next phrase I would like you to look at is

16  demyelinating diseases of the central nervous system.

17  Do you know what those are?

18       A    I don't believe I know what all of them are,

19  but I do know that it's -- multiple sclerosis would be a

20  demyelinating disease.

21       Q    What is your understanding of what a

22  demyelinating disease is?

23       A    It would affect the nervous system, causing

24  you to lose -- lose your mobility, perhaps, or loss

25  of -- unable to use your arms all of a sudden, or legs.

e6330695-ebf3-41d5-9959-7d22ed8aebe6e

1    Just affects the nervous system.

2         Q    Further down the form, there is a section

3    called Employment Information -- do you see that?

4         A    Yes.

5         Q    -- in the center of the form.

6              There is a reference to the occupation, and

7    the occupation that's listed is trial lawyer.  Do you

8    see that?

9         A    I do.

10        Q    When you started working on the file, did you

11   get a job description for what a trial lawyer is?

12        A    We ask Ms. Costa.  In this particular case, we

13   ask for a description, as she knows it best, as to what

14   her job is as a trial attorney.  From time to time, case

15   by case basis, we would ask for job descriptions.  I

16   don't believe we did in this particular case.

17        Q    Do you have an understanding of what a trial

18   lawyer does?

19        A    A trial lawyer is, in addition to their

20   regular responsibilities as an attorney, they would be

21   required to attend a trial.

22        Q    So what are their regular responsibilities as

23   an attorney, in your understanding?

24        A    I wouldn't be able to provide every single

25   detail, but meeting with clients, discovery, I would

e6330695-ebf3-41d5-9959-7d22ed8aebe6

Page 25

1    imagine a lot of writing up of documents.  From my

2    understanding, it is a sedentary in nature type of job.

3         Q     What is your understanding of what discovery

4    is?

5         A     Researching a client, trying to find

6    information for the purpose of trial or mediation.

7         Q     Do you know any of the specific processes that

8    attorneys use to go through discovery?

9         A     No.  No, sir, I don't.

10        Q     And, at the time that Ms. Costa filed her

11   claim -- I would like to show you what I will mark as

12   Exhibit 3 to your deposition -- did she file these forms

13   sometime around the beginning of the claim?

14             (Plaintiff's Exhibit 3 marked for

15             identification.)

16        A     They were received in our office on

17   October 21st, 2015.

18        Q     What day was the claim received?

19        A     If you're referring to the date it was called

20   in during the intake, that would be September 30, 2015.

21        Q     So the documents in Exhibit 3, they have Bates

22   page numbers 1,737 through 1,744, correct?

23        A     I don't have the 44.  Thank you.

24        Q     It says, this page intentionally left blank.

25             These forms were received about two weeks

1    after the claim was called in; is that fair to say?

2          A     I would say roughly three.

3          Q     Well, the 30th to the 15th, so 16 days?

4          A     It's October 21st, 2015.

5          Q     I apologize.  So three weeks.

6                What is the title on the first form?

7          A     Initial Claim Form for Disability Benefits.

8          Q     And is this a Met Life form?

9          A     Yes, it is.

10         Q     Would someone have sent these forms to

11   Ms. Costa in the mail to complete?

12         A     That's correct.

13         Q     Would that have been you?

14         A     It would have been likely a claims support

15   unit rep -- representative.

16         Q     Would that have been at your direction?

17         A     Or Ms. Susan Ballata's direction.

18         Q     And the Initial Claim for Disability Benefits

19   has multiple sections to it, correct?

20         A     Correct.

21         Q     First section is Claimant's Statement, Section

22   A --

23         A     Yes.

24         Q     -- right?

25                And Section B is a Description of

Page 27

1    Occupation/Activities, right?

2         A    Yes.

3         Q    Does the Section B, Description of

4    Occupation/Activities ask questions about the mental or

5    cognitive functioning of the job?

6         A    No, it does not.

7         Q    Does Met Life have a form that asks questions

8    about the mental or cognitive requirements of an

9    occupation?

10        A    No, not that I'm aware of.

11        Q    And there is no Section C.  There's an

12   Attachment 1, Attending Physician's Statement, correct?

13        A    Yes.

14        Q    And Ms. Costa had written a note on this

15   Attending Physician Statement.  Can you read that into

16   the record?

17        A    Dr. Madden is in the process of completing,

18   and I will provide to you upon receipt.

19        Q    Who was your understanding of -- excuse me.

20             What was your understanding of who Dr. Madden

21   was?

22        A    Well, because it was written on the initial

23   intake form, I would have known that it was her

24   neurologist.

25        Q    As we sit here today, is that your

Page 28

1    understanding?

2        A    Yes.

3        Q    Do you recall when your first actual contact

4    with Ms. Costa was?

5        A    I don't recall the specific date, but it would

6    have been within 15 days after she filed receipt of the

7    initial claim on 9/30.

8             (Plaintiff's Exhibit 4 marked for

9             identification.)

10       Q    I will show you what I will mark as Exhibit 4.

11   Can you tell me what this is?

12       A    This is a document of a phone call on

13   October 13, 2015.

14       Q    And, at the top, it says Memorandum to IDI

15   Claim File, then it has a blank where Ms. Costa's name

16   is written.

17            Is this a standard form used at Met Life?

18       A    No, it's not a standard form.  Every examiner

19   tailors it to their own liking.  It's how we all

20   document phone calls.

21       Q    Is this your format that you use?

22       A    This is the format I typically use.

23       Q    When you would make a note about phone

24   conversations, you would use this format and create this

25   kind of a memo to the file?

Page 29

1      A    Correct.

2      Q    That was your standard practice?

3      A    Yes.

4      Q    What was the date of this one?

5      A    October 13, 2015.

6      Q    And please take a moment to review it.

7      A    Okay.

8      Q    This has a page number at the lower right

9   corner of 1,703, correct?

10     A    Correct.

11     Q    After reviewing it, do you believe that

12  October 13, 2015 was your first phone conversation with

13  Lori Costa?

14     A    Based off of reading it, it appears this would

15  be our first interaction over the phone.

16          (Plaintiff's Exhibit 5 marked for

17          identification.)

18     Q    I would like to show you what I will mark as

19  Exhibit 5 to your deposition and ask you to review it.

20     A    Okay.

21     Q    Can you tell me what this document is that

22  we've marked as Exhibit 5?

23     A    Once I receive a claimant's claim forms, we

24  conduct this call to help us understand, you know, to

25  get a full understanding of the claim itself, to help us

Page 30

1    understand better, more than just the claim forms.

2        Q    Okay.  So this is, at the top it says File

3    Documentation.

4            Is this a particular form used at Met Life, or

5    is this another form that you've created for your use?

6        A    Another one created for my use.

7        Q    And this particular File Documentation relates

8    to a phone call that you had with Ms. Costa on

9    October 23rd, 2015, right?

10        A    Correct.

11        Q    Fair to say it's five pages of single space

12    notes about that phone call?

13        A    Yes.

14        Q    And the page numbers we see at the bottom

15    right are 1,698 through 1,702?

16        A    Correct.

17        Q    The time reflected on the first page is

18    9:30 a.m.  Do you know what time the phone call ended?

19        A    I cannot recall what time the phone call

20    ended.

21        Q    And there is a claim number immediately above

22    the time.  Is that the identification number used at

23    Met Life to refer to Ms. Costa's claim?

24        A    That would be the claim number.

25        Q    And that's stayed with her claim the entire

Page 31

1    time it was open?

2         A    Correct.

3         Q    How is that number generated?

4         A    I honestly don't know exactly how that number

5    is generated.

6         Q    How do you learn what that number is?

7         A    I just refer to it on the claim file itself.

8    I don't -- if I need to search for the specific claim, I

9    have, you know, multiple modalities to do that based off

10   her name, her social security number, you know, if I

11   didn't -- couldn't recall the exact claim number.

12        Q    So when you get a paper claim file handed to

13   you, is that number on the outside of the jacket?

14        A    That's correct.

15        Q    Somebody else has put it on there?

16        A    Yes.

17        Q    Do you have a computer system that you can go

18   into and search for that claim number?

19        A    It's a -- only for making payments and

20   generating diaries, which are essentially notes, like,

21   reminders.  There's no claim file system with this

22   claim.  Like, no imaged claim file, is what I'm saying.

23        Q    What is the name of that system you're

24   describing?

25        A    UDSE.

1        Q    So if you would have given yourself reminders

2    or made some notes about Ms. Costa's claim, they would

3    have been made in UDSE?

4        A    Right.

5        Q    Other than what you typed up and put in the

6    paper file?

7             MR. MEAGHER:  I object.  Assumes facts not in

8        evidence.  You can answer.

9             THE WITNESS:  You know, it wouldn't be notes.

10       It would just be, like, tasks, reminders.

11   BY MR. TUCKER:

12       Q    Do you know if you inserted any tasks or

13   reminders into UDSE about Ms. Costa?

14       A    I cannot recall.

15       Q    At Met Life, do you have any other system

16   other than UDSE to remind you to do things on a file?

17       A    No, sir.

18       Q    Do you make reminders on every one of your

19   files?

20       A    When you -- when I'm talking about this UDSE

21   would be, when do I need to generate a status letter,

22   when is it due.  No notes, like, particular notes on

23   that -- on the case.  Just kind of, you know, when the

24   next letter is due, when I need to make a phone call.

25   Those types of things.

Page 33

1      Q    Fair to say it's a task list --

2      A    Correct.

3      Q    -- or a tick alert system?

4      A    To let us know that something is due,

5  something needs to be generated.

6      Q    Would it be part of your usual practice to

7  make notes in UDSE for those types of tasks or reminders

8  about Ms. Costa?

9      A    Yes.

10     Q    And do those continue to exist after the

11  reminder comes up, or are they deleted?

12     A    No.  They would continue to -- let me rephrase

13  that.  If it's one that's followed up with, let's say,

14  on a monthly basis, then I would just update that same

15  note for the next month.  If it was something that was

16  completed and I'm not going to refer back to it again,

17  then it's in the system permanently.

18     Q    And if you were going to make some type of

19  task or reminder on Ms. Costa's claim in UDSE, what

20  process would you go through to access that system and

21  enter her file?

22     A    There's a log-in to get into the system,

23  requires my ID number and a password.  Then I could

24  either enter her claim number, her name, or look her up

25  by social security number.

1     Q    So if you were at your desk today, could you

2   go into it and take a look at all of the tasks or

3   reminders you had put into UDSE regarding Ms. Costa?

4     A    I could.

5     Q    I would like to look back at the File

6   Documentation of February 23rd, 2015.

7          Do you have any recollection about how long

8   this phone call may have lasted?

9     A    I don't recall how long it would have lasted.

10    Q    When you got -- strike that.

11         Why is it important at that stage of the claim

12  to have a conversation with the Claimant and make

13  documentation about the phone conversation?

14    A    Because it assists in our evaluation to help

15  us understand the insured's claim.  It gives us

16  additional details in their own words regarding their

17  disability claim.

18    Q    So, after reviewing what we've marked as

19  Exhibit 5, do you have a recollection of what your

20  understanding was about the nature of Ms. Costa's

21  disability or the reasons why she wasn't able to do her

22  own occupation in October of 2015?

23    A    In October 2015, after this phone call, I had

24  a better idea of why she felt she couldn't work due to

25  her conditions.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        Q     What was that understanding?  What was your

2    understanding at that time?

3        A     Well, I mean, she states -- it's clearly

4    stated here that she cannot work due to episodes of

5    dizziness, double vision, headaches, tingling in hands

6    and feet, slurred speech with mouth droop, and cognitive

7    issues.  She is also fatigued.  So that was my

8    understanding as to why she felt she could not work.

9        Q     And, to the extent that you had detail about

10   that, you would have typed it in here from that

11   conversation?

12       A     In addition to what's here?

13       Q     In other words, in addition to what you just

14   told me, if there was additional detail, you would have

15   typed it into this File Documentation following that

16   phone conversation?

17       A     Right.  Correct.

18       Q     I would like to show you what I will mark as

19   Exhibit 6 to your deposition and ask you if you can

20   identify that document.

21             (Plaintiff's Exhibit 6 marked for

22             identification.)

23       A     This is an acknowledgment letter acknowledging

24   that we received her October 29, 2015 letter, which

25   included attached 2012 to 2014 individual income tax

Page 36

1    returns and schedule Pay Ones.

2         Q    What is the date of this letter?

3         A    November 3rd, 2015.

4         Q    Is that your signature appearing on the

5    letter?

6         A    That's correct.

7         Q    And was this letter addressed to Ms. Costa?

8         A    Yes.

9         Q    Had you asked Ms. Costa to provide tax

10   returns, or had someone else?

11        A    I did in the -- in this detail call that was

12   conducted on October 23rd.

13        Q    Why?

14        A    She was 50 percent partner with her firm.  We

15   wanted to independently verify her sources of income.

16        Q    How come?

17        A    To help us understand if she was gainfully

18   employed at the time of the claim.

19             (Plaintiff's Exhibit 7 marked for

20             identification.)

21        Q    I will show you what I've marked as Exhibit 7

22   to your deposition and ask if you can identify this.

23        A    It's a status letter sent on November 4th,

24   2015 by myself.

25        Q    And, in this particular status letter, on the

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 37

1    first page, you quote some sections of the Disability

2    Income Policy, correct?

3        A    Correct.

4        Q    At this stage of the claim, is this a standard

5    form letter that you send to someone inserting the

6    specifics about their claim?

7        A    It would be to make sure that they understand

8    what their definitions of total disability are, or

9    residual disability, to provide them with what the

10   monthly indemnity would be, as well as any additional

11   riders that are provided, and then where we are

12   currently at in our evaluation.

13       Q    When you say monthly indemnity, what does that

14   mean?  Explain that to the jury.

15       A    A monthly benefit; what the policyholder would

16   be paid on a monthly benefit, should we find them

17   totally disabled.

18       Q    And, in Ms. Costa's case, at the time of the

19   claim, that was $5,950?

20       A    That's correct.

21       Q    There was also a 90-day elimination period

22   that you described.  What is that?

23       A    The 90-day elimination period is essentially

24   the waiting period that a claimant must satisfy before

25   any benefits would start to accrue.

1     Q    When you talk in this letter about several

2  riders, what is a rider?

3     A    A rider would be an additional benefit on top

4  of your base monthly indemnity that you can purchase at

5  the time you purchase the policy.

6     Q    One of the riders was a monthly benefit for

7  total disability and your occupation rider.  What was

8  that rider for?

9     A    It essentially enhances the definition of

10  total disability.

11     Q    When you say that, what do you mean?

12     A    It removes -- let me refer back to the --

13     Q    Feel free.

14     A    Do you mind if I refer back --

15     Q    Any time you need to refer to another

16  document, feel free.  I think you indicated you were

17  going to refer to the policy itself and the rider?

18     A    Yes.

19     Q    Go ahead.

20     A    So, for this particular policy, the total

21  disability in your occupation rider removes not

22  gainfully employed from the total disability definition.

23     Q    What does that mean?

24     A    It means that a claimant, the requirement of

25  not -- of proving that they are not gainfully employed

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    is not a requirement to be fully disabled for this

2    particular policy.

3        Q    So Ms. Costa did not have to prove to Met Life

4    that she was gainfully employed to recover the benefit;

5    is that what you're saying?

6        A    I'm saying that had she been gainfully

7    employed after claiming disability, we could still

8    evaluate the claim, potentially pay out total disability

9    benefits, even if she was gainfully employed.

10        Q    In another occupation, is that what you're

11    saying?

12        A    If she were gainfully employed in another

13    occupation without transferable skills -- which isn't

14    the case in this situation -- potentially, a claimant

15    could still be paid benefits.

16        Q    To prove disability, did Ms. Costa purchase an

17    insurance policy that applied specifically to her

18    occupation as a trial lawyer?

19             MR. MEAGHER:  Objection to form.

20             MR. TUCKER:  What is the form objection?

21             MR. MEAGHER:  The form is the policy speaks

22        for itself.  It's a contract.

23    BY MR. TUCKER:

24        Q    I am asking your understanding.  Did Ms. Costa

25    have to demonstrate that she could not be a trial lawyer

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 40

1   as opposed to any other occupation?

2          MR. MEAGHER:  Same objection.

3          THE WITNESS:  With this case, the occupation

4       wasn't an issue.  We didn't, you know, state that

5       she wasn't a trial attorney.  The fact was there's

6       no sickness or injury that would prevent her from

7       working.

8   BY MR. TUCKER:

9       Q    So Met Life agreed she is a trial attorney, or

10  was a trial attorney?

11         MR. MEAGHER:  Objection to form.  You can

12      answer.

13         MR. TUCKER:  What is the form objection?

14         MR. MEAGHER:  When you say Met Life agreed, we

15      have a legal position that will be established

16      through the evidence, so that's my objection.

17  BY MR. TUCKER:

18      Q    So, you just testified about her position as a

19  trial attorney.  At any time, did you, as the adjustor

20  handling the file, state that she was not a trial

21  attorney?

22      A    No.  We took, based off of Ms. Costa, what she

23  verbally expressed to us, that she was a trial attorney,

24  so that's the position we took; that she was a trial

25  attorney.

Page 41

1        Q     At any time during your handling of the claim,
2    did you have any reason to dispute that?
3        A     No, we don't have any reason to dispute that.
4        Q     Did you investigate whether she was a trial
5    attorney?
6        A     Other than us asking her during this call and
7    during the visit, the field visit we had with her, and
8    the interview with Mr. Turner, there was no, I guess,
9    like, audit to verify -- well, we did -- what we did do
10   is also run what's known as a PACER search to see if any
11   trials popped up that were associated with Ms. Costa.
12       Q     Did you find cases that were associated with
13   Ms. Costa?
14       A     I did.  I can't recall how many, but from what
15   I recall, it wasn't an extensive amount.
16       Q     When you say that, can you associate a number
17   with that?
18       A     I can't.
19       Q     And you said a PACER search; that would be the
20   federal court system, right?
21       A     Right.
22       Q     Did you search through the state court system?
23       A     It would be specific to the State of Florida,
24   I would have searched as well.
25       Q     So you're saying you did a PACER search for

Page 42

1    the federal courts in Florida?

2         A    The -- how do you mean, do a search for the

3    federal --

4         Q    You described the PACER search.

5         A    Uh-huh.

6         Q    Can we agree that PACER is the federal filing

7    system --

8         A    Okay.

9         Q    -- not the state court filing system, correct?

10        A    Correct.

11        Q    So did you go county by county in the state or

12   circuit by circuit in the state court system to

13   determine what cases she was involved in?

14        A    No, I did not do that.

15        Q    The letter we're talking about here,

16   Exhibit 7, it's dated November 4th, 2015, the day after

17   the last letter we discussed, right?

18        A    November 4th, yes.

19        Q    Is that your signature appearing on the second

20   page of the letter, Bates page 1,632?

21        A    Yes, that is my signature.

22        Q    You make reference on that page that the file

23   will be reviewed, quote, by one of our consulting board

24   certified physicians, end quote.

25             Explain to me what a consulting board

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 43

1    certified physician is at Met Life, please.

2         A    A consulting board certified physician would

3    be an in-house consultant that is tasked with reviewing

4    the medical records; any medical information received.

5         Q    So when you say in-house, does that mean

6    they're employed by Met Life?

7         A    No.

8         Q    So when they're in-house, what does that mean?

9         A    It means that potentially, in addition to

10   running their own practice, they frequently -- they will

11   also come into the Tampa Met Life office and review

12   disability claims.

13        Q    They actually have an office in the Tampa

14   office?  When I say an office in, I mean like a room

15   we're sitting in now with a door.

16        A    No.  Well, there is one consulting physician

17   that does technically have an office.  I'm not clear as

18   to whether or not he also has a practice outside of

19   Met Life consulting, but many of the consultants still

20   have their own medical practice in addition to examining

21   disability cases for Met Life.

22        Q    Do they have a designated area where they come

23   in and review files?

24        A    Most of them have a designated cubicle type

25   area to come in and review files.

Page 44

1      Q     Do you have an office or a cubicle yourself?

2      A     A cubicle.

3      Q     So they come in and sit at a cubicle just like

4   you?

5      A     Right.  We're not by each other, but...

6      Q     The consulting physician that has an office,

7   did that physician do any work on Ms. Costa's claim?

8      A     No.

9      Q     Now, at the time you wrote the letter of

10  November 4th, 2015, did you know which consulting

11  physician would be reviewing her file?

12     A     I did not.

13     Q     How is that determined?

14     A     There would be a consulting board certified

15  physician who would triage these cases and determine who

16  the medical consultant will be based on specialty,

17  things of that nature, of who should be assigned to the

18  case.

19     Q     So, to put it simply, does that mean there's a

20  gatekeeper consulting physician who doles out the

21  assignments to the other consulting physicians?

22     A     Correct.

23     Q     So you don't actually make the assignment to

24  the doctor that's reviewing the file; that's something

25  that's delegated to a doctor who is paid by Met Life?

1       A    It's delegated to a consulting physician

2   for -- working for Met Life.

3       Q    Now, you are the person who made the decision

4   on the file, right?

5       A    That's correct.

6       Q    So whether Ms. Costa got paid or not, was that

7   up to you or somebody else?

8       A    The review and determination was developed by

9   me.  An ultimate determination, as I stated previously,

10  would need to be signed off by a manager.

11      Q    So the consulting physicians were not the ones

12  who made the decision whether Ms. Costa got approved or

13  denied?

14      A    No.

15           (Plaintiff's Exhibit 8 marked for

16           identification.)

17           MR. MEAGHER:  Before we leave, just for the

18      record, Plaintiff's Exhibit 7 is incomplete, as

19      there is an enclosure that is not marked.  I don't

20      want to be confused later on.  It's not included in

21      the letter.

22  BY MR. TUCKER:

23      Q    I would like to show you what I will mark as

24  Exhibit 8 to your deposition.  I will ask if you can

25  identify what this document is, please.

Page 46

1        A     It is a financial referral form.

2        Q     And what is that?

3        A     It's an internal form that we use to basically

4    show that we're referring it to a consultant for

5    financial review.

6        Q     What would be the purpose of a financial

7    referral?

8        A     In this particular case, we had financial

9    documentation that we wanted reviewed by a CPA.

10       Q     Now, on this form, in the middle of the

11   section at the bottom, there is a line that says, policy

12   effective date, May 10, 2008.

13             What would be the significance of the date the

14   policy went into effect on the financial referral?

15       A     I believe this form is generated from an

16   internal database system, and I think it's just

17   automatically generated.  If there's a significance for

18   any effective date, I don't know what that is for it

19   being on this form.

20       Q     That financial referral was made on or

21   requested on what date?

22       A     November 4th, 2015.

23             (Plaintiff's Exhibit 9 marked for

24             identification.)

25       Q     I will show what you I will mark as Exhibit 9.

1    On the same date you made a database query request; is
2    that right?
3           A     That's correct.
4           Q     Are you the person that created this document
5    that we've marked as Exhibit 9?
6           A     Yes.
7           Q     What would be the purpose of the database
8    query request?
9           A     To obtain additional information for our
10   evaluation.
11          Q     So was the additional information that you
12   were looking for the items that have the word Yes
13   written next to them in the Search/Check For section?
14          A     Correct.
15          Q     Are those your initials or some signature of
16   yours by the words Yes in that section?
17          A     Those are my initials.
18          Q     And tell me, please, what you were looking for
19   on November 4th, 2015 with this database query request.
20          A     Anything that would be helpful for our
21   evaluation of reviewing Ms. Costa's claim.
22          Q     So what is business background?
23          A     It would be an Accurint search, LexisNexis, to
24   pull up any businesses associated with Ms. Costa.
25          Q     And what would a pro license check be?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 48

1        A     To check for any professional license, as

2    she's an attorney, you know, to see if there's any

3    certifications or licenses that would pop up.

4        Q     And what is a litigation check?

5        A     That would be the PACER search I referred to

6    previously.

7        Q     And what is a background search?

8        A     It would be also an Accurint LexisNexis search

9    that provides us with details regarding any background

10   information on Ms. Costa.

11       Q     So, on this form, her occupation is, again,

12   listed as trial attorney, right?

13       A     Correct.

14       Q     Underneath that, what is the ICD-9?

15       A     Again, this form is automatically generated

16   from a database, and that ICD-9 is automatically

17   populated.  That ICD-9 code was entered in at the onset

18   of the claim, likely by the Claims Support Unit, so it's

19   not something that I would have typed myself there.

20       Q     Does it have any significance in the claim?

21       A     It has -- that specific line on this form

22   doesn't have any significance in my determination, if

23   that's what you're asking me.

24       Q     Is that information in Met Life's system, what

25   is the significance of that, not just on this form?

1        A     It's entered at the time the claim is created

2    to help you understand what the claim may be related to,

3    and I don't know if there's multiple diagnoses you can

4    include in there, or if you have to select one.  I

5    don't -- I don't know.

6        Q     Have you ever been the person to assign the

7    ICD-9 description?

8        A     No.  A claims specialist wouldn't be assigned

9    with that.

10        Q     And the databases that were being queried, are

11   they the ones you described before; LexisNexis, PACER?

12        A     Right.

13        Q     Are there any others that you haven't

14   identified?

15        A     Not that I can recall.

16        Q     So, you said PACER.  Were you aware at the

17   time what courts Ms. Costa typically litigated in?

18        A     When I go into PACER, I essentially search for

19   the state and area where the insured works and resides,

20   and try and pull everything up from that database.

21        Q     Were you aware that you cannot find the state

22   court system cases in PACER?

23        A     No.

24              (Plaintiff's Exhibit 10 marked for

25              identification.)

1        Q    I would like to show you what I will mark as

2   Exhibit 10 to your deposition.   This is also dated

3   November 4th, 2015, correct?

4        A    Correct.

5        Q    Is this a form you would have created?

6        A    It's a generated form from another access

7   database that pre-populates information.   I'm able to

8   manipulate what goes in there.

9        Q    It's called a field report request; is that

10   right?

11        A    Correct.

12        Q    Part of the word field is taken out by what

13   appears to be a hole-punch, correct?

14        A    Yes.

15        Q    The Bates page number is 1,637?

16        A    Correct.

17        Q    What is the purpose of the field report

18   request?

19        A    This form is created to then be sent to a

20   field claims representative for the purpose of

21   requesting a field visit with a claimant.

22        Q    Do you actually send someone out to meet with

23   the claimant?

24        A    Correct.

25        Q    There is a section at the bottom that says

Page 51

1    request response time within 30 days.  What does that

2    mean?

3         A    It means that will be the requested time that

4    they schedule the meeting, within 30 days.  That would

5    be the ideal time.

6         Q    So, on November 4th, you wanted someone to do

7    a field interview within the next 30 days?

8         A    Ideally, yes.

9              (Plaintiff's Exhibit 11 marked for

10             identification.)

11        Q    I would like to show you what I have marked as

12   Composite Exhibit 11 to your deposition and ask if you

13   can tell me what this is.

14        A    This front page appears to be the cases that

15   were generated from PACER.

16        Q    The entire composite runs from Bates page

17   1,593 to 1,630, correct?

18        A    Correct.

19        Q    It's not just the PACER report, is it?

20        A    No.

21        Q    What other things are included in here?

22        A    Other documents included are the business

23   background search and individual background search.

24        Q    Was there any information derived from those

25   database searches that you considered significant for

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 52

1    purposes of the claim when you were handling it?

2         A    Can you repeat the question?

3         Q    Was there any information contained in these

4    database reports that you considered significant for

5    purposes of the claim when you were handling it?

6         A    I mean, it would have been factored in.

7         Q    Was there anything in there that you found

8    particularly significant for assessing Ms. Costa's claim

9    as to whether she was disabled?

10        A    Again, it would just be a factor, something to

11   consider.

12        Q    Was there anything in the database

13   documentation that you relied upon, any fact that led

14   you to conclude that she was not being truthful with

15   Met Life at any time?

16        A    Not that I can recall.

17        Q    Is there any factor reflected in the database

18   reports that you relied upon to conclude that Ms. Costa

19   was not disabled?

20        A    No.  As -- no.

21             (Plaintiff's Exhibit 12 marked for

22             identification.)

23        Q    I would like to show you what I have marked as

24   Exhibit 12 and ask you to review that.  Please let me

25   know when you're done reviewing it.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 53

1        A     Okay.

2        Q     Can you identify that, please?

3        A     This is a medical consultant review form or

4    referral form completed by a consulting physician.

5        Q     What is the date on it?

6        A     The date it was created or the date it was

7    reviewed?

8        Q     The date at the top right.

9        A     November 12, 2015.

10       Q     That's on the first page, Bates number 1,466,

11   correct?

12       A     Correct.

13       Q     Did you create this top sheet?

14       A     Yes, I did.

15       Q     What's the title, please?

16       A     Medical Consultant Referral for Dr. T.

17   Seehausen.

18       Q     Who is Dr. T. Seehausen?

19       A     He is a consulting board certified family

20   physician.

21       Q     And the remaining pages of this exhibit, were

22   they prepared by Dr. Seehausen?

23       A     Correct.

24       Q     And they are directed to you?

25       A     Directed to me -- they're -- it gives a

Page 54

1    detailed history of the medical records, and then, you

2    know, we're requesting that he gives us restrictions,

3    limitations, so that's what he's tasked with.

4         Q    Was any other disability claim examiner

5    handling the file at this time other than you?

6         A    No.

7         Q    There's a reference on the first page, it has

8    your name, then it says T410.  What is that, please?

9         A    Essentially, my identification number.

10        Q    Okay.  So your Met Life employee number, that

11   type of thing?

12        A    When I was referring to the UDSE system,

13   that's my identification in that particular system.

14        Q    The primary diagnosis section, what conditions

15   are listed there?  Please read those into the record.

16        A    Fibromyalgia, ataxic gait, ophthalmoplegia,

17   restless leg syndrome, vertigo, paresthesia, frontal

18   processing errors.

19        Q    Was frontal processing errors something that

20   was added to the list sometime between September and

21   November 12th?

22        A    I would have to review the prior documents.

23        Q    Look at the initial claim, if you could.  It

24   was not listed on the initial claim report, was it, that

25   first exhibit that we had?

```
 1        A    Exhibit 1, the original intake call form?

 2        Q    Either, but Exhibit 1 was what I was referring

 3   to.

 4        A    No, it's not listed here, so it must have been

 5   discussed during our initial call.

 6        Q    Do you know who would have added it to the

 7   list?

 8        A    I would have added it to the list.

 9        Q    Who would have selected Dr. Seehausen?  That's

10   S-E-E-H-A-U-S-E-N.

11        A    I can't say with 100 percent certainty who did

12   it, but it would be the physician in charge of triage,

13   Dr. Clayton Hauser.

14        Q    Where is Dr. Hauser based?

15        A    In Tampa.

16        Q    Is it H-A-U-S-E-R or H-O-U-S-E-R?

17        A    H-A-U-S-E-R.

18        Q    Do you know what process Dr. Hauser went

19   through to select Dr. Seehausen?

20        A    I do not.

21        Q    Do you know why Dr. Hauser would have triaged

22   this and sent it to a family practice doctor?

23        A    He would have given it to him, because

24   Ms. Costa was apparently claiming medical conditions

25   that he would be able to review and comment on.
```

1      Q     In comparison to some other medical specialty,

2   do you know why he would have selected family practice?

3      A     I do not know specifically why it would have

4   been family practice.

5      Q     Did you request a family practice doctor?

6      A     No.

7            MR. TUCKER:  I don't have any other questions

8        about that exhibit.

9            (Plaintiff's Exhibit 13 marked for

10           identification.)

11  BY MR. TUCKER:

12     Q     Let me show you what I have marked as

13  Exhibit 13 to your deposition and ask if you can

14  identify what that is for me, please.

15     A     This is a letter sent by me to Ms. Costa on

16  December 14, 2015.

17     Q     In that letter, you indicate that a board

18  certified family physician completed a review of records

19  from a variety of medical doctors, correct?

20     A     Correct.

21     Q     And your signature is on the second page of

22  that letter?

23     A     Yes.

24     Q     Is the board certified family physician

25  referred to in that paragraph, the first full paragraph

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    there in the December 4th letter Dr. Seehausen?

2         A    Yes.

3         Q    Do you know anything about Dr. Seehausen's

4    qualifications other than he is a board certified family

5    practice doctor?

6         A    That is the only qualification I know, is that

7    he is board certified.

8         Q    There is a sentence after that list of doctors

9    that reads, quote, based on the available information we

10   find that additional information is needed for your --

11   excuse me -- for our review, end quote.

12             Why was that?

13        A    Because, at that time, we found additional

14   information was needed, as stated in the medical review

15   of November 18th, 2015 by Dr. Seehausen.

16        Q    What additional information was needed?

17        A    Well, at this time, the claim, the information

18   we were seeking at this time was a telephone conference

19   with Dr. Madden.

20        Q    Was that the only information needed?

21        A    I can't say that that's the only information

22   that was needed.

23        Q    What other information was needed?

24        A    At that time, we were also referring the

25   available information to a consulting board certified

Page 58

1    physiatrist.

2        Q    What's a physiatrist?  What is your

3    understanding of what a physiatrist is?

4        A    Well, I can state for this particular case,

5    the reason why we selected -- why a physiatrist was

6    asked to review the case was so he could review the EMG

7    studies to understand the nerve conduction testing and

8    comment on that.

9        Q    Okay.  So what is your understanding of what a

10   physiatrist is?

11       A    A physician that would review a patient to

12   understand where their pain is coming from, my

13   understanding, typically dealing with the nerves and

14   things like that.

15            (Plaintiff's Exhibit 14 marked for

16            identification.)

17       Q    We will get to that in a minute.

18            I would like to show you what I have marked as

19   Exhibit 14 to your deposition and ask if you can

20   identify this.

21       A    This is the completed financial report.

22       Q    Who prepared it?

23       A    Mr. Douglas Franzese.

24       Q    F-R-A-N-Z-E-S-E?

25       A    Yes.

Page 59

1      Q      He is a CPA?

2      A      Yes.

3      Q      What is your understanding of what a CPA is?

4      A      Certified public accountant, or certified

5   accountant that is certified to review financials, tax

6   returns, business tax returns, and provide a

7   comprehensive breakdown of what those numbers mean.

8      Q      So Exhibit 14, is that a memo from

9   Mr. Franzese to you?

10     A      Yes.  It is his completed report that he then

11   sends to me, gives to me.

12     Q      At the top, it says, to Sean White, senior

13   disability claims specialist, right?

14     A      Correct.

15     Q      And it's dated December 4th, 2015?

16     A      Yes.

17     Q      Under policy information, do you know why

18   Mr. Franzese wrote, 39-year-old, quote, attorney, end

19   quote?

20     A      I can't speak for why he put that there.

21     Q      Did you have any discussions about Ms. Costa's

22   occupation with Mr. Franzese?

23     A      Not that I recall.

24     Q      Did you speak to Mr. Franzese about Ms. Costa

25   verbally?

Page 60

1      A      I may have spoken with him once he sent the

2   report back to me if I happened to be there, but I can't

3   recall any interactions with him for this particular

4   report.

5      Q      If you had, would that have been documented in

6   writing somewhere?

7      A      No.

8      Q      Is Mr. Franzese a Met Life employee?

9      A      No, he's not.

10     Q      He is an outside consultant?

11     A      Yes.

12     Q      Have you interacted with Mr. Franzese on other

13   claims?

14     A      I have.

15     Q      Are you able to estimate how many times?

16     A      No.

17     Q      More than five?

18     A      Yes.

19     Q      More than 10?

20     A      I would say yes.

21     Q      More than 20?

22     A      That I don't know.

23     Q      Why was this report needed?

24     A      As stated previously, we requested the

25   financial documents to help us understand Ms. Costa's

Page 61

1    sources of income, and seeing that I'm not a CPA, I then

2    refer it to a CPA to take that financial documentation

3    she provided to me and put it into this comprehensive

4    report.

5         Q    Is it a standard practice to get a report like

6    this?

7         A    It's on a case by case basis, but it's fairly

8    common, yes.

9         Q    Is this format prescribed by Met Life, or is

10   this something Mr. Franzese creates himself?

11        A    This would be something that he creates for

12   himself.

13        Q    And what was the useful information or

14   conclusions that you were able to draw from this memo

15   that you used in handling Ms. Costa's claim?

16        A    Well, the report was -- it was factored in in

17   our review.  It just helped us understand what the

18   breakdown of her earnings were just prior to her claimed

19   disability to help us understand her earnings.

20        Q    So, at the time she became disabled, am I

21   correct in reading this, that her prior average monthly

22   earnings were $13,654.06?

23        A    That's correct; based off of the three-year

24   average.

25             (Discussion held off the record.)

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 62

1          VIDEOGRAPHER:   This is the end of video number

2     one.   The time is now 11:09.   We are going off the

3     record.

4          (A short recess was taken.)

5          VIDEOGRAPHER:   This is the beginning of video

6     number two.   The time is now 11:26.   We are back on

7     the record.

8  BY MR. TUCKER:

9     Q    Mr. White, who is Patricia Parvin?

10    A    She is a field claims representative.

11    Q    I would like to show you what I will mark as

12 Exhibit 15 to your deposition and ask if you can

13 identify those documents for me.

14         (Plaintiff's Exhibit 15 marked for

15         identification.)

16    A    The first photo appears to be a picture of a

17 street with homes; I'm assuming Ms. Costa's

18 neighborhood.   The second photo, a picture of

19 Ms. Costa's home.   The third, a driver's license photo.

20 And the fourth, an actual photo of Ms. Costa during the

21 interview.

22    Q    And what are the three Bates page numbers in

23 this exhibit?

24    A    19, 20, and 21.

25    Q    1,019, 1,020, and 1,021?

1       A     Correct.

2       Q     Why do your field claim representatives obtain

3    a copy of the driver's license when they go out?

4       A     Not all of them do, but it's fairly common

5    to -- if we don't know what the claimant looks like --

6    to give us a photo ID.

7       Q     Is that the same reason for taking a

8    photograph of the person?

9       A     Correct.

10      Q     And why would a picture of their home be

11   obtained?

12      A     Should we do any activity monitoring, it would

13   be helpful to understand the exact location of where the

14   insured lives.

15      Q     Activity monitoring; is that surveillance by a

16   private investigator?

17      A     Correct.

18      Q     This was something that was done on this

19   claim, correct?

20      A     That's accurate.

21            MR. TUCKER:  We'll talk about that in a while.

22            (Plaintiff's Exhibit 16 marked for

23            identification.)

24   BY MR. TUCKER:

25      Q     You can put that down.  I will show you what I

Page 64

1    have marked as Exhibit 16 and ask you if you can

2    identify this.

3         A    This is the field claim report completed by

4    Patricia Parvin.  Completion date was December 7, 2015.

5         Q    And what was the purpose of having Ms. Parvin

6    go out and do a field interview?

7         A    The purpose of the field interview is to

8    obtain additional information that we may have not

9    gathered previously in our evaluation that may be

10   helpful for our evaluation.

11        Q    Was there anything obtained in the field claim

12   report that you found was not accurate?

13        A    The occupational information, Ms. Costa notes

14   that she provided us or already sent us a trial attorney

15   questionnaire, and we never actually received that form.

16        Q    Before this date or ever?

17        A    We have never received the form.

18        Q    Did you tell her that?

19        A    I don't recall if that was verbally discussed,

20   but it doesn't matter; the basis of our -- we conceded

21   the fact that she was a trial attorney.

22             The basis of our claim was her medical

23   condition and the fact that we didn't find a sickness or

24   injury preventing her from working.

25        Q    Is there anything else that was not accurate

Page 65

1    or correct?

2              MR. MEAGHER:  I'm going to object.  Calls for

3         speculation.  You can answer.

4              THE WITNESS:  There's nothing to my

5         recollection that was in addition to what I just

6         told you that was inaccurate or that was -- I don't

7         recall anything specific that was, you know, not

8         true.

9    BY MR. TUCKER:

10        Q    Okay.  On page 10 of 13, there's a header

11   titled Restrictions/Limitations.  Page 10, Bates page

12   1,038.

13        A    Okay.

14        Q    So, in the interview that Ms. Parvin conducted

15   with Ms. Costa, they went through several things that

16   Ms. Costa described as the restrictions or limitations

17   that kept her from performing her occupational duties,

18   and those are reflected here; is that accurate?

19        A    That's accurate.  She reports what she states

20   she's experiencing.  The restrictions, limitations she's

21   experiencing.

22        Q    So the bullet points come under different

23   headers with some additional text, but the headers read,

24   frontal processing problems, difficulty reading, poor

25   memory, speech, focus, periodic episodes of dizziness

Page 66

1    and balance problems, and then on the next page,

2    fatigue.  Is that accurate?

3         A    That's accurate.

4         Q    Now, Ms. Parvin was also assigned to speak to

5    Ms. Costa's business partner, Mr. Turner, correct?

6         A    She did conduct a collateral interview.

7              (Plaintiff's Exhibit 17 marked for

8              identification.)

9         Q    I will show you what I've marked as

10   Exhibit 17.  Are you able to identify that?  It's

11   actually two documents combined as one.

12        A    Yes.  It's a December 16, 2015 e-mail from

13   Ms. Patricia Parvin in regards to her collateral

14   discussion with Scott Turner on December 7th, 2015.

15        Q    What is a collateral discussion?

16        A    In addition to meeting with the insured to

17   discuss the details of their claim, they were also asked

18   to then reach out to Ms. Costa's partner, Mr. Scott

19   Turner, to interview him regarding Ms. Costa's

20   employment.

21        Q    And the e-mail dated December 16 from

22   Ms. Parvin is addressed to you and other individuals?

23        A    It is addressed to me and two other

24   individuals.

25        Q    Who is Kris, K-R-I-S, Anderson?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 67

1        A     He was my manager at the time.

2        Q     And who was Jamie Frederick?

3        A     He was also an IDI claims manager at the time.

4        Q     Do you know why this e-mail was directed to
5    both of them?

6        A     Kris Anderson was copied because he is my
7    manager, so it's common for the field representatives to
8    include, CC them on field reports.

9              Jamie Frederick, I believe he -- Ms. Parvin
10    reported to him at the time.

11       Q     And what is the purpose of copying the
12    managers on the field reports?

13       A     So that they're aware that it's taken place.

14       Q     In the summary of the conversation titled
15    Field Claim Report, which starts on the second page of
16    this exhibit, Ms. Parvin describes the number of cases
17    that Mr. Turner reported as their firm having.  That
18    would be on the second page of the field report, Bates
19    page 1002.

20       A     Uh-huh.

21       Q     And what she wrote was that Mr. Turner
22    reported they had approximately 300 cases, and that
23    Ms. Costa had her own caseload, which was about
24    one-third of that amount; is that accurate?

25             MR. MEAGHER:  Objection to form.  You can

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 68

1       answer.

2    BY MR. TUCKER:

3       Q    Is that an accurate statement of what the

4    report says?

5       A    It's accurate that Mr. Turner stated that.

6    That's how it's stated in this report.

7       Q    So that would be approximately 100 cases that

8    Ms. Costa was handling, according to Mr. Turner?

9       A    According to Mr. Turner.

10      Q    Did Met Life have any reason to doubt that?

11      A    Not at this -- no, I wouldn't have any reason

12   to doubt what Mr. Turner provided.

13      Q    Did you do any additional investigation into

14   the comments that Mr. Turner told Ms. Parvin as

15   reflected in this field claim report?

16      A    Anything in regards to how many cases?

17      Q    Anything in the report.

18      A    I don't believe there was any further

19   investigation, as we didn't find it necessary, as we

20   concede to the fact that she was a trial attorney.

21      Q    So you did not request that Ms. Parvin follow

22   up on anything, correct?

23      A    To the best of what I can recall, Ms. Parvin

24   was -- had no more interaction in this case after this

25   meeting.

1      Q     So, after December 16th, 2015, Ms. Parvin was

2    not involved in the claim in any way?

3      A     I believe she was not.

4      Q     Did you assign anyone else or request anyone

5    else do any investigation regarding anything about

6    Mr. Turner or Mr. Turner's law firm after December 16th,

7    2015?

8      A     Any inquiries specifically reaching out to

9    him?

10     Q     For any reason.

11     A     Not that I can recall.

12           If I may go back to when I was referring to

13    Ms. Parvin, when we talked about scheduling

14    surveillance, she may have been the person who

15    assigned -- who reached out to an investigator to

16    schedule that.

17     Q     Okay.  We'll come to that in a moment.

18           Did you ever personally -- meaning yourself --

19    speak to Mr. Turner?

20     A     I don't believe so, no.

21     Q     Did you ever speak to anyone that worked for

22    the law firm that Mr. Turner and Ms. Costa had?

23     A     No, I did not.

24     Q     Did Ms. Parvin speak to any employees of the

25    law firm other than Mr. Turner or Ms. Costa?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        A     I don't believe Ms. Parvin had any interaction

2   with anybody else other than Mr. Turner.

3        Q     Did anyone working for or on behalf of

4   Met Life at any time while the claim was pending have

5   any interaction with any employee of the law firm

6   Ms. Costa and Mr. Turner had together, other than

7   Mr. Turner or Ms. Costa?

8        A     Not to my recollection, no.

9        Q     Did anyone other than Ms. Parvin speak to

10  Mr. Turner at any time while the claim was pending on

11  behalf of Met Life?

12       A     No.

13              (Plaintiff's Exhibit 18 marked for

14              identification.)

15       Q     I would like to show you what I have marked as

16  Exhibit 18.  We are going to move on to December 7,

17  2015, and I would like to ask if you can identify what

18  these two documents are.  They are Composite 18.

19       A     The first is a December 7th, 2015 e-mail to

20  IDI Claims Medical Scheduling for the purpose of

21  scheduling a doctor-to-doctor phone call.

22       Q     And that was an e-mail that you sent, correct?

23       A     This was an e-mail that I sent to IDI Claims

24  Medical Scheduling.

25       Q     From your Met Life e-mail address?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        A    Correct.

2        Q    And is IDI Claims Medical Scheduling some

3   central clearinghouse where there's one single e-mail

4   and assignments go from there?

5        A    Correct.

6        Q    And is that Dr. Hauser's e-mail or somebody

7   else's e-mail?

8        A    This would be assigned to our Claim Support

9   Unit, who would -- like you said, the clearinghouse.  It

10  would be assigned to somebody on our Claims Support

11  team.

12       Q    Would they know that Dr. Seehausen had already

13  done a review on the file and known to direct it to

14  Dr. Seehausen?

15       A    Well, in the form itself, it's stating who the

16  consultant is that I would like to schedule a call for

17  and who the claimant's doctor is that I want him to

18  speak with.

19       Q    And that's the second page of Exhibit 18?

20       A    Yes.

21       Q    Is the request for doctor-to-doctor call form,

22  the second page of this exhibit, a Met Life form, or is

23  that something you created?

24       A    It's a Met Life form.

25       Q    Does this reside in paper format, or is it in

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 72

1    the computer system?

2         A    It's in electronic form.

3         Q    And where is that electronic form found in

4    Met Life's computer system?

5         A    It would be in a folder within our shared

6    company drive.

7         Q    Is there a name for that folder?

8         A    I don't recall what it would be.  It's just a

9    forms folder for IDI claims.

10        Q    Is this what you're describing; is it as if a

11   person was on their own computer looking at Windows and

12   just navigating through folders to find something, or

13   does it look different?

14        A    Right.  It would be on a shared drive within

15   the computer.  You would navigate into that drive, then

16   go into a folder to find this specific Word document.

17        Q    And what is the title of the folder where you

18   would find that form?

19        A    Again, I don't recall the exact name of it.

20             (Plaintiff's Exhibit 19 marked for

21             identification.)

22        Q    I am going to show you what I'll mark as

23   Exhibit 19.  Is that document dated December 8, 2015?

24        A    It is December 8, 2015.

25        Q    And what is this document?

Page 73

1        A      It is a letter from Ms. Lori Costa to myself
2   and Patricia Parvin regarding a follow-up to the
3   in-person meeting that Ms. Parvin had with her on
4   December 7th.
5        Q      And there's a stamp to the right in the middle
6   of the page that says 15 December 11.  Is that a date
7   stamp?  It has a time also.
8               Is that a date stamp that's put on by somebody
9   at Met Life when it's received?
10       A      Correct.
11       Q      So December 11 of 2015 is the date that letter
12  was received at Met Life?
13       A      That's right.
14       Q      Are you able to determine when you first saw
15  that letter?
16       A      I mean, it should -- if I was in the office, I
17  would have likely seen it on that day or the next.
18       Q      And, at that time, how did you get your mail?
19       A      It's delivered by our Claims Support Unit by
20  paper.
21       Q      Did you physically get a stack of mail each
22  day?
23       A      Yes.
24       Q      When you got letters such as this, would it
25  come with the envelope attached to it in your mail

Page 74

1    stack?

2        A    It should be stapled to it if there's an

3    envelope.

4        Q    Were these documents at the time imaged

5    anywhere, or were they just maintained in the paper

6    format?

7        A    Paper format.

8        Q    Are they imaged today in your claim files

9    electronically?

10       A    No.  This claim file is paper only.

11       Q    So there's no part of this claim file that

12   ever made its way into an electronic format, other than

13   perhaps counsel may have scanned it or something like

14   that?

15       A    Correct.

16       Q    What was your understanding of Ms. Costa's

17   purpose of sending this letter to you and Ms. Parvin?

18       A    It appears that she would -- wanted to add

19   statements that she did not provide to Ms. Parvin as

20   well as a clarification.

21       Q    Was one about her processing speed of dealing

22   with information at work?

23       A    One was about processing speed.

24       Q    Was a second about how stress impacts her?

25       A    Yes.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1          (Plaintiff's Exhibit 20 marked for

2          identification.)

3     Q    If I could show you what I've marked as

4   Exhibit 21 to your deposition and ask if you could tell

5   me what this is.

6     A    This is an incomplete review of our consulting

7   board certified physiatrist done on 12/9/2015.

8          MR. TUCKER:  What exhibit number did I put on

9     that, please?

10         THE WITNESS:  21.

11         MR. TUCKER:  I apologize.  I think we are on

12    20.  That's my mistake.  We will change that to 20.

13    I will modify it.  I actually did it correct on

14    this one, and that includes the report.

15         THE WITNESS:  Okay.  So this is a medical

16    consultant referral to Dr. Jairo Parada dated

17    December 8, 2015.

18  BY MR. TUCKER:

19    Q    J. Parada is Jairo Parada; J-A-I-R-O, Parada?

20    A    Correct.

21    Q    Is Dr. Parada the physiatrist you talked about

22  earlier?

23    A    He is.

24    Q    Do you know what an EMG slash NCV report is?

25    A    The EMG is what I believe to be -- reveals the

1    nerves to test for any type of damage, but I don't know

2    the, you know, technical aspects of it.

3         Q    Was there anything that Dr. Parada found was

4    abnormal?

5              MR. MEAGHER:  I object to form.  You can

6         answer.

7    BY MR. TUCKER:

8         Q    To the extent you understand, was there

9    anything that Dr. Parada found to be abnormal?

10             MR. MEAGHER:  I'm also going to object; the

11        document speaks for itself.  You can answer.

12             THE WITNESS:  All right.  The document speaks

13        for itself.

14   BY MR. TUCKER:

15        Q    So you're deciding the claim, right?

16        A    I am.

17        Q    You have to understand what's wrong with the

18   person to decide the claim, right?

19        A    Correct.

20        Q    So you send these reports out to these

21   consulting doctors to get information to help you

22   understand what's going on to make a decision in the

23   claim, correct?

24        A    I do.

25        Q    So what was your understanding of what

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 77

1    Dr. Parada told you?

2         A    That at this time he had not -- did not

3    provide any type of restrictions, limitations, based off

4    of what he reviewed.

5         Q    And is it your understanding that he thought

6    that she was perfectly normal from the EMG and NCV

7    testing?

8         A    I can't tell you what he was thinking.

9         Q    Well, from his report, your understanding.

10             MR. MEAGHER:   I object to form.

11             THE WITNESS:   Based off of this, it appears

12        what he has at this time, he's unable to determine

13        what medical conditions she may or may not have.

14   BY MR. TUCKER:

15        Q    So as of December 8, 2015, was your

16   understanding that you didn't have enough information to

17   decide what was wrong with Ms. Costa, if anything?

18        A    That's correct.

19        Q    Did you have any information that would lead

20   you to doubt what Ms. Costa was telling you about her

21   restrictions and limitations?

22        A    It's not that I have information that would

23   lead me to doubt what she's telling me.  That's not my

24   job, to doubt what she's telling me.

25             It's just based on the facts that I've

1    collected in the file so far, am I able to justify a

2    sickness or injury that causes impairment.

3        Q    So you didn't dispute the fact that she was

4    having all the restrictions and limitations she told

5    Ms. Parvin?

6        A    Again, I'm not -- we are -- I guess I'm

7    unclear as to what you're asking.

8        Q    Did you have any information that caused you

9    not to believe Ms. Costa when she listed several

10   restrictions and limitations in her interview with

11   Ms. Parvin?

12       A    Right.  We are not in the business of not

13   believing somebody, but we have to gather the facts,

14   make a determination based off of the facts that have

15   been provided to us, and at this time, in the review,

16   our consulting medical physicians did not provide me

17   with a response or any information that would allow me

18   to say that I could make a determination of disability

19   at that time.

20       Q    So do you consider what a claimant tells you

21   to be a fact?

22       A    No, I don't consider what a claimant tells me

23   to be a fact.

24       Q    Do you consider what a claimant tells you to

25   be information that you have to consider in the claim?

1        A     Right.   What's told to me by a claimant, I

2   have to give consideration to and research what's given

3   to me.

4        Q     But you do not believe it is part of your job

5   to find information that either confirms or disputes

6   what the claimant tells you?

7        A     That is part of my job, and that's, I believe,

8   reflected in the file.

9        Q     As of December 8, 2015, did you have any

10  information that led you to dispute what Ms. Costa had

11  told Ms. Parvin in the field interview?

12       A     At December 8th, we were still -- there was

13  still outstanding information to gather, so, again, we

14  weren't at a point to make a determination of the claim.

15             (Plaintiff's Exhibit 21 marked for

16             identification.)

17       Q     Let me show you what I will mark as Exhibit 21

18  to your deposition.   Is this a letter dated December 11,

19  2015?

20       A     Yes, this is a letter dated December 11, 2015

21  to Ms. Lori Costa from myself.

22       Q     So you signed this letter?

23       A     Yes, I did.

24       Q     This letter, does it refer to what we marked

25  as Exhibit 19, per December 8th, 2015 letter?

1        A     Yes, it does.

2        Q     So you're just acknowledging receipt of that

3    letter?

4        A     Yes, I am.

5              (Plaintiff's Exhibit 22 marked for

6              identification.)

7        Q     Now, on December 15 of 2015 -- I will show you

8    what I've marked as Exhibit 22 to your deposition -- you

9    interacted with Dr. Seehausen again, correct?

10       A     He completed another review of the file on

11   December 16, 2015.

12       Q     Was this at your request?

13       A     Yes.

14       Q     How often do you interact with Dr. Seehausen

15   in doing your job in general?

16       A     We do interact.  I can't put a time on how

17   much we interact.  It's not something that would be

18   daily necessarily.

19       Q     How many files has Dr. Seehausen consulted on

20   that you handled?

21       A     I couldn't provide a number.

22       Q     More than 20?

23       A     Probably more than 20.

24       Q     More than 50?

25       A     That I'm not certain of.

Page 81

1        Q     How about Dr. Parada?

2        A     Again, I can't give a number, but let's say

3    generally the same.

4        Q     In Ms. Costa's case, do you have occasion at

5    any time to speak to Dr. Seehausen?

6        A     I believe I talked to Dr. Seehausen about this

7    case.

8        Q     And was that recorded anywhere in writing?

9        A     No, there would be no recording in writing of

10   our conversations.

11       Q     Why not?

12       A     Because we let the file speak for itself.

13   Anything we discussed, if it's not pertinent to the

14   claim file, it wouldn't be included in the file itself.

15       Q     So if it was pertinent to the claim, would it

16   be recorded in writing?

17       A     Basically what I'm asking him is what's

18   pertinent.  I'm asking him to review the updated records

19   and to comment.

20       Q     Okay.

21       A     What you're asking --

22       Q     Had you spoken to him -- if I understand you

23   correctly, anything that you would have spoken to

24   Dr. Seehausen about, that doesn't get written down; he

25   writes a report, but that is not a reflection of a

Page 82

1    conversation?

2         A    What we speak about would be in regards to

3    this report.

4         Q    So is every word you speak about recorded?

5         A    No.  I'm saying if he were to come by my desk

6    and drop this off, we may talk about it.

7         Q    And that wouldn't be reflected in this report,

8    because he's dropping it off to you?

9         A    Right.

10        Q    And if you had a conversation with him before

11   he wrote the report, he may or may not include all or

12   part of that into the report?

13        A    No, he wouldn't include a conversation that we

14   had into the report.  He's going to review the medical

15   records or have a phone conference with somebody, and

16   that's what will be included in the report.

17        Q    At any time, did you tell Dr. Seehausen what

18   you were looking for in terms of answers to questions?

19        A    No.  I don't lead him on what I want him to

20   put in the report.

21        Q    For instance, in the request, you said,

22   comment on restrictions and limitations.

23             Did you ask him to address any specific

24   restrictions and limitations?

25        A    No.

Page 83

1        Q    How did he know what restrictions and
2    limitations you wanted information about?
3        A    Well, as his specialty, he knows which medical
4    conditions he's qualified to comment on and which ones
5    he wouldn't be.
6        Q    So, in the restrictions and limitations
7    section of his report dated December 16, 2015, he makes
8    reference to her overall presentation has suggested a
9    diagnosis of multiple sclerosis to multiple physicians.
10            Do you know if he is qualified to diagnose
11   multiple sclerosis?
12       A    He is not asked to diagnose her with multiple
13   sclerosis.  He is reviewing the records that we've been
14   provided with to determine if a diagnosis of any medical
15   condition has been given.
16       Q    He is a family physician doctor, right?
17       A    Correct.
18       Q    He's not a neurologist, correct?
19       A    No.
20       Q    Typically, a person goes to see a neurologist
21   to get information about multiple sclerosis, correct?
22            MR. MEAGHER:  Objection to form.
23            THE WITNESS:  I don't know who they typically
24       would go to, but in this case, Ms. Costa had gone
25       to a neurologist.

Page 84

1   BY MR. TUCKER:

2       Q    Do you know what medical specialty treats and

3   diagnoses multiple sclerosis?

4       A    A neurologist would diagnose a condition like

5   that.

6       Q    Is it your view that Dr. Seehausen, on

7   December 16th, 2015, addressed all of the conditions

8   Ms. Costa was describing when he assessed any

9   restrictions and limitations he thought applied?

10      A    He would comment on -- like I said -- any

11  conditions he's qualified to comment on.

12      Q    Did she have any conditions that he was not

13  qualified to comment on?

14          MR. MEAGHER:  Objection.  Speculation.  You

15      can answer.

16          THE WITNESS:  I'm sorry.  Can you repeat it?

17  BY MR. TUCKER:

18      Q    Within your understanding, were there any

19  conditions that Ms. Costa had that Dr. Seehausen was not

20  qualified to render an opinion about?

21      A    Well, I reviewed earlier, the physiatrist was

22  involved, commented on the EMG studies, to comment on

23  anything unrelated -- any type of restrictions and

24  limitations she may have as a result of those studies

25  that were performed.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1      Q    Other than that, was Dr. Seehausen qualified,
2  in your view, to comment on every other condition that
3  she had reported?
4      A    I rely on his expertise to tell me what he's
5  qualified to report on.
6      Q    So you don't know what he's qualified to
7  report on?
8      A    I wouldn't know every -- any and every single
9  thing he's qualified to report on.  That would be his
10 expertise.
11     Q    So if he gave you an opinion about something,
12 you would not know one way or the other if he was
13 actually qualified to give you the opinion?
14     A    As a board certified medical consultant, if he
15 was able to confirm what her, or any claimant's, doctors
16 were saying about them, then I would rely on that
17 information to assist me in my review.
18     Q    So you're relying on him to tell you that he's
19 qualified?
20     A    Well, he's board certified in his specialty,
21 so that's -- I mean, yeah, I would rely upon what he
22 gives me as a response, what he -- what conditions he --
23 you know, what restrictions and limitations he would
24 find.
25     Q    Is that a yes; you are relying on him to tell

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 86

1    you that he's qualified to give you an opinion?

2        A    I know that he's a qualified board certified

3    physician.  If you're asking me if I know every single

4    type of condition or symptom he can comment on, that's

5    not my expertise.

6        Q    You are making the claim decision, as we've

7    discussed before, right?

8        A    Correct.

9        Q    You are asking these physicians to give you

10   information to help you make the claim decision, right?

11       A    Right.

12       Q    Don't you have to know if they are qualified

13   to give you the opinion that they're giving you?

14       A    Right.  I know that they are qualified

15   consulting board certified physicians.  They have worked

16   for Met Life for -- or worked as a consultant for

17   Met Life for many years, and worked on many cases.  You

18   know, I know I can rely upon what they are saying.  But,

19   again, if you're asking me every type of thing they can

20   comment on, I can't -- every type of condition, I can't

21   comment on or know that.

22       Q    Did you do any research into Dr. Seehausen's

23   background at any time?

24       A    No.

25       Q    Did you do any research into his

1    qualifications other than he worked for Met Life and was

2    a consultant who worked for Met Life?

3        A    No, I did not.

4        Q    So we are in mid 2015 at this point.  I have a

5    memorandum to IDI claim file, which is dated

6    December 16, 2015.  I would like to show you a copy that

7    I have marked as Exhibit 23.

8             (Plaintiff's Exhibit 23 marked for

9             identification.)

10       Q    Was this prepared by you to put in the file?

11       A    Yes, it was.

12       Q    Do I have the date right; December 16, 2015?

13       A    That's correct.

14       Q    It's a two-page memo of your phone

15   conversation -- I'm sorry -- about a voicemail from

16   Ms. Costa, then a phone conversation with her, correct?

17       A    That's correct.

18       Q    The Bates page numbers are 1,017 and 1,018?

19       A    That's right.

20       Q    At this point, you had not made a decision on

21   the claim, correct?

22       A    Correct.

23       Q    Do you know from your review of the file

24   before the deposition today, your memory, or anything

25   we've looked at, what was the date her 90-day

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 88

1    elimination period was set to expire?

2         A    I don't know what the exact date was, but I

3    know -- I believe she was claiming in September of 2015,

4    so it would be 90 days from that point is when -- if she

5    were disabled, that's when the EP, elimination period,

6    would have been satisfied.

7         Q    So that would be in December of 2015; sometime

8    in December?

9         A    Roughly.

10        Q    Did you believe you had an obligation to make

11   a determination on the claim before the 90-day

12   elimination period expired?

13        A    No, I don't believe I had that obligation.

14   And, also, I didn't have at the time the facts necessary

15   to make a determination.

16             (Plaintiff's Exhibit 24 marked for

17             identification.)

18        Q    I would like to show you a letter that I will

19   mark as Exhibit 24 to your deposition and ask if you can

20   identify that.

21        A    It's a letter to Ms. Costa from myself,

22   December 30, 2015.

23        Q    So, at that point in time, can we agree that

24   the 90-day elimination period would have passed?

25             MR. MEAGHER:  Objection to form.  Assumes

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 89

1        facts not in evidence.

2    BY MR. TUCKER:

3        Q    I will rephrase the question.  If she became

4    disabled in December -- I will rephrase the question

5    again.

6            If she became disabled in September 2015, can

7    we agree that as of December 30th, 2015, the 90-day

8    elimination period would have passed?

9        A    It would have, yes.

10       Q    And, at that time, you did not have the

11   information you believed you needed to make a claim

12   decision?

13       A    Correct.

14       Q    Do you recall all of the physicians from whom

15   you had medical records at that time?

16       A    I cannot recall all the physicians.

17       Q    Does this letter tell you some of those

18   doctors?

19       A    It does provide some of those doctors and a

20   clinic.

21       Q    So you had records in your file from

22   Dr. Richard Unger, correct?

23       A    Correct.

24       Q    Dr. Eduardo Nevarez, N-E-V-A-R-E-Z, correct?

25       A    Correct.

1        Q    Dr. Anna Khanna, K-H-A-N-N-A, correct?

2        A    Correct.

3        Q    The Mayo Clinic, correct?

4        A    Correct.

5        Q    And if you could look back at Exhibit 13 --

6    it's probably in this stack over here --

7        A    Okay.

8             MR. TUCKER:  Let's not get them out of order,

9        though.  That's going to be a nightmare for all of

10       us.

11            THE WITNESS:  Sorry about that.

12            MR. TUCKER:  That's okay.

13   BY MR. TUCKER:

14       Q    That letter of December 4th reflects that

15   records were in Met Life's file from Dr. Brian Angston,

16   correct --

17       A    Yes.

18       Q    -- A-N-G-S-T-O-N?

19            Dr. Paul Carney, C-A-R-N-E-Y, correct?

20       A    Correct.

21       Q    Dr. Steven Ho?

22       A    Correct.

23       Q    Dr. Jody Abrams?

24       A    Correct.

25       Q    Dr. Patrick Madden?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 91

1          A      Correct.

2          Q      Now, going back to Exhibit 24, the letter of

3    December 30th, 2015 --

4          A      Uh-huh.

5          Q      -- the second full paragraph, there is a

6    reference to neuropsychological testing.  Please read

7    that paragraph.

8          A      Starting with, Please?

9          Q      Yes.

10         A      Please note that it is our understanding that

11   you have received neuropsychological testing.  However,

12   the records received from the treatment providers you

13   have provided to us did not include the

14   neuropsychological testing.  We kindly ask that you

15   provide us with the name and contact information of this

16   neuropsychologist that performed the testing.

17         Q      So why did you believe you needed that to make

18   a claim decision?

19         A      As Ms. Costa was claiming frontal processing

20   errors slash cognitive impairment and had

21   neuropsychological testing, we wanted to review the

22   results of that testing to understand any impairment she

23   was experiencing -- cognitive impairment she was

24   experiencing.

25         Q      So, at the very latest, Ms. Costa told

1    Ms. Parvin about that on December 7, 2015, right?  That

2    was the date of Ms. Parvin's interview of her?

3         A    At the very latest, is that --

4         Q    Yes.

5         A    Yes, she mentioned it during the field visit.

6         Q    Do you know if there were questions or

7    comments in this claim about any cognitive issues before

8    December 7, 2015?

9              MR. MEAGHER:  Objection.  The file speaks for

10             itself.  You can answer.

11             THE WITNESS:  As we discussed previously in

12             the -- my first initial call, she presented that

13             she was experiencing frontal processing errors.

14   BY MR. TUCKER:

15        Q    So, from September 2015, you knew that she had

16   frontal processing errors?

17             MR. MEAGHER:  Objection to form.

18             THE WITNESS:  No.  She was claiming that she

19             had frontal processing errors.  I'm aware --

20   BY MR. TUCKER:

21        Q    From September 2015, you were aware that she

22   said she was having frontal processing errors?

23        A    Not September, because if you were -- we

24   didn't receive her claim forms until October, then our

25   phone call, first phone call, wasn't until just after

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 93

1    that, so it would have been October.

2        Q    Well, the date on Exhibit 1 is September 30th,

3    2015, right?

4        A    Right.

5        Q    So December 30th, 2015 is three months later;

6    can we agree on that?

7        A    Yes.

8        Q    In that period of time, had you asked any

9    consulting physician to review the file that would have

10   had a mental health background?

11       A    Having that there was no cognitive testing in

12   the file to date, we would not have referred it to a

13   neuropsychologist at that point.

14       Q    Met Life had the right to have her examined by

15   a psychologist, right?

16       A    Correct.

17       Q    And that policy, it specifically states that

18   Met Life can get an examination by a physician, right?

19       A    Right.

20       Q    And a physician is defined as both a medical

21   doctor or a licensed psychologist, right?

22       A    Correct.

23       Q    Between September 30th and December 30th of

24   2015, at any time, did you request to have Ms. Costa

25   examined by a physician?

1      A     No.  I wouldn't have done that.  She already

2   sought that type of treatment or testing on her own, so

3   we were requesting a copy of that test.

4      Q     The testing you were referring to at that time

5   occurred in 2013, didn't it?

6      A     Correct.

7      Q     So you wanted testing from two years earlier

8   to tell you whether she had a disability in September or

9   October of 2015?

10     A     If she was experiencing cognitive impairment

11  at that time in 2013.

12     Q     How does the 2013 report tell you if she's

13  disabled in 2015?

14     A     Well, we need to know if it expressed

15  cognitive impairment in the first place, but, in

16  addition to that, she also noted she was going to have a

17  second neurological exam referred by Dr. Madden, so we

18  were also going to request a copy of that.

19     Q     The letter of December 30, 2015 doesn't

20  reference getting that testing that Dr. Madden had been

21  requesting; it referenced previous neuropsychological

22  testing, right?

23     A     Yes, it did, because we were expecting to

24  receive a copy of that test with the records we had

25  requested at that time.  However, it was not included.

1       Q    Was the neuropsychological testing from 2013

2    done at the University of South Florida, Shands Medical

3    Center?

4       A    It was.

5       Q    I will show you what's marked as Exhibit 25 to

6    your deposition.  It is a letter dated January 4, 2016

7    from you to Ms. Costa, correct?

8            (Plaintiff's Exhibit 25 marked for

9            identification.)

10      A    January 4th, 2016 letter to Ms. Costa from

11   myself.

12      Q    Shands apparently needed some special

13   authorization to be signed to get the records; is that

14   right?

15      A    That's right.

16      Q    And you sent that authorization with this

17   letter to Ms. Costa for her to sign and send back to

18   you?

19      A    Yes, I did.

20      Q    Did she return it?

21      A    I believe she did.

22      Q    We talked earlier about the

23   doctor-to-doctor communication, and you had submitted

24   that form.

25           I will show you what I've marked as Exhibit 26

Page 96

1    to your deposition and ask if you can tell me what this

2    is.

3              (Plaintiff's Exhibit 26 marked for

4              identification.)

5         A    This is an e-mail or a calendar schedule for

6    that doctor-to-doctor call showing that it was scheduled

7    for Tuesday, January 5th, 2016 at 12:30 p.m. between

8    Dr. Patrick Madden and Dr. Seehausen.

9         Q    So is this something you sent to

10   Dr. Seehausen, this document?

11        A    Seeing that my name is at the top, it appears

12   that I was the one that sent it.

13        Q    So this went through Met Life's internal

14   e-mail system, correct?

15        A    Correct.

16        Q    It came from your e-mail account to

17   Dr. Seehausen?

18        A    Yes, and the following names.

19        Q    Does Met Life have a name for its e-mail

20   system?

21        A    We use Outlook.

22        Q    So, when this is printed out, was it printed

23   out directly from Outlook and just put in the paper

24   file?

25        A    Correct.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        Q     Before the doctor-to-doctor conversation, was

2    any information or were any questions given to

3    Dr. Seehausen?

4        A     No.

5        Q     How did he know what he needed to discuss with

6    Dr. Madden?

7        A     Well, seeing that he was the consultant that

8    felt it was necessary to conduct a call, I'm assuming he

9    knew what questions he was going to ask.

10       Q     What was your understanding of why he was

11   going to have that doctor-to-doctor call?

12       A     Because based off the medical records he had

13   from Dr. Madden, he was unclear as to, you know, what

14   Dr. Madden's opinions were regarding her medical

15   conditions, so he wanted to speak with him directly.

16       Q     At this point in time, had Dr. Madden returned

17   an attending physician's statement form?

18       A     Provided with the claim forms?

19       Q     Correct.

20       A     I would have to review the claim forms to see

21   if he was the physician that signed that.

22       Q     That's something that would have been

23   considered, correct?

24             MR. MEAGHER:  Objection to form.

25             THE WITNESS:  In reviewing --

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 98

1    BY MR. TUCKER:

2         Q     The claim.

3         A     Correct.

4         Q     You would have looked at Dr. Madden's

5    attending physician statement and considered that as

6    part of the evidence in the claim?

7         A     Correct.

8               (Plaintiff's Exhibit 27 marked for

9               identification.)

10        Q     I will show you a document that I've marked as

11   Exhibit 27 and ask if you can identify that.

12        A     It is another phone call with Ms. Lori Costa

13   and myself on January 6, 2016 at 9:05 a.m.

14        Q     So, the doctor-to-doctor conversation was

15   canceled?

16        A     It did not take place on the original

17   scheduled date.

18        Q     Was that because Ms. Costa was going to be

19   with Dr. Madden?

20        A     No.

21        Q     At the time, did Ms. Costa express frustration

22   or concern that her claim had not yet been decided?

23        A     Based on this call, it appears she's

24   frustrated.

25              MR. MEAGHER:  Excuse me.  This is a good

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        question for me to state that what we really have

2        here is some kind of claims handling bad faith case

3        that was originally pled by you regarding her

4        frustration, delay, all the things you have been

5        asking about for three hours this morning but was

6        stipulated to be dismissed, and has been dismissed

7        by the parties.

8            This is a breach of contract action, so this

9        step by step, going through the claim process, and

10       her frustration, all that is bad faith discovery.

11       I have been sitting here quietly, and I will

12       continue to sit here quietly, because if you want

13       to pursue this claim until it gets abusive, I will

14       let you pursue a claim not pled, but that is what's

15       being involved here, and that last question is a

16       perfect illustration of it.  So go ahead and

17       proceed.

18           MR. TUCKER:  So I understand, you are not

19       objecting to any question, John, correct?

20           MR. MEAGHER:  Well, I will be objecting to the

21       admissibility of any of that, virtually all.  There

22       may be a few of your questions and answers that

23       related to a breach of contract action.

24           But, if this is ever tried to be admitted in

25       this case, I will be objecting vociferously,

1        because it's not relevant.

2   BY MR. TUCKER:

3        Q     So, at the bottom of that first page, Bates

4   page 989, there is a reference where you told her that

5   the consulting family physician would like to speak with

6   Dr. Madden to discuss the details of her condition; is

7   that accurate?

8        A     I'm trying to find where you're at.

9        Q     Last sentence on the first page.  It continues

10  onto the second page.

11       A     So you're asking me if it states -- I stated

12  our consulting family physician would like to speak with

13  Dr. Madden to discuss the details of her condition.

14       Q     That's what you told Ms. Costa at the time?

15       A     Yes.

16       Q     Was there any other information that you

17  needed at that time, other than that doctor-to-doctor

18  conversation to make a decision in the claim?

19       A     I mean, I think the file speaks for itself as

20  to what we were requesting and what we had requested and

21  what remained outstanding at that time.

22             (Plaintiff's Exhibit 28 marked for

23             identification.)

24       Q     I will show you what I have marked as

25  Exhibit 28.  It is a letter dated January 7, 2016 from

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    you to Ms. Costa; is that accurate?

2          A    Yes.

3          Q    And your signature appears on that letter?

4          A    Yes.

5          Q    It's Bates page 985?

6          A    Correct.

7          Q    In that letter, do you tell Ms. Costa that her

8    90-day elimination period would have been satisfied as

9    of December 22nd, 2015?

10         A    I state, should you satisfy the terms of

11   provisions of the policy, the 90-day elimination period

12   will be satisfied as of December 22nd, 2015.

13              (Plaintiff's Exhibit 29 marked for

14              identification.)

15         Q    I will show you what I have marked as

16   Exhibit 29, a composite exhibit.  Are you able to

17   identify what this is?

18         A    This would be the surveillance report

19   completed by Brito Investigations.

20         Q    Did you order the surveillance?

21         A    I would have requested the surveillance.

22         Q    And why did you order it?

23         A    So I could understand what her current level

24   of activities are, as well as get a visual of her and

25   visual signs of impairment we could see.

Page 102

1      Q    What day did you order it?

2      A    It appears I contacted them on December 30th,

3   2015.

4      Q    And what days do they conduct the

5   surveillance?

6           MR. MEAGHER:  Objection.  The document speaks

7        for itself.

8           THE WITNESS:  The document speaks for itself

9        on what days.

10          MR. MEAGHER:  Read him the dates.

11          THE WITNESS:  January 6, 2016, January 7,

12       2016, and January 8, 2016.

13   BY MR. TUCKER:

14      Q    Did the surveillance tell you anything at all

15   useful to your claim about her cognitive impairments?

16          MR. MEAGHER:  I'm going to object.  Assumes

17       facts not in evidence.

18          THE WITNESS:  I can tell you what -- from my

19       recollection -- what I can recall from the

20       surveillance.

21          She seemed to be active all three days, which

22       you can see by the report.  She was driving her

23       kids to school -- her kid to school, she did make a

24       trip to the grocery store, and did exercise around

25       her neighborhood, walk.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 103

1    BY MR. TUCKER:

2         Q    What information did you get out of the

3    surveillance report that addressed whether she could

4    perform her duties as a trial attorney?

5              MR. MEAGHER:  Objection.  Asked and answered.

6         You can answer again.

7              THE WITNESS:  It just played a factor into our

8         overall decision.

9    BY MR. TUCKER:

10        Q    I know you considered it.  I'm asking you

11   specific things in this report that gave you

12   information.

13             What information did you derive from this that

14   addressed whether she could or could not be a trial

15   attorney?

16             MR. MEAGHER:  Objection.  Asked and answered.

17             THE WITNESS:  From a cognitive impairment

18        standpoint, we did not receive information that --

19        to help us make a determination from that aspect.

20             We did verify that she was active all three

21        days, did exercise around her neighborhood, and any

22        information was referred to our physiatrist to

23        review to comment on her gait as well.

24   BY MR. TUCKER:

25        Q    It confirmed she had an ataxic gait, did it

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 104

1   not?

2       A    It did confirm that.  However, we don't find

3   that an ataxic gate would prevent her from working as an

4   attorney, as stated in the file.

5       Q    Did Ms. Costa ever tell you that she could not

6   walk as part of her claim?

7       A    Not that I recall.

8       Q    Did Ms. Costa ever tell you that she could not

9   go shopping at Publix?

10      A    She did not specifically tell me that she

11  could not go shopping at Publix.

12      Q    At any time, did Ms. Costa tell Met Life that

13  she could not go shopping at Wal-Mart?

14      A    No.

15      Q    Is there anything in this surveillance report

16  that, to you, demonstrated facts that would lead you to

17  disbelieve anything that Ms. Costa told you?

18      A    Again, as I stated earlier, it's not about

19  disbelieving.  It's about adding another layer to our

20  review to help us understand what she's stating is

21  impairing her, so we factored it in, in addition to the

22  medical records and all the reviews by the different

23  consulting physicians.

24      Q    So there was nothing in this report that led

25  you to conclude that Ms. Costa was lying to you about

1    anything, was there?

2        A    Again, we're not in the business of calling

3    people liars, but I was not -- if you're asking if I was

4    able to make any type of determination of her claim

5    based off of this surveillance report, the answer is no.

6                (Plaintiff's Exhibit 30 marked for

7                identification.)

8        Q    I will show you what I've marked as

9    Exhibit 30.  Is that a letter dated January 11, 2016

10   that you sent to Ms. Costa?

11       A    Yes.

12       Q    Does that confirm that she returned that

13   Shands Hospital authorization we discussed earlier?

14       A    It does confirm it.

15       Q    Did you then use that authorization to get

16   records from Shands Hospital?

17       A    I did use that authorization to reach out to

18   them to request records.

19       Q    So the records were received and were

20   considered as part of her claim, correct?

21       A    The neuropsychological review is what was in

22   question here, 2013 review.

23       Q    So you obtained that, and it was actually

24   considered as part of her claim, right?

25       A    After delay, because they couldn't find it.

Page 106

1      Q     Do you know when it was received?

2      A     I don't recall the exact date.

3            (Plaintiff's Exhibit 31 marked for

4            identification.)

5      Q     I will show you what I marked as Exhibit 31.

6  This is a letter to Dr. Madden confirming that

7  doctor-to-doctor phone call was rescheduled to

8  January 19, 2016?

9      A     Correct.

10     Q     Did that doctor-to-doctor phone call actually

11 happen?

12     A     I believe it did.

13           (Plaintiff's Exhibit 32 marked for

14           identification.)

15     Q     I will show you what I will mark as Exhibit 32

16 and ask if you can identify what those documents are.

17     A     This is a medical consultant referral to

18 Dr. Seehausen dated January 19, 2016.

19     Q     And does the attached report reflect

20 Dr. Seehausen's notes from his phone call with

21 Dr. Madden?

22     A     It does reflect their phone call.

23     Q     Do you know if Dr. Madden was asked by

24 Dr. Seehausen specifically what restrictions or

25 limitations Dr. Madden would assign to Ms. Costa?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1       A    It appears that Dr. Madden was asked if

2    Ms. Costa was capable of legal practice if she did not

3    have cognitive impairment, and the doctor provided that

4    her symptomology would not.

5       Q    Where are you reading from, sir?

6       A    It is the second page --

7            MR. MEAGHER:  Give him the Bates in the lower

8       right-hand.

9            THE WITNESS:  Sorry.

10           MR. MEAGHER:  That's okay.

11           THE WITNESS:  It's the 0971.

12   BY MR. TUCKER:

13      Q    And what is the paragraph you're reading from;

14   what do the words start with?

15      A    It's actually 0972.  I'm sorry.  It starts

16   with, I asked if you felt Ms. Costa was capable of legal

17   practice if she did not have cognitive impairment, and

18   you stated that her other symptomology would not limit

19   her.

20      Q    So it was your understanding that Dr. Madden's

21   concern was about her cognitive impairment, not her

22   other problems?

23      A    Based off of this phone conversation, it

24   appeared that he -- her other symptomology other than

25   her complaints of cognitive impairment wouldn't limit

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    her from work.

2         Q    Did Ms. Costa ever tell you that the problems

3    she was having other than her cognitive impairment would

4    limit her ability to do her job?

5         A    I believe she did.

6         Q    How?

7         A    I can't state verbatim how she stated it.  I

8    think it states it clearly in the file to our phone

9    documentation and letters and her progress reports.

10        Q    So if it's not written in your file, then you

11   don't have any recollection of it?

12        A    If it's not written in my file, do I not have

13   recollection of it?

14        Q    What you're telling me, to the extent she told

15   you that it's reflected in the file, you have no

16   independent recollection of it, other than what might be

17   written in the file?

18        A    I know that she's complained of other

19   symptomology, like vertigo, and the gait, fatigue.

20             MR. MEAGHER:  Could you read the question

21        back?

22             (Record read back.)

23             MR. TUCKER:  You actually probably wanted to

24        go back two questions.

25   BY MR. TUCKER:

1       Q     What I'm asking you, sir, is to the extent

2   that she told you that some physical problem, something

3   other than her cognitive problems was impacting her

4   ability to be an attorney, you don't have any

5   independent recollection of it; you would have to look

6   at the file to see what she said?

7       A     I recall that she did claim other conditions

8   and symptoms that prevent her from working, but if you

9   want me to specifically tell you, I would have to review

10   the file.

11      Q     So your recollection is she did talk about

12   physical problems and said those physical problems kept

13   her from working; is that what you're saying?

14      A     In addition to the cognitive impairment, yes.

15      Q     If you could look at the first page of that

16   exhibit, right at the top of the handwritten notes,

17   Dr. Seehausen, it's his writing.

18      A     This?

19      Q     Yes.

20      A     Yes.

21      Q     He makes reference to the field visit in

22   December, and Ms. Costa's partner had a concern of

23   malpractice because of the cognitive difficulties.  I

24   believe it says rash of cognitive difficulties, if I'm

25   reading it correctly.

1          How did you utilize that in the handling of

2    the claim?

3          A    The 12/17/15 field visit and Ms. Costa's --

4    how did I use that to evaluate the claim?

5          Q    Yes.  You considered it, right?

6          A    I consider all the information that's

7    provided.

8          Q    Okay.  So I'm asking you how that factored

9    into your decision.

10         A    Well, we have to establish that the condition

11   exists, so it's really a moot point unless we establish

12   the fact that she's got a condition.

13         Q    And your conclusion at the end was that

14   Ms. Costa has no condition that was causing a cognitive

15   impairment, right?

16         A    That's correct.

17         Q    That was your conclusion?

18         A    Based off of the resources I utilized.

19              (Plaintiff's Exhibit 33 marked for

20              identification.)

21         Q    Let me show you what I have marked as

22   Exhibit 33 to your deposition.  Is this a phone note

23   dated January 26, 2016?

24         A    Yes.

25         Q    Does it reflect that you reached out to

1  United Healthcare?

2      A    It does.

3      Q    Why did you do that?

4      A    In order to get a -- any additional

5  information that we could possibly get to help us

6  understand her medical conditions.

7      Q    What would you have been able to get from

8  United Healthcare?

9      A    I can't say, because we never received

10  anything.

11      Q    But if you're asking for information from

12  them, what are you looking for?  What do you think they

13  would have that could help you?

14      A    I don't know, but we reached out to them to

15  see if there might be any additional medical information

16  that could assist in our review to help us understand

17  her medical conditions.

18           (Plaintiff's Exhibit 34 marked for

19           identification.)

20      Q    I will show you what I marked as Exhibit 34.

21  This is a medical consultant referral to Dr. Parada

22  dated January 29th, 2016, correct?

23      A    Correct.

24      Q    Could you read your request, please?

25      A    Please review the surveillance report from

1   January 6, 2016 through January 8, 2016 and comment on
2   any musculoskeletal restrictions and limitations.
3        Q    So you utilized Dr. Parada's report as part of
4   your claim decision, right?
5        A    Yes.
6        Q    You were not asking Dr. Parada to give you an
7   opinion about any cognitive issues at that point,
8   correct?
9        A    I was not.
10       Q    At no time did you ask Dr. Parada for any
11  opinions about any cognitive issues, right?
12       A    That's correct.
13            (Plaintiff's Exhibit 35 marked for
14            identification.)
15       Q    I will show you what I marked as Exhibit 35 to
16  your deposition and ask if you can tell me what that is.
17       A    This is a letter dated January 29, 2016 to
18  Ms. Lori Costa from myself.
19       Q    What was the purpose of this letter?
20       A    It's providing Ms. Costa with status regarding
21  our evaluation of the claim.
22            (Plaintiff's Exhibit 36 marked for
23            identification.)
24       Q    I will show you what I marked as Exhibit 36.
25  Please tell me what that is.

1        A      This is a medical consultant referral to

2   Dr. J. Boone.

3        Q      What does the J stand for?

4        A      Jim.

5        Q      What type of doctor is Dr. Boone?

6        A      He is a consultant board certified

7   neuropsychologist.

8        Q      Is he a neuropsychologist that Met Life has

9   used on other claims that you have worked on?

10       A      Yes.

11       Q      Are you able to tell me how many times?

12       A      No.

13       Q      More than 10?

14       A      Right around that number probably.

15       Q      Have you ever had a phone conversation with

16   Dr. Boone?

17       A      No.

18       Q      Anything Dr. Boone had to tell you about

19   Ms. Costa would be contained in his written reports?

20       A      Yes.

21       Q      Were there any e-mails between you and

22   Dr. Boone that you remember?

23       A      Not that I remember from this particular case.

24       Q      Do you know how Dr. Boone was selected?

25       A      Because he's a board certified

1    neuropsychologist.

2         Q    Other than him being a board certified

3    neuropsychologist, do you know anything about

4    Dr. Boone's qualifications?

5         A    No.

6         Q    Do you know how long he's practiced?

7         A    I don't know how long he's practiced.

8         Q    Do you know where his office is?

9         A    No.

10        Q    Have you ever read a report where he said

11   somebody actually had limitations?

12        A    Yes.

13        Q    How many?

14        A    I can't provide a number.

15        Q    It's less than 10, though?

16        A    I don't know.

17        Q    Do you know how much Dr. Boone was paid to do

18   that consult?

19        A    No idea.

20        Q    Any of these consulting physicians, are you

21   aware of how much they're paid?

22        A    I have no knowledge of how much they get paid.

23        Q    Do you know how much was paid for the

24   surveillance?

25        A    I can look at how much was paid by looking at

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

Page 115

1    the report.

2        Q    It's reflected on the report?

3        A    It may be, but, I mean, I do get an invoice

4    that tells me how much it costs after it was done.

5        Q    I ask because I don't remember seeing that, so

6    maybe you can direct me to it and I just missed it.

7             MS. RAY:  Exhibit 29.

8    BY MR. TUCKER:

9        Q    If you'll look at Exhibit 29 and tell me if

10   you see that reflected on there.

11       A    I don't see it on here, but I do know how much

12   they charge after it's completed.

13       Q    How much is that?

14       A    Like I said, it's not provided on this one, so

15   I don't know what the exact amount would be.

16       Q    You're saying you could see the invoice if you

17   looked in the system?

18       A    Right.  I should see it and then approve it.

19       Q    Do you not approve the invoices for the

20   consulting doctors?

21       A    No.

22       Q    Where would you find that invoice in your

23   system for the surveillance?

24       A    I could reach out to our Claims Support Unit

25   to investigate how much we paid to this investigator for

1    this particular surveillance.

2        Q    How come that's not put in the claim file

3    itself?

4             MR. MEAGHER:  Objection to form.

5    BY MR. TUCKER:

6        Q    Well, let me ask you first; is the invoice put

7    in the claim file?

8        A    Typically it is included, a copy of it, if the

9    Claims Support Unit brings it back to you, a copy.

10       Q    So, back to Dr. Boone.

11       A    Okay.

12       Q    Why did you need the consult from Dr. Boone?

13       A    So he could review the neuropsychological

14   evaluation and comment on it.

15       Q    Then you've got another from him in March.  I

16   will show you what I've marked as Exhibit 37.

17            Why was the second one needed?

18            (Plaintiff's Exhibit 37 marked for

19            identification.)

20       A    Because Ms. Costa did attend a second

21   neuropsychological exam on February 25th.

22       Q    Is that the exam by Dr. O'Neill --

23       A    Yes.

24       Q    -- does that sound familiar?

25       A    Uh-huh.

1           MR. MEAGHER:  You have to answer verbally.

2           MR. TUCKER:  You have to say yes or no.

3           THE WITNESS:  Yes, by Dr. O'Neill.

4    BY MR. TUCKER:

5       Q    Now, at some point, a decision was made by

6    someone at Met Life to obtain a neuropsychological

7    evaluation from a doctor hired by Met Life, correct?

8       A    Correct.

9       Q    Do you know when that was?

10      A    It would have been after this March 28, 2016

11   review by Dr. Boone.

12           It would have been after he had the

13   opportunity to review both the 2013 neuropsychological

14   exam she had and the 2016 exam she had, and compare

15   those reports as well as the raw data, and at that time,

16   we found it necessary to ask Ms. Costa to attend a

17   neuropsychological IME.

18           (Plaintiff's Exhibit 38 marked for

19           identification.)

20      Q    I will show you what I marked as Exhibit 38 to

21   your deposition.  What is this document?

22      A    This is an IME, so independent medical exam,

23   physician request.

24      Q    So what's the date on it?

25      A    June 10th, 2016.

1      Q      And did you prepare this?

2      A      I would have prepared all the typed data.

3      Q      So the handwritten information is not your

4   handwriting?

5      A      No.

6      Q      Do you know whose handwriting that is?

7      A      I do.

8      Q      Whose is it, please?

9      A      Dr. Karina Kubik.

10     Q      Who is Dr. Kubik?

11     A      She's a consulting board certified internist.

12     Q      And what was her role?

13     A      Her role was to find a suitable and qualified

14   physician to conduct this independent medical exam.

15     Q      On this form called IME Physician Request --

16   the Bates number, by the way, is 347, right?

17     A      Correct.

18     Q      The primary diagnosis on this form is listed

19   as cognitive impairment; is that right?

20     A      It is.

21     Q      Did you state that you wanted a

22   neuropsychologist to evaluate the file?

23     A      I did.

24     Q      The list of all the doctors on here; is that

25   all of the physicians whose records you had in the claim

1    file at the time?

2        A    It's not necessarily everybody's records I

3    have.  It's a detailed list, comprehensive list of the

4    doctors I know she's treated with.

5        Q    So Dr. Kubik handwrote, Please use Rodney

6    Vanderploeg, Ph.D., then provided a phone number; is

7    that right?

8        A    Correct.

9        Q    Dr. Kubik wrote that on August 23rd, 2016?

10       A    She did.

11       Q    Do you know how she selected Dr. Vanderploeg?

12       A    Well, the part that I do know is the reason I

13   provide this list of physicians is to kind of give her a

14   general area of where she should be looking based off of

15   where the claimant has treated in the past.

16            As far as from a medical specialty, she's

17   looking for somebody who's qualified, but I can tell

18   you, in addition to that, the reason Dr. Vanderploeg was

19   chosen was because he was willing to videotape, per

20   Ms. Costa's request.

21       Q    There was originally a request for it to be

22   done with a Dr. Larrabee?

23       A    Correct.

24       Q    Dr. Larrabee refused to do videotaping; is

25   that correct?

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        A      Correct.  He felt it would alter the testing.

2        Q      Do you recall who Dr. Shaw was, on the east

3    coast?

4        A      I can't recall Dr. Shaw.

5               MR. TUCKER:  We can go off the record for a

6        moment.

7               VIDEOGRAPHER:  The time is now 12:55.  We are

8        going off the record.

9               (A lunch recess was taken.)

10              VIDEOGRAPHER:  The time is now 1:30.  This is

11       the beginning of video number three.  We are now

12       back on the record.

13   BY MR. TUCKER:

14       Q      Mr. White, I believe when we left off, we were

15   talking about Dr. Vanderploeg; is that right?

16       A      That's right.

17       Q      So the decision was made to hire him, and

18   arrangements were set up for an evaluation to be done,

19   and is that the last exhibit that we have there?  What

20   is the number on it, please?

21       A      38.

22              (Plaintiff's Exhibit 39 marked for

23              identification.)

24       Q      I would like to show you a letter, it appears

25   to be dated August 29, 2016, regarding that evaluation.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    Is this a letter that you wrote?

2         A    Yes.

3         Q    And that evaluation was set up to take place

4    October 22nd, 2016, correct?

5         A    That's correct.

6         Q    At a Holiday Inn Express in Cocoa?

7         A    Correct.

8         Q    This letter dated August 29, 2016.  On the

9    second page, Bates page 198, is that your signature?

10        A    It is.

11        Q    To the left, in the circle, what is that,

12   please?

13        A    It is the initials of my manager.

14        Q    So your manager had to sign off on the letter?

15        A    Correct.

16        Q    Tell me how that process works, please.

17        A    It's procedure in our department, if a

18   claimant is being represented by an attorney, that it

19   does need manager's approval before going out if a

20   letter is being directed to an attorney.

21        Q    Now, earlier that summer, there is

22   correspondence in June that I would like to show you.

23             (Plaintiff's Exhibit 40 marked for

24             identification.)

25        Q    Do you recognize that letter?

1        A     I do.

2        Q     And the date of that letter is June 24, 2016?

3        A     Correct.

4        Q     In that letter, Ms. Ray signed the letter for

5    me; is that correct?  Is that what you understood?

6        A     Yes.

7        Q     That letter addressed a phone conference that

8    was to take place with Dr. Madden on June 29 of 2016,

9    and I had appeared as the attorney representing

10   Ms. Costa.  Was that your understanding?

11       A     Yes, it was.

12       Q     I had asked you to be available or -- excuse

13   me -- to attend any conferences with my client's

14   doctors, and I had said in that letter that I didn't

15   object to the doctor being talked to as long as I was on

16   the call, right?

17       A     Correct.

18       Q     The last paragraph of that letter, the full

19   paragraph, it starts with, To be clear.  Could you read

20   that into the record, please.

21       A     To be clear, neither you nor your physician

22   consultant has any authority to speak to Dr. Madden or

23   any of Ms. Costa's other physicians without me being

24   present, or if the conversation is by telephone, on the

25   telephone call.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1            (Plaintiff's Exhibit 41 marked for

2            identification.)

3       Q    I will show you what I will mark as

4    Exhibit 41.  If you can tell me what that is, please.

5       A    This is a phone memorandum dated September 12,

6    2016 where I called Dr. Madden's office.

7       Q    Did you understand that authorization to talk

8    to Dr. Madden had been revoked?

9       A    I did, but it was my understanding that it was

10   for our physician to speak with Dr. Madden and not

11   myself.

12      Q    So when the letter said neither you nor your

13   physician consultant, you read that just to apply to the

14   physician consultant?

15      A    Again, I didn't speak with Dr. Madden.  I just

16   spoke with his office.

17      Q    So are you saying you only thought it applied

18   to speaking to Dr. Madden?

19      A    Based off of this letter, that's how I read

20   the letter, that it was directed towards our consulting

21   physician or any other consulting physician.

22      Q    Other than Dr. Vanderploeg, were any

23   evaluations, examinations scheduled to take place with

24   physicians or psychologists that were hired by Met Life

25   involving Ms. Costa?

1       A     No, no other examinations other than what was

2     scheduled.   There was the one in July that we asked

3     Dr. Larrabee to conduct.   However, he wouldn't videotape

4     the exam, so Ms. Costa declined that one.

5             Then we moved to another physician who

6     couldn't get it done in a reasonable time, which ended

7     up getting us to Dr. Vanderploeg.

8       Q     Do you know if the policy that Ms. Costa

9     purchased in Met Life requires a diagnosis to be

10    declared disabled?

11      A     Can you repeat that?

12      Q     Do you know if the policy that Ms. Costa

13    purchased from Met Life requires a diagnosis to be

14    declared disabled?

15            MR. MEAGHER:   Objection to form.

16            THE WITNESS:   I can speak, or I can read the

17        policy for you, what it states, in order to be

18        required totally disabled.

19    BY MR. TUCKER:

20      Q     I asked if you knew if it required a

21    diagnosis.   Do you know?

22      A     The policy requires a sickness -- requires the

23    claimant, due solely to a sickness or injury, an

24    impairment caused by sickness or injury, is what the

25    policy states.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1        Q    Does sickness or injury -- do the definitions

2   of those terms include the word diagnosis in the policy?

3             MR. MEAGHER:  Objection.  The policy speaks

4        for itself.  You can answer.

5             THE WITNESS:  I would have to view the policy.

6        I can read it.

7   BY MR. TUCKER:

8        Q    So you don't know as we're sitting here; you

9   would have to look at the policy?

10       A    To see if it states diagnosis exactly.

11            (Plaintiff's Exhibit 42 marked for

12            identification.)

13       Q    I would like to show you what I've marked as

14   Exhibit 42 to your deposition.  What is this, please?

15       A    This is the completed neuropsychological

16   evaluation performed by Dr. Vanderploeg on October 24th,

17   2016 -- or it's dated October 24th, 2016.

18       Q    Now, you are not a trained neuropsychologist,

19   right?

20       A    No.

21       Q    So are you able to interpret what this says?

22       A    I am able to interpret this, but I also have

23   my -- have a consulting board certified

24   neuropsychologist physician to review it, comment on its

25   accuracy and thoroughness.

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1      Q    And did you have a doctor do that?

2      A    I did.

3      Q    Was that Dr. Boone?

4      A    Yes.

5      Q    So why did you feel a need to have Dr. Boone

6  evaluate what Dr. Vanderploeg had written?

7      A    As a medical expert in the field, he would be

8  able to review Dr. Vanderploeg's report and comment on

9  its accuracy and thoroughness and whether or not it

10  would be considered a valid test.

11      Q    Other than telling you if it was a valid test,

12  what else could Dr. Boone tell you that Dr. Vanderploeg

13  wasn't telling you in his report?

14           MR. MEAGHER:  Objection to form.  Speculation.

15      You can answer.

16           THE WITNESS:  I don't know what else he could

17      tell me.  I can tell you what he did tell me on his

18      report.

19      Q    He reflected that on the document I am going

20  to show you that's marked Exhibit 43, correct?

21           (Plaintiff's Exhibit 43 marked for

22           identification.)

23      A    That's correct.

24      Q    Did you speak to Dr. Boone about

25  Dr. Vanderploeg?

1       A     I did not.

2       Q     So anything Dr. Boone had to say to you about

3   Dr. Vanderploeg is written in this report that appears

4   to be hand dated December 1st, 2016?

5       A     Correct.

6       Q     So do you know whether Dr. Vanderploeg was

7   given a job description for the profession of attorney?

8       A     I don't, but it -- I don't believe that it

9   mattered.  It was to determine whether or not she had a

10  cognitive impairment.

11      Q     Well, Dr. Vanderploeg's report said -- and

12  Dr. Boone actually quoted it -- quote, do not indicate

13  any acquired difficulties and abilities to work as an

14  attorney, end quote, correct?

15      A     Correct.

16      Q     So, to make that conclusion, wouldn't the

17  person writing it have to know what an attorney's

18  required abilities were?

19      A     Dr. Vanderploeg would have been, you know, if

20  he has a general knowledge of what an attorney does, but

21  he was not provided with a job description.

22      Q     Do you know what his general knowledge was?

23      A     I can't speak for Dr. Vanderploeg and what he

24  was thinking and what he knows as an attorney.

25      Q     Did you talk to Dr. Boone about some type of

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1   job description for an attorney?

2        A    No, I did not.

3        Q    Did you provide Dr. Boone with a job

4   description for an attorney?

5        A    No.  I simply asked him to review -- to

6   determine if there is a cognitive impairment.

7        Q    If you look at Exhibit 42, Dr. Vanderploeg's

8   opinion again, does the stamp on there reflect that

9   Met Life received the letter addressed to you dated

10  October 24th, 2016 on October 31st, 2016?

11       A    It does.

12       Q    Do you know when you would have first read it

13  yourself?

14       A    It may have been on October 31st, if I was in

15  fact in the office on that date when it was received in

16  my inbox.  The 31st is when it was date stamped by the

17  Claims Support Unit.

18       Q    So on Exhibit 43, the last exhibit, the

19  medical consultant referral from Dr. J. Boone, that's

20  dated November 1st, 2016, right?

21       A    Yes.

22       Q    Does that mean you would have looked at

23  Dr. Vanderploeg's report and done the referral to

24  Dr. Boone within two days of the day it was received,

25  either on the 31st or the 1st of November?

1       A     The reports -- the referral is dated

2   November 1st, so then I would have -- I would have

3   reviewed it between October 31st and November 1st.

4       Q     Would you have automatically had Dr. Boone

5   review it as a consulting psychologist, no matter what

6   Dr. Vanderploeg said?

7       A     I would have, to get his professional opinion.

8       Q     So did you need Dr. Boone to explain what

9   Dr. Vanderploeg had said?

10      A     I needed him to comment on the review itself

11  and comment on whether or not it was, you know, a good,

12  thorough review, and whether or not, you know, his

13  statements were supported.

14      Q     And how did you know that Dr. Boone was

15  qualified to give you that opinion?

16      A     Because he's a board certified consultant for

17  Met Life, working for Met Life for many years.  You

18  know, we're a big company.  We wouldn't hire a

19  consultant that wasn't experienced.

20      Q     Do you know if you ever issued a decision

21  stating that benefits were denied?

22      A     I did issue a letter stating that benefits

23  weren't payable, yes.

24      Q     And when was that?

25      A     I don't recall the exact date, but I believe

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    it was in January of 2017.

2              (Plaintiff's Exhibit 44 marked for

3              identification.)

4      Q    I will show you what I've marked as Exhibit 44

5    to your deposition.  Is that the letter to which you

6    were just referring?

7      A    Yes, it is.

8      Q    And that is not your signature on the last

9    page, though, correct?

10     A    No, it's not.

11     Q    Do you recognize that signature?

12     A    I do.

13     Q    Whose signature is it?

14     A    John Dieguez, the director.

15     Q    Was he your supervisor at the time?

16     A    No.  He was the director of our department.

17     Q    Was he your supervisor's supervisor?

18     A    Yes.

19     Q    And in your view, this was the final decision

20   on Ms. Costa's claim?

21     A    This was a determination.  This letter was a

22   determination of whether or not benefits were

23   compensable.  At this time, we found that they were not.

24     Q    Were there any reasons why benefits were not

25   payable that were not stated in this letter?

Page 131

1      A     Is there any reason benefits --

2      Q     I will rephrase it.  Is every reason why

3   Met Life denied the claim stated in this January 6, 2017

4   letter?

5      A     Yes, I believe so.

6      Q     So, after considering a claim for

7   approximately 15 months, all of the facts that supported

8   Met Life's decision to deny the claim were stated in the

9   January 6, 2017 letter?

10     A     This letter provides a detailed history of our

11  review and how we got to a determination of benefits not

12  being payable, if that's what you're asking.

13     Q     Well, I'm asking you, if there were facts that

14  Met Life relied upon to deny the claim, they would not

15  have been left out of the letter, correct?

16     A     No.

17     Q     They would have been included?

18     A     Correct.

19     Q     Did you meet with Mr. Dieguez to assist him in

20  preparing this letter?

21     A     I did, as I was the claims examiner who

22  evaluated the case prior to sending this letter.  He

23  would have no knowledge.

24     Q     Are there any notes of that meeting?

25     A     No.

Page 132

1        Q     Why not?

2        A     Because it would be nothing that would be

3   pertinent to the file that would need to be documented.

4        Q     Weren't you discussing the decision on the

5   claim?

6        A     Yes, but we would be reviewing the file

7   itself, going through the documents, in order to provide

8   a detailed response.

9        Q     Are the reasons for the detailed response

10  pertinent to the claim?

11             MR. MEAGHER:   Objection to form.

12             THE WITNESS:   Any verbal conversation isn't

13        recorded in our office between associates.

14  BY MR. TUCKER:

15       Q     Why not?

16       A     We just don't find that it's necessary.   It

17  didn't need to be -- every conversation in our

18  department doesn't need to be recorded.

19       Q     Is it fair to say that you and Mr. Dieguez

20  reached the decision together?

21       A     The facts were gathered by me, I developed the

22  case, I came to the conclusion.   If you're wondering why

23  Mr. Dieguez is involved, it's because a civil remedy

24  notice was filed, and it requires him to approve this

25  correspondence that then goes out, so that January 6

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1    letter is a response; not only a claims determination,

2    but a response to a civil remedy notice, but the claims

3    review was my review and determination.

4         Q    So who actually made the decision; you or

5    Mr. Dieguez?

6         A    I would make the claims decision based off the

7    facts of the case.

8         Q    So the reasons, the facts, the rational stated

9    in the January 6th letter is your decision, and

10   Mr. Dieguez signed the letter; is that fair to say?

11        A    He did sign the letter upon reviewing it in

12   the case.

13        Q    Who actually wrote the letter?

14        A    We both discussed in writing the letter, what

15   would go into it.

16        Q    Maybe this is a better question.  Who typed

17   the letter?

18        A    I drafted the letter, and he would review it

19   to decide if he thought that that's what would need to

20   be in the letter.

21        Q    Do you recall if he edited your draft at all?

22        A    I can't recall.

23        Q    Was your ultimate conclusion that Ms. Costa

24   had no impairments?

25        A    No, that's not the case.  If you reflect in

1    the letter, we did find her to have restrictions and

2    limitations related to her gait, but from -- but as far

3    as impairment that would prevent her from working, we

4    did not find an impairment that would prevent her from

5    working.

6        Q    Did you conclude that she had no cognitive

7    limitations of any type?

8        A    Correct.

9        Q    Was that based on your reliance on

10   Dr. Vanderploeg's report?

11       A    Dr. Vanderploeg's report, and our consulting

12   board certified neuropsychologist, who then reviewed the

13   report and verified it.

14       Q    Dr. Boone did not add anything to the

15   conclusions reached by Dr. Vanderploeg, though, correct?

16       A    He did not add anything in addition to what

17   was written.

18       Q    Did you reject conclusions stated by

19   Dr. O'Neill?

20       A    We used Dr. Vanderploeg's report, because he

21   evaluated both Dr. O'Neill's and the physician at

22   Shands, and compared to his own to include the raw data,

23   so that's why we used Dr. Vanderploeg's as a basis for

24   our decision.

25       Q    Were there any other reasons?

1        A     I can go back to Dr. Boone.  On Dr. Boone's

2    report, I can't recall which date it was done on, but he

3    did refer to Dr. O'Neill's report not having validity

4    testing, or adequate validity testing, if I'm recalling

5    correctly.

6        Q     Was it Met Life's conclusion that

7    Dr. O'Neill's evaluation was not valid?

8        A     It was the opinion of Dr. Boone that there was

9    not validity testing, and that an independent medical

10   review would be necessary, and we agreed with his

11   assessment.

12       Q     Was your conclusion based on an understanding

13   of Dr. Vanderploeg's report that Ms. Costa had no

14   abnormalities whatsoever cognitively?

15            MR. MEAGHER:  Objection.  Asked and answered.

16       You can answer.

17            THE WITNESS:  That was our determination.

18            MR. TUCKER:  Let's go off the record for a

19       second.

20            VIDEOGRAPHER:  The time is now 1:57.  We are

21       going off the record.

22            (A short recess was taken.)

23            VIDEOGRAPHER:  The time is now 1:59.  We are

24       back on the record.

25   BY MR. TUCKER:

1       Q    We talked briefly about whether you made any

2   notes about your conversation with Mr. Dieguez when you

3   all were discussing this final decision.

4            Is it your practice to not record any

5   conversation among Met Life employees?

6       A    Within our --

7       Q    In writing.

8       A    It's not our practice to record conversations.

9       Q    So you would only record conversations you had

10  with people outside the company, like doctors or

11  claimants?

12      A    I don't personally record any conversations

13  unless I'm being told that I'm being recorded.

14      Q    And when I say record, I also mean reduce to

15  writing, like your phone notes.

16      A    Right.  Then that would be accurate.  Phone

17  calls with doctors' offices, the insured, we don't do

18  anything that you can see within our claim file.

19      Q    So let me ask it a different way.  The only

20  time you would prepare a memorandum to IDI claim file is

21  when you communicate with somebody outside the company,

22  Met Life?

23      A    Correct.

24      Q    At any time, did you have a vocational

25  rehabilitation consultant evaluate Ms. Costa's claim?

Page 137

1       A    No.  Didn't find it necessary.

2       Q    How long did you speak to Mr. Dieguez in

3   crafting the January 6, 2017 letter?

4       A    I couldn't give you a time, how much time.

5       Q    Are we talking an hour long meeting, minutes?

6       A    I would say that the -- he would have had a

7   chance to review it himself, then us discuss about it,

8   or discuss the case.  It could be upwards of an hour,

9   but I don't know for certain.

10      Q    But you don't know, and you all do not keep

11  any time records, so you would have no way to check,

12  right?

13      A    No, sir.

14           MR. TUCKER:  I don't have any other questions,

15      Mr. White.  I appreciate your time.

16           THE WITNESS:  Thank you.

17           MR. MEAGHER:  I have no questions, and we will

18      read if it's ordered.

19           MR. TUCKER:  We will order.

20           VIDEOGRAPHER:  This concludes this deposition.

21      We are now going off the record at 2:01.

22           MR. TUCKER:  To clarify, we determined that we

23      marked two exhibits as 38.  We are going to mark

24      the August 29, 2016 letter as 39 and the IME

25      physician request will remain number 38.  Is that

1          acceptable, Mr. Meagher?

2               MR. MEAGHER:  It is, and the testimony will be

3          changed accordingly.

4               MR. TUCKER:  Agreed.

5

6               (The taking of the deposition was

7                concluded at 2:01 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   RE    : COSTA vs. MET LIFE
     DEPO OF: SEAN WHITE
 2   TAKEN : November 30, 2017

 3

 4                          EXCEPT FOR ANY CORRECTIONS
                            MADE ON THE ERRATA SHEET BY
 5                          ME, I CERTIFY THIS IS A TRUE
                            AND ACCURATE TRANSCRIPT.
 6                          FURTHER DEPONENT SAYETH NOT.

 7                          _____
                            SEAN WHITE
 8

 9

10   STATE OF FLORIDA    )
                         )  SS:
11   COUNTY OF HILLSBOROUGH)

12

13           Sworn and subscribed to before me this

14   _____ day of _____, 2017.

15   PERSONALLY KNOWN _____ OR I.D._____

16

17                          _____
                            Notary Public in and for
18                          the State of Florida at
                            Large.
19

20

21   My commission expires:

22

23

24

25
```

1                            ERRATA SHEET

2     RE     : COSTA vs. MET LIFE
      DEPO OF: SEAN WHITE
3     TAKEN  : November 30, 2017

4        DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

5     Page #| Line #|  Change                    | Reason

6     _____| _____| _____|_____

7     _____| _____| _____|_____

8     _____| _____| _____|_____

9     _____| _____| _____|_____

10    _____| _____| _____|_____

11    _____| _____| _____|_____

12    _____| _____| _____|_____

13    _____| _____| _____|_____

14    _____| _____| _____|_____

15    _____| _____| _____|_____

16    _____| _____| _____|_____

17    _____| _____| _____|_____

18    _____| _____| _____|_____

19    _____| _____| _____|_____

20    _____| _____| _____|_____

21    State of Florida)
      County of Hillsborough)
22
      Under penalties of perjury, I declare that I have
23    read by deposition transcript, and it is true and
      correct subject to any changes in form or
24    substance entered here.
      _____          _____
25    Date                      SEAN WHITE

1                     CERTIFICATE OF OATH OF WITNESS

2

3      STATE OF FLORIDA       )
                             ) SS:
4      COUNTY OF HILLSBOROUGH)

5

6            I, KIM AUSLANDER, Registered Professional

7      Reporter, Notary Public in and for the State of Florida

8      at Large, certify that the witness, SEAN WHITE,

9      personally appeared before me on November 30, 2017 and

10     was duly sworn by me.

11           WITNESS my hand and official seal this 13th

12     day of December, 2017.

13

14

15                    _____
                      KIM AUSLANDER, RPR
                      Notary Public, State of Florida
16                    at Large

17

18     Notary #FF184913

19     My commission expires: 1/10/2019

20

21

22

23

24

25

1                    REPORTER'S DEPOSITION CERTIFICATE

2

3              I, KIM AUSLANDER, Registered Professional

4    Reporter, certify that I was authorized to and did

5    stenographically report the deposition of SEAN WHITE,

6    the witness herein on November 30, 2017; that a review

7    of the transcript was requested; that the foregoing

8    pages numbered from 1 to 144 inclusive is a true and

9    complete record of my stenographic notes of the

10   deposition by said witness; and that this

11   computer-assisted transcript was prepared under my

12   supervision.

13             I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties, nor

15   am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action.

17             DATED this 13th day of December, 2017.

18

19             *Kim Auslander*

20             _____

21                    KIM AUSLANDER
                      Registered Professional Reporter

22

23

24

25

e6330695-ebf3-41d5-9959-7d22ed8aeb6e

1                          ANTHEM REPORTING
                        101 South Franklin Street
2                          Tampa, Florida 33602
                            (813) 272-2720
3
    December 13, 2017
4
    SEAN WHITE
5   c/o JOHN MEAGHER, ESQ.
        SHUTTS & BOWEN, LLP
6       200 South Biscayne Boulevard
        Miami, Florida 33131
7
    RE    : COSTA vs. MET LIFE
8   DEPO OF: SEAN WHITE
    TAKEN : November 30, 2017
9   AVAILABLE FOR READING UNTIL:  January 18, 2018

10  ATTN:  SEAN WHITE:

11  This letter is to advise you that the transcript
    of your deposition is available for reading and signing.
12
    PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT to
13  come to the Anthem office closest to you to read and
    sign the transcript.
14
    In the event other arrangements are made, please send us
15  a notarized list of any and all corrections and/or
    changes, noting page and line numbers, and the reason
16  for such changes, so that we can furnish respective
    counsel with a copy.
17
    If the reading and signing has not been completed
18  prior to the above-referenced date, we shall conclude
    that you have waived the reading and signing of the
19  deposition transcript.

20  Your prompt attention to this matter is appreciated.

21                       Sincerely,

22

23
                         KIM AUSLANDER, RPR
24  cc: Attorneys of Record

25

Page 144

```
 1                    ANTHEM REPORTING
                   101 South Franklin Street
 2                   Tampa, Florida 33602
                        (813) 272-2720
 3

 4   December 13, 2017

 5   JOHN V. TUCKER, ESQ.
     AMY RAY, ESQ.
 6   TUCKER & LUDIN, PA
     5235 16th Street North
 7   St. Petersburg, Florida 33703

 8
     RE     : COSTA vs. MET LIFE
 9   DEPO OF: SEAN WHITE
     TAKEN  : November 30, 2017
10   READ & SIGN BY:  January 18, 2018

11

12   Dear Counsel:

13
     The original transcript of the deposition listed
14   above is enclosed for your file.  The witness
     did not waive reading and signing and has been
15   sent a letter notifying them to come in and read
     and sign their deposition transcript.
16
     The witness will be provided a copy of their
17   deposition for reading in our office
     should they come in to review the transcript, and
18   we will forward to you any corrections made by
     the witness at that time, along with an original
19   signature page which should be attached to the
     original transcript.
20

21                       Sincerely,

22

23                    KIM AUSLANDER, RPR

24

25
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com